# EXHIBIT D

1  Stacy D. Ford-Kelly
   1561 Mohican Dr
2  Lake Havasu City, AZ 86406
   928-505-4963
3  Plaintiff Pro Per

FILED
BY: _____

2011 JAN 14  PM 4: 36

VIRLYNN TINNELL
SUPERIOR COURT CLERK

4              **SUPERIOR COURT OF THE STATE OF ARIZONA**

5                       **COUNTY OF MOHAVE**

6
7                                              Case No: CV-2010-07063
8          **STACY D. FORD-KELLY,**
                  Plaintiff                   **FIRST AMENDED CIVIL COMPLAINT in re:**
9                                             Violation of AEPA, Breach of Employment Contract,
                      v.                      Violation of AZ Drug Testing Law, Violation of the
                                              Whistle Blowing Act, Theft, Attempted Bribery, FLMA
10    **AMEC EARTH & ENVIRONMENTAL, INC.,**   Violation, Defamation of Character/Libel, Blacklisting,
                  Defendant                   Privacy Act Violation, Sexual Harassment, Racial
11                                            Discrimination, Religious Discrimination, Punitive
                                              Damages for Financial, Emotional, Physical & Mental
12                                            Distress/Damages

13  COMES NOW, Stacy D. Ford-Kelly, in pro per for her complaint against the above named Defendant, alleges and states

14  as follows:

15
16    1.  Plaintiff, Stacy D. Ford-Kelly, resides at 1561 Mohican Drive, Lake Havasu City, AZ 86406.

17    2.  Defendant AMEC Earth & Environmental, Inc., a division of the International Corporation AMEC Holdings, is a

18        licensed Arizona Corporation located at 94 Acoma Blvd. S. #100, Lake Havasu City, AZ 86403. Defendant is a

19        corporation with a business office in Mohave County, State of Arizona, and that all matters and the obligation

20        hereinafter set forth incurred and is payable in Mohave County, State of Arizona.

21    3.  Original Civil Complaint was filed by the Plaintiff on April 15, 2010. On December 20, 2010, the Honorable

22        Randolph A. Bartlett ordered granting the Plaintiff's Motion to Amend Civil Complaint.

23
24    4.  That the amount of Plaintiff's claim is within the jurisdictional limits of this Court, the venue is proper, and

25        that the Defendant is liable for and/or has contractual obligations to Plaintiff which are to be carried out and
          fulfilled in this jurisdiction.

26
                                                                                    Page 1 of 11

L8015CV201007063

## FIRST CAUSE OF ACTION- BREACH OF CONTRACT

5.  Plaintiff alleges that on or about January 21, 2008, the Defendant, AMEC Infrastructure, Inc. now known as AMEC Earth & Environmental, Inc., made and delivered to the Plaintiff an Employment Contract that was executed by both parties and that was effective January 28, 2008 and expires December 31, 2013 which is in the form and figures as set forth in Exhibit 1 attached hereto and by reference made a part hereof. Defendant violated Arizona Employment Protection Act of 1996 and breached the employment contract when they laid her off on April 21, 2009.

6.  Employment contract became due and payable in full on April 24, 2009, which is three days after Plaintiff was involuntarily laid off and is eligible for rehire as set forth in Exhibit 2 attached hereto and by reference and made a part hereof. Balance due for remainder of employment contract is $455,672.93, which includes unpaid wages, bonuses, vacation, and sick pay for the remaining period of the employment contract; plus the eighteen months of Cobra in the amount of $24,830.28 for a total of $480,503.21.

7.  Pursuant to A.R.S. 23-353(A), Payment of wages as stated in paragraph 6 for the period of the Employment Contract is due and payable in the amount of $480,503.21 is enforceable pursuant to A.R.S §23-1501(2) and A.R.S. § 23-1501(3)(a). Amount of recovery in accordance with ARS §23-255(A) of the amount owed is treble the unpaid wages, etc, ($455,672.93 x 3=$1,367,028.18) as set forth in Exhibit 3 & Exhibit 4 attached hereto and reference made a part hereof. Treble wages $1,367,018.78 plus Cobra $24,830.28 = $1,391,849.06.

## SECOND CAUSE OF ACTION- VIOLATION OF ARIZONA DRUG TESTING LAW

8.  Plaintiff alleges that the Defendant violated A.R.S. § 23-493.04(D) by instituting a mandatory drug testing policy on January 01, 2008 as AMEC Infrastructure, Inc., was merging with AMEC Earth & Environmental, Inc. AMEC Earth & Environmental, Inc. does Homeland Security and other US Government projects. Plaintiff was subjected to pre-employment drug testing on 1/23/2008 as set forth in Exhibit 5 attached hereto and reference made a part hereof . All the other compensated employees, including officers, directors and supervisors admitted to Plaintiff they were not required to undergo drug testing or sign the Employee

Substance Abuse Policy Acknowledgment or participate in Supplemental Training for Employees Involved in

U.S. Government Work as set forth in Exhibit 6 attached hereto and reference made a part hereof.

9.  Plaintiff seeks relief for punitive damages in the amount of $70,000.00

### THIRD CAUSE OF ACTION- VIOLATION OF WHISTLE BLOWING ACT

10. Plaintiff alleges that her involuntary layoff on April 21, 2009 was in retaliation for two incidents of "Whistle

Blowing". On April 16, 2009 Plaintiff's immediate supervisors discovered that Plaintiff had lodged formal

complaints about the incidents involving overpriced construction costs/bid rigging by AMEC Earth &

Environmental that is funded with Federal and State public funds to the Criminal Division of the Environmental

Protection Agency  as set forth in Exhibit 7 attached hereto and reference made a part hereof, Arizona

Department of Environmental Quality (ADEQ) and the Arizona Board of Professional Registrants because AMEC

did nothing to correct the matters that they are legally liable for as described below. Plaintiff's complaints of

design errors that led to overpriced construction costs/bid rigging are backed up by the former oversight

engineer Todd Connelly from RCI, Inc. as set forth in Exhibit 8 attached hereto and reference made a part

hereof.

11. The first incident was notifying superior Nick Bokaie via telephone and then reiterated in an email dated August

28, 2008, as set forth in Exhibit 9 attached hereto and reference made a part hereof, that Plaintiff had

discovered AMEC inspectors approved serious errors in the plans during construction of the Hillside Area of

Lake Havasu City Wastewater Expansion Project that had already been completed. When Plaintiff brought her

findings to her immediate supervisor, Darin Miller, he just said "Not good" and that there wasn't much we

could do about it. The design errors were in violation of ADEQ minimum slope design requirements/standards.

12. The second incident occurred October 6, 2008 when Plaintiff had notified superior Nick Bokaie, whose PE

stamp was on all documents and construction plans, via email as set forth in Exhibit 10 attached hereto and

reference made a part hereof, that her immediate supervisor, Darin Miller, was insisting that the Engineering

Report she was preparing for the Neptune Area of the Lake Havasu City Wastewater Sewer Expansion Project

be submitted to ADEQ with construction material quantities that were known by Darin Miller and Plaintiff to be

incorrect. Plaintiff refused to submit the Engineering Report because it was unethical and illegal. Plaintiff also notified Nick Bokaie in the same email (Exhibit 10) that the issue for Bid (IFB) plans and quantities in the Bid Package, which were to be included in the ADEQ submittal with the Engineering Report, had already been submitted to the Lake Havasu City Public Works Department and were currently being advertised for bid.

13. Both incidents are in violation of the Arizona Employment Protection Act of 1996, Whistleblower Protection Act of 1989, 40 C.F.R. 7.100(b), A.R.S. § 23-1501(3)(c)(i) and A.R.S. § 23-1501(3)(c)(ii). Plaintiff asks for punitive relief for damages in the amount of $5,000,000.00 for her termination being "malicious, willful, reckless, wanton, fraudulent, and/or in bad faith."

## FOURTH CAUSE OF ACTION -THEFT OF ORIGINAL CREDENTIALS

14. Plaintiff alleges that her work area was illegally searched on April 20, 2009 and resulted in the theft of Plaintiff's original BSCE Degree, original Engineering Certification License, official transcripts, and computer. The Plaintiff also alleges that her former supervisor, Darin Miller and former City Manager, Richard Kaffenberger, took part in the search looking for documentation that could prove the illicit activities. Kaffenberger has a history of unwarranted searches as set forth in Exhibit 11 attached hereto and reference made a part hereof.

15. These actions by Defendant are in violation of A.R.S. § 12-542.04. Plaintiff cannot get employment within the Civil Engineering field or finish her Master's Degree in Civil Engineering without all of the original professional credentials that were stolen and seeks punitive damages in the amount of $3,000,000.00

## FIFTH CAUSE OF ACTION-EXTORTION AND ATTEMPTED BRIBERY

16. Plaintiff alleges that Defendant committed extortion and attempted to bribe her by asking her to sign a Separation Agreement as set forth in Exhibit 12 attached hereto and reference made a part hereof and would in return receive her professional credentials consisting of Plaintiff's original BSCE degree, original Engineering Certification License and official transcripts that were stolen from her work area and an undisclosed amount of cash that were in an envelope on the desk in front of her.

17. Plaintiff refused to sign the agreement and seeks punitive damages in the amount of $3,000,000.00.

**SIXTH CAUSE OF ACTION- VIOLATION OF FMLA**

18. Plaintiff alleges that the Defendant was laying her off due to the fact that she had exhausted all employment protected Family Medical Leave as set forth in Exhibit 13 attached hereto and reference made a part hereof. Defendant was mistaken, Plaintiff was on Non-FML Short Term Disability from December 22, 2008 through March 6, 2009, as set forth in Exhibit 14 attached hereto and reference made a part hereof, because she did not qualify for FML until January 28, 2009 and was informed of this in a letter from Defendant, as set forth in Exhibit 15 attached hereto and reference made a part hereof. Plaintiff was never offered FML by defendant, but if taken there would have been six weeks used out of twenty four weeks available, according to company policy, leaving an available balance of employment protected leave of 18 weeks.

19. Defendant's admitted reason for Plaintiff's involuntary layoff was a violation of FMLA governed by 29 U.S.C. 2615(a)(1). Plaintiff seeks statutory liquidated damages in the amount $43,905.60, which is two times eighteen weeks of salary at the time (2 x 18 x $1219.60 = $43,905.60)

   A. Plaintiff cites *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001). The Ninth Circuit emphasized that Bachelder's lawsuit was governed by 29 U.S.C. 2615(a)(1), which prohibits an employer from "interfer[ing] with" an employee's FMLA rights. The court declared that an employer violates this provision any time it uses an employee's protected leave as "*a negative factor*" in an adverse employment action. The "negative factor" language comes from a DOL regulation which the court found worthy of deference. 29 C.F.R. 825.220(c). *Bachelder* is the first published appellate decision to expressly apply DOL's "negative factor" standard. America West's termination of Bachelder violated FMLA as a matter of law and she could recover statutory liquidated damages.

**SEVENTH CAUSE OF ACTION-DEFAMATION OF CHARACTER & LIBEL**

20. Plaintiff alleges that Defendant publicized the Plaintiff in the Lake Havasu City Today's-News Herald newspaper article dated November 19, 2009 in such a way that it made her appear to be incompetent and a liar about the design errors, twisting her allegations around to make it sound as if Plaintiff had accused Defendant of corruption and misconduct. Plaintiff had actually turned the Defendant in for violation of design standards and

Page **5** of **11**

knowingly submitting false information to Local and State agencies. See Lake Havasu City Today's-News Herald newspaper article dated November 19, 2009 as set forth in Exhibit 16 attached hereto and reference made a part hereof.

21. Plaintiff seeks punitive damages for invasion of privacy false light tort claim for violation of the Privacy Act of 1974 in the amount of $3,000,000.00.

## EIGHTH CAUSE OF ACTION-VIOLATION OF THE PRIVACY ACT OF 1974

22. Plaintiff alleges that Defendant revealed private information, without her consent a list of Plaintiff's former employers to Charlie Cassens, LHC Interim City Manager and Cassens took it upon himself to contact Plaintiff's former employers as stated in a memo from Mr. Cassens and publicized in the Lake Havasu City Today's-News Herald newspaper article dated November 19, 2009 as set forth in Exhibit 16 attached hereto and reference made a part hereof.

23. Plaintiff seeks punitive damages for invasion of privacy public release of private information tort claim for violation of the Privacy Act of 1974 in the amount of $3,000,000.00

## NINTH CAUSE OF ACTION-BLACKLISTING

24. Plaintiff alleges that Defendant took part in blacklisting Plaintiff by means of communication or transmittal between two or more employers of labor, or their bosses, foremen, superintendents, managers, officers or other agents, whether verbal or written, whereby the Plaintiff is being prevented or prohibited from engaging in a useful occupation. Defendant and, including but not limited to, the LHC Public Works Department, whom employ engineers, had communications about Plaintiff admittedly beginning May of 2009 in the Lake Havasu City Today's-News Herald newspaper article dated November 19, 2009 as set forth in Exhibit 16 attached hereto and reference made a part hereof.

25. Plaintiff seeks punitive damages in the amount of $3,000,000.00 for Defendant's violation of A.R.S. § 23-1361(A).

1

<u>**TENTH CAUSE OF ACTION-KNOWLEDGE OF SEXUAL HARRASSMENT**</u>

2    26. Plaintiff alleges that Defendant knew of sexual harassment in the workplace due to the fact that on two

3          separate occasions Plaintiff immediately made a verbal complaint after each incident directly to her supervisor,

4          Darin Miller, who was also present during the harassment and witnessed the harassment, both instances were

5          involving Jim Satterwhite, a co-worker, who made sexual comments directly to Plaintiff and another time about

6          Plaintiff to Darin Miller in the Plaintiff's presence. No actions were taken to correct or end Jim Satterwhite's

7          unwanted sexual comments/advancements towards the Plaintiff, which is a violation of EEOC Laws/Regulations

8          and AMEC's Code of Business Conduct as set forth in Exhibit 17 attached hereto and reference made a part

9          hereof. Plaintiff filed an EEOC Complaint in September of 2009 and was given the right to sue by the EEOC in

10         April of 2009 as set forth in Exhibit 18 attached hereto and reference made a part hereof.

11    27. Defendant violated Arizona Employment Protection Act of 1996, EEOC Laws/Regulations and AMEC's Code of

12          Business Conduct. Plaintiff seeks relief for hostile work environment claim in the amount of $100,000.00

13          ($50,000.00 per incident), plus relief for Defendant acting with malice and reckless indifference in the amount

14          of $200,000.00 ($100,000.00 per incident) and punitive damages in the amount of $5,000,000.00

15          ($2,500,000.00 per incident).

16        A. Plaintiff cites *Swenson v. Potter*, 2001 Daily Journal D.A.R. 12653 (9th Cir., November 30, 2001). The

17             Court noted that notice of the sexually harassing conduct triggers an employer's duty to take prompt

18             corrective action that is "reasonably calculated to end the harassment." The employer failed to take

19             prompt corrective action and awarded punitive damages.

20        B. Plaintiff cites *Miller v. Kenworth of Dothan*, 7 D.L.R. A-3to A-4 (11th Cir., January 10, 2002). The jury

21             found in favor of Miller's claims of hostile work environment and that Kenworth acted with malice and

22             reckless indifference awarding Miller monetarily for both claims. The Court readily admitted that

23             Kenworth did have actual knowledge of harassment. Therefore, there was sufficient evidence to

24             support the additional punitive damages award.

25

26

## ELEVENTH CAUSE OF ACTION- KNOWLEDGE OF RACIAL DISCRIMINATION

28. Plaintiff, of Native American decent, alleges that Defendant knew of a hostile work environment in the workplace due to the fact that Plaintiff immediately made a verbal complaint directly to her supervisor, Darin Miller, who was also present during the harassment and witnessed the harassment involving Sean Anderson, a co-worker, who made racial slurs/comments to Plaintiff in the presence supervisor Darin Miller. No actions were taken to correct Sean Anderson's unwanted racial slurs/comments towards the Plaintiff and no corrective actions were taken by the Defendant to end the harassment, which is a violation of EEOC Laws/Regulations and AMEC's Code of Business Conduct as set forth in Exhibit 17 attached hereto and reference made a part hereof. Plaintiff filed an EEOC Complaint in September of 2009 and was given the right to sue by the EEOC in April of 2009 as set forth in Exhibit 18 attached hereto and reference made a part hereof.

29. Defendant violated EEOC Laws/Regulations and AMEC's Code of Business Conduct. Plaintiff seeks relief for hostile work environment claim in the amount of $50,000.00, plus relief for Defendant acting with malice and reckless indifference in the amount of $100,000.00 and punitive damages in the amount of $2,500,000.00.

   A. Plaintiff cites *Miller v. Kenworth of Dothan*, 7 D.L.R. A-3 to A-4 (11th Cir., January 10, 2002). The jury found in favor of Miller's claims of hostile work environment and that Kenworth acted with malice and reckless indifference awarding Miller monetarily for both claims. The Court readily admitted that Kenworth did have actual knowledge of harassment. Therefore, there was sufficient evidence to support the additional punitive damages award.

## TWELFTH CAUSE OF ACTION – KNOWLEDGE OF RELIGIOUS DISCRIMINATION

30. Plaintiff, a Christian, alleges that Defendant knew of a hostile work environment in the workplace due to the fact that Plaintiff immediately made a verbal complaint directly to her supervisor, Darin Miller, who was also present during the harassment and witnessed the harassment involving Jim Satterwhite, a co-worker, who made negative religious slurs/comments about Plaintiffs religious preference in the presence of supervisor Darin Miller. No actions were taken to correct Jim Satterwhite's unwanted negative religious slurs/comments towards the Plaintiff and no corrective actions were taken by the Defendant to end the harassment, which is in

violation of EEOC Laws/Regulations and AMEC's Code of Business Conduct as set forth in Exhibit 17 attached hereto and reference made a part hereof. Plaintiff filed an EEOC Complaint in September of 2009 and was given the right to sue by the EEOC in April of 2009 as set forth in Exhibit 18 attached hereto and reference made a part hereof.

31.  Defendant violated EEOC Laws/Regulations and AMEC's Code of Business Conduct. Plaintiff seeks relief for a hostile work environment claim in the amount of $50,000.00, plus relief for Defendant acting with malice and reckless indifference in the amount of $100,000.00 and punitive damages in the amount of $2,500,000.00.

    A.  Plaintiff cites *Miller v. Kenworth of Dothan*, 7 D.L.R. A-3 to A-4 (11th Cir., January 10, 2002). The jury found in favor of Miller's claims of hostile work environment and that Kenworth acted with malice and reckless indifference awarding Miller monetarily for both claims. The Court readily admitted that Kenworth did have actual knowledge of harassment. Therefore, there was sufficient evidence to support the additional punitive damages award.

**THIRTEENTH CAUSE OF ACTION-FINANCIAL, PHYSICAL, EMOTIONAL & MENTAL DISTRESS/DAMAGES**

32.  Plaintiff alleges that Defendant's actions have caused irreversible financial, physical, emotional, mental distress/damages to the Plaintiff as a result of losing her employment with Defendant. Defendant has two daughters ages 11 and 15 at the time of her discharge. Plaintiff had 100% physical custody of her oldest daughter and was unable to pay for an attorney when the father filed for a modification requesting full custody along with the Plaintiff forgiving over $11,000.00 in back child support and $20,000.00 in back medical owed to her. Plaintiff had 50% physical custody and of her youngest daughter and was unable to pay for an attorney when the father filed for a modification requesting full custody and support. Plaintiff lost any and all custody of both of her daughters because she could not afford an attorney or travel to Idaho several times and the Idaho courts denied her telephonic appearance and she now pays child support in the amount of $357.00 per month. Plaintiff is convinced that these losses would have never happened if Defendant had not breached Plaintiff's employment contract.

33. Plaintiff seeks relief of punitive damages for irreversible financial, mental, physical and emotional distress/damages in the amount of $4,250,000.00.

WHEREFORE, Plaintiff prays for Judgment against the Defendant(s) and on behalf of Plaintiff as follows:

A. Breach of Contract-Treble wages $1,367,018.78 plus COBRA $24,830.28 = $1,391,849.06

B. Punitive damages in the amount of $34,320,000.00

C. Statutory liquidated damages of $43,905.60

D. Relief for hostile work environment claim in the amount of $200,000.00

E. Malice and reckless indifference in the amount of $400,000.00

F. Total Principal Balance in the amount of **$36,355,754.66** plus interest at the legal rate of 10% per annum.

G. Pursuant to A.R.S. § 12-341.01, for Plaintiff's costs of suit incurred herein of court filing fee of $256.00 and any other costs associated in bringing this action to court.

H. For such other relief as the Court may deem just and proper.

Respectfully submitted this ___14th___ day of January 2011.

_Stacy D. Ford-Kelly_

Stacy D. Ford-Kelly, Plaintiff

**OATH OR AFFIRMATION**

STATE OF ARIZONA    )
                        )ss.

County of Mohave    )

I, Stacy D. Ford-Kelly, declare under penalty of perjury that the information contained herein is true and correct to the best of my knowledge and belief.

_Stacy D. Ford-Kelly_                  _01/14/2011_

Stacy D. Ford-Kelly, Plaintiff           Date

Subscribed, sworn to (or affirmed) before me on this ___14___ day of January 2011.

By _Stacy Deann Ford Kelly_

My commission Expires:_____

                                        Deputy Clerk / Notary Public

Copy sent via Certified Mail to each of the following:

         Statutory Agent for
         AMEC Earth & Environmental, Inc.
         CT Corporation System
         2394 E. Camelback Rd.
         Phoenix, AZ 85016

         Roger Jinks, President
         AMEC Earth & Environmental, Inc.
         502 W. Germantown Pike, STE 850
         Plymouth Meeting, PA 19462

         David Ott, Vice President
         AMEC Earth & Environmental, Inc.
         Midwest Plaza Building #1200
         800 Marquette Ave.
         Minneapolis, MN 55402

# PLAINTIFF'S

# EXHIBIT 1



January 21, 2008

_Private & Confidential_

Stacy Ford
1720 Dearborn St. #4
Caldwell, ID 83605

Dear Ms. Ford,

On behalf of AMEC Infrastructure (AMEC), I am pleased to offer you the position of Design Engineer, reporting to me in the Lake Havasu, AZ office, effective January 28, 2008. If you need to change the date, we will be pleased to discuss one that is mutually acceptable.

The following will outline the terms and conditions of employment:

**Compensation Agreement**

- Status – Exempt; Contracted and salaried full-time employee.
- Contract of employment beginning January 28, 2008 and expires December 31, 2013.
- Starting salary is $2,384.62 payable on a bi-weekly basis, which annualizes to $62,000.12.
- Salary to increase to $85,000.00 beginning January 1, 2010, ending December 31, 2013 with a 2.25% annual minimum cost of living increase beginning January 1, 2011.
- The balance of monetary compensation of this contract due to you shall be paid in full within three business days if employment with AMEC ceases due to no fault of your own and is initiated by AMEC after the three-month probationary period. Balance of compensation is to include any accrued and future benefits ending December 31, 2013 for both vacation time and sick leave as outlined below. If such action takes place by AMEC you will also receive payment equivalent to 18 months of COBRA costs which will be included with the balance of this contract compensation due to you. If the remainder of contract is less than 18 months COBRA costs to be paid will be adjusted accordingly.
- You will receive a relocation allowance in the amount of $4,500.00 – the terms of this allowance are attached. Please sign and return with this employment agreement.

**Benefits**

Enclosed, please find the _Choices_ Benefits Package that explains the benefits currently offered to AMEC regular, full-time employees. Upon your employment you will be immediately eligible for:

- Health insurance coverage, including medical, vision, dental and prescription drug.
- Participation in AMEC's 401(k) program.
- Flexible Spending Account.
- Employee Assistance Plan.
- Short Term Disability, Long Term Disability, Life Insurance, Accidental Death & Dismemberment Insurance.
- You will accrue annual vacation leave at a rate of 15 days per year or 4.62 hours bi-weekly.
- Holidays – AMEC observes 7 holidays per year plus 3 floating holidays throughout the year, the details of which are provided in the Employee Handbook.

**Background Screening and Employment Documentation**

It is AMEC's policy to provide a safe and secure work environment for both our employees and our clients. To that end it is the policy of AMEC that all offers of employment are contingent upon the successful completion of a background screening, drug screening and educational credentials

AMEC Infrastructure
94 Acoma Blvd South # 100
Lake Havasu City, AZ 86403
Phone: 928-854-8030
Fax: 928-854-8035                    www.amec.com

confirmation (where applicable). If any of the screenings returned are found to be in conflict with AMEC's policy we will discuss the results with you and determine if employment will continue. All screenings will be conducted within the guidelines of all state and federal legislation.

Employees are required to complete the Employment Eligibility Verification Form (I-9) attesting to their employment eligibility and must provide documentation to support their statement. Examples of acceptable proof of employment eligibility include a U.S. Passport, or both a valid State Driver's License and Social Security Card. Please bring these documents with you on the first day of your employment. If you do not have the documents mentioned you may contact the Human Resources Department for further information.

**Probationary Period and Employment Termination**

AMEC has a three-month probationary period for all newly hired contracted and non-contracted regular, full-time and part-time employees during which time an employee's work performance and/or general suitability for AMEC employment will be evaluated. While we are confident that your employment with us will be a positive and mutually rewarding experience please understand that your employment, both during and after the probationary period, is not guaranteed for any specific amount of time and is terminable at will, which means that either you or AMEC may end the employment relationship at any time for any reason. Your employment relationship with AMEC is not terminable at will after the three-month probationary period if a contract of employment is outlined within the Compensation Agreement section on the first page of this offer of employment and will be in accordance with the Compensation Agreement.

**Severability**

If any part of this offer of employment is held to be invalid, illegal, or unenforceable, the remaining provisions of this agreement will be enforced.

Further information regarding AMEC, its policies and programs will be provided during your orientation. Upon acceptance of the above and enclosed, please sign and return the enclosed copy of this letter, a completed application for employment and any other enclosed documents within seven business days to the Lake Havasu, AZ location. Please feel free to contact me should you have any questions.

We look forward to having you join us and wish you much success in your new position.

Sincerely,
**AMEC Infrastructure, Inc.**

**Chris Hassert**
**Unit Manager – Lake Havasu, AZ**


I have read and accept the offer of employment contained in this letter, including the referenced attachments.

Date _January 21, 2008_              Employee Signature _Stacy D. Ford_

2

# PLAINTIFF'S

# EXHIBIT 2

**Earth & Environmental**

**Employee Action Form**



---

DATE 04-21-09        EFFECTIVE DATE 04-21-098        UNIT 6712D        EMPLOYEE NO. 506535

NAME OF THE EMPLOYEE Stacy Ford
EMAIL ADDRESS stacy.ford@amec.com        New Hire ☐  Rehire ☐  -enter 1st day worked  ☒ Term)

## New Hires/Offer Proposal Information  (Mark off all applicable boxes)

Level Title _____        Work Location _____
Job Title _____              Hours/week _____
☐ Regular, Full-Time (24 - 40 hr/wk)                        ☐ Exempt (salaried)        ☐ Nonexempt (hourly)
☐ Temporary, Full-Time (24 - 40 hrs/wk – Max. 6 mo.)*    Pay $ _____  (biweekly if exempt / hourly if nonexempt)
☐ Regular, Part-Time (Max. 23 h/wk)*                      Unit Billable (average 70% unit pricing work) ☐ Yes  ☐ No
☐ Temporary, Part-Time (Max. 23 hrs/wk – Max. 6 mo.)*    Participation in: ☐ Driving Program ☐ Medical Surv. Program
☐ On-Call (no set schedule or hours / no benefits)* *not eligible for Choices benefits
Vacation Exception: ☐ 3 weeks ☐ 4 weeks                  ☐ Signing Bonus: $ _____  ☐ Moving Allowance: $ _____
*Please attach applicant resume or application

## Changes  (Mark off all applicable boxes)

☐ New Level Title _____        ☐ New Job Title _____
☐ New Location _____           ☐ New Supervisor/Manager _____
☐ New Unit _____               ☐ New Timesheet Approver _____
☐ Regular  or  ☐ Temporary                      ☐ Exempt to Nonexempt
☐ PT to FT (24 - 40 hr/wk) _____ hrs/wk        ☐ Nonexempt to Exempt (attach job description; prior HR approval)
☐ FT to PT (Max. 23 hd/wk / no benefits) _____ hrs/wk   ☐ New Hours per Week _____
☐ FT/PT to On-Call (no set schedule or hours / no benefits)  ☐ On-Call to FT or PT (circle one) _____ hrs/wk
☐ Employee requested  or  ☐ Employer requested, if due to lack of work contact HR

☐ Base Pay Change    Current Pay $ _____        New Pay $ _____  (biweekly if exempt / hourly if nonexempt)
  Reason for Change**  ☐ Merit Increase  ☐ Promotion  ☐ Market Adjustment _____ % Increase
  ** Attach appropriate documentation (i.e., market data if this is a adjustment) or use explanation area below

## Leave of Absence  (Start – use first day not working.  Return – use first day back.  Attach appropriate documentation)

☐ Start Leave of Absence    Date: _____        Type: ☒ FMLA        ☐ Military
☒ Return from Leave of Absence  Date: 04-21-09        ☐ Personal        ☐ Lack of Work (Temporary Layoff)

## Terminations  (Attach resignation letter/form.  For separations attach documentation and final timesheets.)

☐ Resignation                                    Separation Code [O]          (reference leave codes)
☐ Involuntary Separation – Term with cause       Eligible for rehire? ☐ Yes or ☐ No  (If No is checked, please attach
☒ Involuntary Separation – Layoff                                              or provide explanation)

2 weeks  sev.  1 1mo COBRA 1379.46*

**Explanations/Notes:** Ms. Ford has been on an extended FMLA leave beginning on 12-16-08. She has medial approval
to return to work tomorrow, 04-21-09. Since Ms Ford has been absent, her duties have been redistributed to other
personnel, and there is no need to reinstate her subsequent to her leave. She is being laid off coincidental with her return

* Dental F/F  120.82, * OAP IN F/F 1240.13 * Vision F/F _____ 17H

| AUTHORIZATIONS | WHEN REQUIRED | SIGNATURE | DATE |
|---|---|---|---|
| Unit Manager | All Changes | *illegible* | April 20, 2009 |
| Area Manager | See Limits of Authority | attached | |
| Regional Manager | See Limits of Authority | | |
| Human Resources | Reviews All Changes; Concurrence per Limits of Authority | attached | |
| Exec. Vice- President | See Limits of Authority | | |

| For Office Use Only:  revised March 2006 | ENTERED BY HR | Billing Class Code _____ | EEO Code _____ |
|---|---|---|---|
| ☐ New Hire  ☐ Promotion | APR 1 7 2009 | 254 Title _____ | Headcount Title _____ |
| ☐ Rehire  ☐ Other | | Accrual Rate _____% | Continued Service date _____ |

HR/Payroll Use Only    HR Initial AO    XDP Initial _____    RSF Initial _____

# PLAINTIFF'S

# EXHIBIT 3

| | 2009 | 2010 | 2011 | 2012 | 2013 | TOTAL | TOTAL x 3 |
|---|---|---|---|---|---|---|---|
| UNPAID WAGES | $63,419.20 - $12,075.98 = $51,343.22 | $85,000.00 | $86,912.50 | $88,868.03 | $90,867.56 | $402,991.31 | $1,208,973.93 |
| UNPAID BONUS (5%OF GROSS WAGES) | $3,170.96 | $4,250.00 | $4,345.63 | $4,443.40 | $4,543.38 | $20,753.36 | $62,260.09 |
| HOURLY WAGE RATE | $30.49 | $40.87 | $41.78 | $42.73 | $43.69 | | |
| UNPAID VACATION (120 HOURS/YEAR) | $3,658.80 | $4,903.85 | $5,014.18 | $5,127.00 | $5,242.36 | $23,946.19 | $71,838.57 |
| UNPAID SICK LEAVE (40 HOURS/YEAR) | $1,219.60 | $1,634.62 | $1,671.39 | $1,709.00 | $1,747.45 | $7,982.06 | $23,946.19 |
| GRAND TOTAL | | | | | | $455,672.93 | $1,367,018.78 |

| UNPAID COBRA | # MONTHS | $/MONTH | TOTAL |
|---|---|---|---|
| | 18 | $1,379.46 | $24,830.28 |

# PLAINTIFF'S

# EXHIBIT 4



January 5, 2009

**PRIVATE & CONFIDENTIAL**

Stacy D Ford

Dear Stacy D Ford:

I am pleased to formally provide you with your employment changes for 2009. Effective 12/27/08  your salary will be increased to $63,416.20.   This will be reflected on your 1/16/09 paycheck.

We thank you for being a significant part of our success in 2008 and look forward to our continued collaboration as we move into 2009.

Sincerely,

**AMEC Earth & Environmental**

Mike Lywood

cc:  Human Resources



**James&Stacy Kelly <kelly.jamesstacy@gmail.com>**

# AMEC paycheck

1 message

**Bennion, David B <David.Bennion@amec.com>**                    Fri, Apr 24, 2009 at 3:33 PM
To: kelly.jamesstacy@gmail.com

Stacy:

Regarding your final check.  The amounts you see on the pay statement for COBRA and
Severance, are there because the checks for those amounts have already been cut.  This is
done so that in the event that you signed the agreement, the checks would be sent to you
more quickly because they have already been produced.

There is a defined deadline established in the separation agreement during which you can
execute the document and receive the severance pay and COBRA payment. In the event
that you do not sign the separation agreement by that deadline, the checks will be voided
and the amounts for COBRA and severance payments that appear on the pay statement
received with your check will be backed out of the payroll system, and will not appear as
part of your annual gross income.

Dave Bennion
SW Region HR Manager
Mesa, AZ
480-648-5331

The information contained in this e-mail is intended only for the individual or entity to whom it is addressed.
Its contents (including any attachments) may contain confidential and/or privileged information.
If you are not an intended recipient you must not use, disclose, disseminate, copy or print its contents.
If you receive this e-mail in error, please notify the sender by reply e-mail and delete and destroy the message.

**McKay, Lisa**

| | |
|---|---|
| From: | Halladay, Mary |
| Sent: | Wednesday, August 19, 2009 4:08 PM |
| To: | Bell, Victoria; Driscoll, Kathy; McKay, Lisa |
| Subject: | Stop Pays |

Case Number: 005273714
Co. Code: BFC
Co. Name: AMEC EARTH & ENVIRON

We have submitted the ADPCheck Stop Payment request(s) for:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 415.42 04/22/2009
506536 FORD,STACY D 1,379.46 04/22/2009
506536 FORD,STACY D 1,526.94 04/22/2009
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 862.08 03/11/2009

This case will be considered closed, but can be re-opened at any time if further action is needed.

The following conditions apply to requests for ADPCheck stop payments:
() Payment can only be stopped on uncashed ADPChecks.
() The net amounts of ADPCheck stop payments are generally refunded within three business days.
() The fee for ADPCheck stop payments is $25 per transaction.
Note: Placing a stop payment on an ADPCheck may not always protect you against liability for the net amount of that check.

ADP is obligated to pay the net amount of a stopped check if:
() The check is cashed in good faith by a third party.
() The party cashing the check does not have visibility or knowledge that the check is no longer valid.
If ADP must honor a stopped ADPCheck under these circumstances, ADP will re-debit your account for the net amount.

If you do not intend to reissue the same net amount to the employee, a reversal of the payroll transaction using manual check entries is necessary.
() Reversing the check amounts via manual check entries will ensure the accuracy of year-to-date amounts for employees.
() Accurate accounting for both employee and employer paid taxes is also ensured.

If you need further assistance, select the applicable tab on the Support Center and click Contact Us Online, or call your ADP Service Team.

Thank you,

ADP Client Services

1

**Manual Checks - BFC 506536 Stacy D Ford**

Hours/Earnings | Taxes | Deductions | Memos

| OK |
| Cancel |
| Help |

Pay #: A    Check #: 29438730

Transaction Type: Reversal of an existing check

Tax Frequency: B    ☐ Spread taxes over 2 weeks

Temp Dept: 006722

Regular Hours:         Regular Earnings:

Overtime Hours:         Overtime Earnings:

**Other Hours/Earnings**

| Code | Description | Hours | Earnings | Field # |
|------|-------------|-------|----------|---------|
| T | Severance | | -2,439.20 | 5 |
| ☑ | | | | |
| | | | | |
| | | | | |
| | | | | |

Net Pay: -1,526.94

| Gross Pay: | -2,439.20 |
| Taxes: | -912.26 |
| Deductions: | 0.00 |
| Calculated Net: | -1,526.94 |



POSTED
AUG 1 8 2009



| CO. | FILE | DEPT. | CLOCK | NUMBER | 076 |
|-----|------|-------|-------|--------|-----|
| BFC | 506536 | 006722 | 1 | 0029438730 | 2 |

# Earnings Statement

**ADP**

**AMEC EARTH & ENVIRONMENTAL, INC.**
**11810 NORTH CREEK PKWY NORTH**
**BOTHELL, WASHINGTON 98011**

| | |
|---|---|
| Period Beginning: | 04/04/2009 |
| Period Ending: | 04/17/2009 |
| Pay Date: | 04/24/2009 |

Taxable Marital Status:
  Federal:    Married

Exemptions/Allowances:
  Federal:    0,Tax Blocked

**STACY D FORD**
**1561 MOHICAN DR**
**LAKE HAVASU CITY AZ 86406**

Social Security Number: XXX-XX-6402

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Severance | | | 2,439.20 | 2,439.20 |
| Cobra | | | | 2,203.58 |
| | | | | 14,497.15 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| G.T.L. | | 19.20 |
| Vacation Hours | | 0.00 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Federal Income Tax | -609.80 | 2,232.81 |
| | Social Security Tax | -151.23 | 858.87 |
| | Medicare Tax | -35.37 | 200.87 |
| | AZ State Income Tax | -115.86 | 424.24 |

**Additional Tax Withholding Information**
Taxable Marital Status:
  AZ:    Single
Exemptions/Allowances:
  AZ:    Tax is 19% of Federal

| Other | | |
|-------|---|---|
| Checking | | 910.72 |
| Dental-Ppo | | 60.51 |
| Dependent Life | | 1.56 |
| Med-Oapin | | 579.03 |
| Optional Life | | 31.65 |
| Spouse Life | | 18.74 |
| United Healthcr | | 24.03 |

Net Pay

Your federal taxable wages this period are
$2,439.20



VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

AMEC EARTH & ENVIRONMENTAL, INC.
11810 NORTH CREEK PKWY NORTH
BOTHELL, WASHINGTON 98011

BFC
Payroll check number: 0029438730
Pay date: 04/24/2009

Pay to the order of:  **STACY D FORD**

This amount:  ONE THOUSAND FIVE HUNDRED TWENTY SIX AND 94/100 DOLLARS

$1526.94

ASSISTANCE WITH VERIFICATION AVAILABLE AT 877-423-7243

VOID AFTER 180 DAYS

Bank of America
Community Development Bank
1500 Newell Avenue, Suite 200,
Walnut Creek, CA 94596

ADP AUTHORIZED SIGNATURE

⑆29438730⑆  ⑈121141822⑇  7313500073⑆

**e-file** Visit the IRS Web Site at www.irs.gov/efile

Employee Reference Copy

# W-2 Wage and Tax Statement 2009

OMB No. 1545-0008

| Control number 06536 74/BFC | Dept. 006722 | Corp. T | Employer use only 644 |
|---|---|---|---|

Employer's name, address, and ZIP code

AMEC EARTH &
ENVIRONMENTAL INC
11810 NORTH CREEK PRKWY
BOTHELL WA 98011

Batch #01698

Employee's name, address, and ZIP code

TACY D FORD
561 MOHICAN DR
AKE HAVASU CITY AZ 86406

| Employer's FED ID number 91-1641772 | a Employee's SSA number 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 |
|---|---|
| Wages, tips, other comp. 12076.98 | 2 Federal income tax withheld 1072.13 |
| Social security wages 12075.98 | 4 Social security tax withheld 748.71 |
| Medicare wages and tips 12075.98 | 6 Medicare tax withheld 175.10 |
| Social security tips | 8 Allocated tips |
| Advance EIC payment | 10 Dependent care benefits |
| Nonqualified plans | 12a See instructions for box 12 C 24.00 |
| Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |
| State Employer's state ID no. AZ 91-1641772 | 16 State wages, tips, etc. 12075.98 |
| State income tax 203.71 | 18 Local wages, tips, etc. |
| Local income tax | 20 Locality name |

## 2009 W-2 and EARNINGS SUMMARY

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail.
The reverse side includes general information that you may also find helpful.

**1. The following information reflects your final 2009 pay stub plus any adjustments submitted by your employer.**

| | | | | | |
|---|---|---|---|---|---|
| Gross Pay | 12715.55 | Social Security Tax Withheld Box 4 of W-2 | 748.71 | AZ. State Income Tax Box 17 of W-2 | 203.71 |
| | | | | SUI/SDI Box 14 of W-2 | |
| Fed. Income Tax Withheld Box 2 of W-2 | 1072.13 | Medicare Tax Withheld Box 6 of W-2 | 175.10 | | |

**2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | AZ. State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 12,715.55 | 12,715.55 | 12,715.55 | 12,715.55 |
| Plus GTL (C-Box 12) | 24.00 | 24.00 | 24.00 | 24.00 |
| Less Other Cafe 125 | 663.57 | 663.57 | 663.57 | 663.57 |
| Reported W-2 Wages | 12,075.98 | 12,075.98 | 12,075.98 | 12,075.98 |

**3. Employee W-4 Profile.** To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

STACY D FORD
1561 MOHICAN DR
LAKE HAVASU CITY AZ 86406

Social Security Number: 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
Taxable Marital Status: MARRIED

Exemptions/Allowances:
FEDERAL: 0   Tax Blocked
STATE:   Tax is 11.5 % of Federal

© 2009 ADP, INC.

---

| Wages, tips, other comp. 12075.98 | 2 Federal income tax withheld 1072.13 |
|---|---|
| Social security wages 12075.98 | 4 Social security tax withheld 748.71 |
| Medicare wages and tips 12075.98 | 6 Medicare tax withheld 175.10 |
| Control number 06536 74/BFC | Dept. 006722 | Corp. T | Employer use only 644 |

Employer's name, address, and ZIP code

AMEC EARTH &
ENVIRONMENTAL INC
11810 NORTH CREEK PRKWY
BOTHELL WA 98011

| Employer's FED ID number 91-1641772 | Employee's SSA number 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 |
|---|---|
| Social security tips | 8 Allocated tips |
| Advance EIC payment | 10 Dependent care benefits |
| Nonqualified plans | 12a See instructions for box 12 24.00 |
| Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |

Employee's name, address and ZIP code

TACY D FORD
561 MOHICAN DR
AKE HAVASU CITY AZ 86406

| State Employer's state ID no. AZ 91-1641772 | 16 State wages, tips, etc. 12075.98 |
|---|---|
| State income tax 203.71 | 18 Local wages, tips, etc. |
| Local income tax | 20 Locality name |

## Federal Filing Copy
W-2 Wage and Tax Statement 2009
OMB No. 1545-0008

---

| 1 Wages, tips, other comp. 12075.98 | 2 Federal income tax withheld 1072.13 |
|---|---|
| 3 Social security wages 12075.98 | 4 Social security tax withheld 748.71 |
| 5 Medicare wages and tips 12075.98 | 6 Medicare tax withheld 175.10 |
| d Control number 06536 74/BFC | Dept. 006722 | Corp. T | Employer use only 644 |

e Employer's name, address, and ZIP code

AMEC EARTH &
ENVIRONMENTAL INC
11810 NORTH CREEK PRKWY
BOTHELL WA 98011

| b Employer's FED ID number 91-1641772 | a Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a C 24.00 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

STACY D FORD
1561 MOHICAN DR
LAKE HAVASU CITY AZ 86406

| 15 State Employer's state ID no. AZ 91-1641772 | 16 State wages, tips, etc. 12075.98 |
|---|---|
| 17 State income tax 203.71 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

## AZ.State Reference Copy
W-2 Wage and Tax Statement 2009
OMB No. 1545-0008

---

| 1 Wages, tips, other comp. 12075.98 | 2 Federal income tax withheld 1072.13 |
|---|---|
| 3 Social security wages 12075.98 | 4 Social security tax withheld 748.71 |
| 5 Medicare wages and tips 12075.98 | 6 Medicare tax withheld 175.10 |
| d Control number 06536 74/BFC | Dept. 006722 | Corp. T | Employer use only 644 |

e Employer's name, address, and ZIP code

AMEC EARTH &
ENVIRONMENTAL INC
11810 NORTH CREEK PRKWY
BOTHELL WA 98011

| b Employer's FED ID number 91-1641772 | a Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a C 24.00 |
| 14 Other | 12b |
| | 13b |
| | 13d |
| | 13 Stat emp Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

STACY D FORD
1561 MOHICAN DR
LAKE HAVASU CITY AZ 86406

| 15 State Employer's state ID no. AZ 91-1641772 | 16 State wages, tips, etc. 12075.98 |
|---|---|
| 17 State income tax 203.71 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

## AZ.State Filing Copy
W-2 Wage and Tax Statement 2009
OMB No. 1545-0008

CIGNA HealthCare, HIPAA Unit, C1MIG
900 Cottage Grove Rd.
Hartford, CT 06152


CIGNA HealthCare

JUNE 19, 2009

STACY FORD
84 ACOMA BLVD N # 100-34
LAKE HAVASU CITY, AZ  86403-6096

RE: Certificate of Group Health Plan Coverage

Dear STACY FORD:

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal act requiring employers and health insurance carriers to provide documentation of coverage when an individual loses health coverage or reaches a lifetime maximum applicable to all benefits under the plan. This letter will serve as your certification of prior coverage with CIGNA HealthCare. If you have just changed coverage to another CIGNA HealthCare product, you may disregard this certificate.

1. Identification number of participant: 499613961356146
2. Group health plan ID:  14649
3. Name of group health plan: AMEC HOLDINGS, INC.
4. Name of individual to whom this certificate applies: The participant named above to whom this certificate is addressed.
5. If the individual to whom this certificate is addressed has at least 18 months of creditable coverage (disregarding periods of coverage before a 63 day break), check here ( ) and skip lines 6 and 7.
6. Date waiting period or affiliation period (if any) began: This is generally your date of hire with your former employer (the group health plan named above). If you need to know what that date is, please call the number shown on line 9 below.
7. Date coverage began: 01-28-2008
8. Date coverage ended (or if coverage has not ended, enter con tinuing ): 04-30-2009
9. For further information, call Member services at 1-800-244-6224.
10. Name, address, and telephone number of plan administrator or issuer responsible for providing this certificate: The CIGNA HealthCare company listed at the top of this certificate.

This certification of coverage is based on information reasonably available to the administrator as of the date of this certificate of coverage. The administrator reserves the right to modify the information contained herein based on facts which are identified subsequent to the date of this notice. In all events, however, this certificate of coverage is evidence of prior health coverage and should not be used by any benefits providers, hospitals or other medical care providers for purposes of verifying any individual s coverage under the plan.

CIGNA HealthCare would like to thank you for giving us the opportunity to serve your health care needs and we hope to serve you again in the near future.

Sincerely,

ELIGIBILITY SERVICES

All questions concerning this certificate should be directed to  Member Services at 1-800-244-6224.

A23291  03-05-2008

CIGNA HealthCare, HIPAA Unit, CLMIG
900 Cottage Grove Rd.
Hartford, CT 06152



CIGNA HealthCare

JUNE 19, 2009

JAMES KELLY
84 ACOMA BLVD N # 100-34
LAKE HAVASU CITY, AZ 86403-6096

RE: Certificate of Group Health Plan Coverage

Dear JAMES KELLY:

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal act requiring employers and health insurance carriers to provide documentation of coverage when an individual loses health coverage or reaches a lifetime maximum applicable to all benefits under the plan. This letter will serve as your certification of prior coverage with CIGNA HealthCare. If you have just changed coverage to another CIGNA HealthCare product, you may disregard this certificate.

1. Identification number of participant: 499613961356201
2. Group health plan ID: 14649
3. Name of group health plan: AMEC HOLDINGS, INC.
4. Name of individual to whom this certificate applies: The participant named above to whom this certificate is addressed.
5. If the individual to whom this certificate is addressed has at least 18 months of creditable coverage (disregarding periods of coverage before a 63 day break), check here ( ) and skip lines 6 and 7.
6. Date waiting period or affiliation period (if any) began: This is generally your date of hire with your former employer (the group health plan named above). If you need to know what that date is, please call the number shown on line 9 below.
7. Date coverage began: 11-03-2008
8. Date coverage ended (or if coverage has not ended, enter con tinuing ): 04-30-2009
9. For further information, call Member services at 1-800-244-6224.
10. Name, address, and telephone number of plan administrator or issuer responsible for providing this certificate: The CIGNA HealthCare company listed at the top of this certificate.

This certification of coverage is based on information reasonably available to the administrator as of the date of this certificate of coverage. The administrator reserves the right to modify the information contained herein based on facts which are identified subsequent to the date of this notice. In all events, however, this certificate of coverage is evidence of prior health coverage and should not be used by any benefits providers, hospitals or other medical care providers for purposes of verifying any individual s coverage under the plan.

CIGNA HealthCare would like to thank you for giving us the opportunity to serve your health care needs and we hope to serve you again in the near future.

Sincerely,

ELIGIBILITY SERVICES

All questions concerning this certificate should be directed to Member Services at 1-800-244-6224.

A23291 03-05-2008

CIGNA HealthCare, HIPAA Unit, C1MIG
900 Cottage Grove Rd.
Hartford, CT 06152



**CIGNA HealthCare**

JUNE 19, 2009

BRITTANY FORD
84 ACOMA BLVD N # 100-34
LAKE HAVASU CITY, AZ 86403-6096

RE: Certificate of Group Health Plan Coverage

Dear BRITTANY FORD:

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal act requiring employers and health insurance carriers to provide documentation of coverage when an individual loses health coverage or reaches a lifetime maximum applicable to all benefits under the plan. This letter will serve as your certification of prior coverage with CIGNA HealthCare. If you have just changed coverage to another CIGNA HealthCare product, you may disregard this certificate.

1.  Identification number of participant: 499613961356171.
2.  Group health plan ID:  14649
3.  Name of group health plan: AMEC HOLDINGS, INC.
4.  Name of individual to whom this certificate applies: The participant named above to whom this certificate is addressed.
5.  If the individual to whom this certificate is addressed has at least 18 months of creditable coverage (disregarding periods of coverage before a 63 day break), check here ( ) and skip lines 6 and 7.
6.  Date waiting period or affiliation period (if any) began: This is generally your date of hire with your former employer (the group health plan named above). If you need to know what that date is, please call the number shown on line 9 below.
7.  Date coverage began: 07-19-2008
8.  Date coverage ended (or if coverage has not ended, enter con tinuing ): 04-30-2009
9.  For further information, call Member services at 1-800-244-6224.
10. Name, address, and telephone number of plan administrator or issuer responsible for providing this certificate: The CIGNA HealthCare company listed at the top of this certificate.

This certification of coverage is based on information reasonably available to the administrator as of the date of this certificate of coverage. The administrator reserves the right to modify the information contained herein based on facts which are identified subsequent to the date of this notice. In all events, however, this certificate of coverage is evidence of prior health coverage and should not be used by any benefits providers, hospitals or other medical care providers for purposes of verifying any individual s coverage under the plan.

CIGNA HealthCare would like to thank you for giving us the opportunity to serve your health care needs and we hope to serve you again in the near future.

Sincerely,

ELIGIBILITY SERVICES

All questions concerning this certificate should be directed to Member Services at 1-800-244-6224.

A23291  03-05-2008

CIGNA HealthCare, HIPAA Unit, C1MIG
900 Cottage Grove Rd.
Hartford, CT 06152



CIGNA HealthCare

JUNE 19, 2009

ARIANNE KELLY
84 ACOMA BLVD N # 100-34
LAKE HAVASU CITY, AZ   86403-6096

RE: Certificate of Group Health Plan Coverage

Dear ARIANNE KELLY:

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal act requiring
employers and health insurance carriers to provide documentation of coverage when an individual
loses health coverage or reaches a lifetime maximum applicable to all benefits under the plan. This
letter will serve as your certification of prior coverage with CIGNA HealthCare. If you have just changed
coverage to another CIGNA HealthCare product, you may disregard this certificate.

1.  Identification number of participant: 499613961356191
2.  Group health plan ID:   14649
3.  Name of group health plan: AMEC HOLDINGS, INC.
4.  Name of individual to whom this certificate applies: The participant named above to whom this
    certificate is addressed.
5.  If the individual to whom this certificate is addressed has at least 18 months of creditable coverage
    (disregarding periods of coverage before a 63 day break), check here ( ) and skip lines 6 and 7.
6.  Date waiting period or affiliation period (if any) began: This is generally your date of hire with
    your former employer (the group health plan named above). If you need to know what that date
    is, please call the number shown on line 9 below.
7.  Date coverage began:   11-03-2008
8.  Date coverage ended (or if coverage has not ended, enter con tinuing ): 04-30-2009
9.  For further information, call Member services at 1-800-244-6224.
10. Name, address, and telephone number of plan administrator or issuer responsible for providing
    this certificate: The CIGNA HealthCare company listed at the top of this certificate.

This certification of coverage is based on information reasonably available to the administrator as of
the date of this certificate of coverage. The administrator reserves the right to modify the information
contained herein based on facts which are identified subsequent to the date of this notice. In all
events, however, this certificate of coverage is evidence of prior health coverage and should not be
used by any benefits providers, hospitals or other medical care providers for purposes of verifying any
individual s coverage under the plan.

CIGNA HealthCare would like to thank you for giving us the opportunity to serve your health care
needs and we hope to serve you again in the near future.

Sincerely,

ELIGIBILITY SERVICES

All questions concerning this certificate should be directed to Member Services at 1-800-244-6224.

A23291  03-05-2008

CIGNA HealthCare, HIPAA Unit, C1MIG
900 Cottage Grove Rd.
Hartford, CT 06152

**CIGNA HealthCare**

JUNE 19, 2009

TAYLOR KELLY
84 ACOMA BLVD N # 100-34    *(mailing address)*
LAKE HAVASU CITY, AZ 86403-6096

*home address is:*
*1561 Mohican Dr.*
*Lake Havasu, AZ.*
*86406*

RE: Certificate of Group Health Plan Coverage

Dear TAYLOR KELLY:

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal act requiring employers and health insurance carriers to provide documentation of coverage when an individual loses health coverage or reaches a lifetime maximum applicable to all benefits under the plan. This letter will serve as your certification of prior coverage with CIGNA HealthCare. If you have just changed coverage to another CIGNA HealthCare product, you may disregard this certificate.

1. Identification number of participant: 499613961356181
2. Group health plan ID:  14649
3. Name of group health plan: AMEC HOLDINGS, INC.
4. Name of individual to whom this certificate applies: The participant named above to whom this certificate is addressed.
5. If the individual to whom this certificate is addressed has at least 18 months of creditable coverage (disregarding periods of coverage before a 63 day break), check here ( ) and skip lines 6 and 7.
6. Date waiting period or affiliation period (if any) began: This is generally your date of hire with your former employer (the group health plan named above). If you need to know what that date is, please call the number shown on line 9 below.
7. Date coverage began:  11-03-2008
8. Date coverage ended (or if coverage has not ended, enter con tinuing )  04-30-2009
9. For further information, call Member services at 1-800-244-6224.
10. Name, address, and telephone number of plan administrator or issuer responsible for providing this certificate: The CIGNA HealthCare company listed at the top of this certificate.

This certification of coverage is based on information reasonably available to the administrator as of the date of this certificate of coverage. The administrator reserves the right to modify the information contained herein based on facts which are identified subsequent to the date of this notice. In all events, however, this certificate of coverage is evidence of prior health coverage and should not be used by any benefits providers, hospitals or other medical care providers for purposes of verifying any individual s coverage under the plan.

CIGNA HealthCare would like to thank you for giving us the opportunity to serve your health care needs and we hope to serve you again in the near future.

Sincerely,

ELIGIBILITY SERVICES

All questions concerning this certificate should be directed to Member Services at 1-800-244-6224.

A23291  03-05-2008

# PLAINTIFF'S

# EXHIBIT 5

26Jan 2008 05:14 FROM:919-572-7438          TO:14258285634          LabCorp 808-833-3984 PAGE 001

```
To: AMEC EARTH & ENVIRONMENTAL          From: LABCORP OTS - SAN DIEGO
    11335 NE 122ND WAY                        13112 EVENING CREEK DR. S.
    SUITE 100                                 SAN DIEGO, CA  92128
                                              800-882-7272 // 858-668-3710
    KIRKLAND              WA 98034

Laboratory Accession No.   269660436     Collected        23-JAN-08 @ 11:30
Specimen ID Number         0269660436    Received         25-JAN-08 @ 21:27
Donor's Social             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   Reported         26-JAN-08 @ 02:10
Employee ID                              Reason For Test      Pre-Employment
First Name                      STACY    Account                     903653
Last Name                       FORD     Location                    903653
Temperature In Range              Y      Location Phone      (425) 820-4669
Donor's Temperature                      P.O.                          OPEN
Donor's Phone #       (208) 389-8087     Collector's Phone   (928) 855-4077

Client:                 HRP/AMEC EARTH & ENVIRON
Coll. Site:             LABCORP - LAKE HAVASU CITY, AZ
Site ID:                800735
Acct. Type:             Non-DOT
Location:               AMEC EARTH & ENVIRON
```

**************************SPECIMEN TEST RESULTS**************************

| Test(s) | Screening Cutoff | Confirm Cutoff | Confirm Quant | Unit | Result |
|---------|------------------|----------------|---------------|------|--------|
| Amphetamines | 1000 | 500 | | ng/mL | negative |
| Cocaine^ | 300 | 150 | | ng/mL | negative |
| Marijuana Metab. | 50 | 15 | | ng/mL | negative |
| Opiates | 2000 | 2000 | | ng/mL | negative |
| PCP | 25 | 25 | | ng/mL | negative |

^as Benzoylecgonine

***** End of Report *****

RT: Chris Hassert
Stacy Jovett
6712
☑ Added to spreadsheet

**Earth & Environmental**



Employee Acknowledgment
Signature Page

| Employee Name | *Stacy D. Ford* |
|---|---|

## EMPLOYEE HANDBOOK ACKNOWLEDGMENT

I have been assigned the AMEC Earth & Environmental, Inc. (AEE) Employee Handbook, and I understand that I am expected to read it and to become familiar with its contents. As in any organization, policies, procedures and reporting structures are changed from time to time. The handbook has been designed to accommodate those changes. Updates will be issued to all employees, with a cover letter indicating where in the handbook the new page(s) should be inserted and what page(s) it will replace. I understand that I will be responsible to keep my own handbook updated so that it will continue to be a useful document. If at any time I do not understand any of the policies or procedures outlined in this manual, or future revisions to this manual, I will seek clarification from my supervisor or human resource representative.

It has been explained to me that it may be necessary, as a condition of employment, to take and pass a physical examination to assure that I have the physical capability of performing the requirements of my position and to assure that I am not taking illegal drugs. During the course of my employment it may be required for me to take further physical exams to assure that my health is not being affected by my duties and that I remain free from illegal drug usage. Also, if I must drive on company business I understand that my driving record may be checked periodically and that my continued employment may be predicated on maintaining a good driving record. I hereby authorize AEE to be the custodian of the reports of my physical condition and driving record, and in return AEE assures me the information contained in these reports will be treated with the same regard for confidentiality that all other private matters pertaining to employees are accorded within the firm.

I understand that these policies can be changed at any time, with no prior notice being required. Also, they serve as guidelines only and AEE reserves the right to interpret any ambiguity.

| *Stacy D. Ford* | *01/28/2008* |
|---|---|
| Employee Signature | Date Signed |

## EMPLOYEE SUBSTANCE ABUSE POLICY ACKNOWLEDGMENT

I have carefully and thoroughly read AMEC Earth & Environmental, Inc. (AEE) substance abuse policy. I have received a copy of this policy, understand its requirements and intend to abide by its contents.

| *Stacy D. Ford* | *01/28/2008* |
|---|---|
| Employee Signature | Date Signed |

 

## CODE OF BUSINESS CONDUCT

## STATEMENT OF ACKNOWLEDGMENT FOR ALL EMPLOYEES

I acknowledge that I have read and understood the AMEC Americas Code of Business Conduct (current version posted on AMECnet).

I acknowledge that I have completed the mandatory training on the Code of Business Conduct. (Training is available through the web-based tutorials on AMECnet or by attending a facilitated training session.)

I have been given an opportunity to raise and discuss any ethics-related concerns with my manager (or other appropriate official) as part of this sign-off procedure. I confirm that I will abide by this Code of Business Conduct with respect to all matters related to my employment with AMEC.

_Stacy D. Ford_
(Print Name)

_Stacy D. Ford_
(Signature)

_6712_
(Unit/Department)

_01/28/2008_
(Date)


## SUPPLEMENTAL TRAINING
## FOR PERSONNEL INVOLVED IN U.S. GOVERNMENT WORK

I have been designated, by my Manager or local Commercial Manager, as an employee who is required to sign this portion of the Code of Business Conduct. I acknowledge that I have read and understood the 'AMEC Americas Code of Business Conduct Supplement for Personnel Involved in U.S. Government Work'.

I acknowledge that I have either attended the training session on the Supplement (where required in designated AMEC work locations) or have reviewed the Supplement video.

I have been given an opportunity to raise and discuss any ethics-related concerns with my manager (or other appropriate official) as part of this sign-off procedure. I confirm that I will abide by the 'Code of Business Conduct Supplement for Personnel Involved in U.S. Government Work' with respect to all matters related to my employment with AMEC.

_Stacy D. Ford_
(Print Name)

_Stacy D. Ford_
(Signature)

_6712_
(Unit/Department)

_01/28/2008_
(Date)

# PLAINTIFF'S

# EXHIBIT 7



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

**FEB  2 4 2010**

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

Mrs. Stacey D. Ford-Kelly
1561 Mohican Drive
Lake Havasu City, AZ  86406

Dear Mrs. Ford-Kelly

This letter responds to the information you provided on January 14, 2010 to the Environmental Protection Agency's Criminal Investigation Division (CID) regarding alleged criminal violations involving Lake Havasu City.   CID forwarded your information to its San Francisco Area Office for review and whatever investigative action is deemed necessary.

Thank you for providing the information.  If you have any additional information regarding this matter, please forward it to U.S. EPA Criminal Investigation Division, San Francisco, CA  94105-3901.  If you prefer to speak to someone, please call (415) 947-8713.

Sincerely,

*Ella R. Barnes*

Ella R. Barnes
CID Director

cc:  Nick Torres, SAC

# PLAINTIFF'S

# EXHIBIT 8



# FW: AMEC July 2 2009 WWSE Assumptions and Methods
1 message

**Todd Connelly <todd@rci-nv.com>**                                   **Mon, Aug 17, 2009 at 12:23 PM**
To: Stacy.deann71@gmail.com

Stacy,

Attached are the comments that are the foundation to my August 11, 2009 Council presentation. As you may note, the errors and misleading statements referenced are very obvious.  Nevertheless, AMEC used the revised criteria in the Final Master Plan Update - specifically Chapter 8.  The incorrect data forms the conclusions and recommendations in the Master Plan Update to indicate there is adequate capacity, as designed.

Please note, my presentation was boring, but I read this information "into the record". Although the Mayor did not want to hear it, the information demonstrates that AMEC and Public Works Staff knowingly and willingly used false information, which is detrimental to the public interest.  The documents cited are contained in the Final Master Plan Update - principally Chapter 8 and Appendices No. 9 and 15.

Thanks,
Todd


**From:** Todd Connelly
**Sent:** Wednesday, July 15, 2009 7:47 AM
**To:** 'nexsenm@lhcaz.gov'; 'Richard Kaffenberger'; 'dennis'; 'Martha Bennett'
**Cc:** 'Garcia, Albert (PhD, PE)'; 'Lywood, Mike'
**Subject:** AMEC July 2 2009 WWSE Assumptions and Methods

Dear All,

I apologize to contribute to an impasse in an apparent technical issue that has been ongoing for the past two-and-one-half years, but RCI's concerns for implications to the City and the ratepayers should not be dismissed by recent communications. RCI's original concerns were associated with the serial pumping system concept.  The Draft Master Plan Update expands RCI's concerns to a significant portion of the gravity sewer system.  Although the numbers used for modeling are changing, the implications to the sewer system, as depicted in the Draft Master Plan Update, should not be taken lightly.

It appears that the July 2, 2009 letter and the July 7, 2009 from AMEC's legal representative (attached) may be considered a response to the issues and concerns raised at the June 9, 2009 and June 16, 2009 OC meetings.  The recent communications do not address or resolve the specific issues addressed to the Palm Tree Design Report, the 30% Sweetwater/Hagen Pump Station Design Report, or the Draft Master Plan Update's modeling.  Although shooting the messenger may be an option; it still does not resolve the OC's recommendation to promptly address the issues presented at the June 9, 2009 OC meeting.

Attached are RCI's comments to the recommenedations for design and modeling assumptions.

If you have any questions or comments, please don't hesitate to contact me.

Thanks,
Todd


**2 attachments**

📎 **06-803.2 AMEC attorney ltr20090713090735.pdf**
   62K

📎 **July 2 PF - RCI Comments.doc**
   57K

WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.
ATTORNEYS AT LAW

3993 Howard Hughes Parkway
Suite 400
Las Vegas, Nevada 89169

Telephone: 702-789-3100
Facsimile: 702-832-2650
www.wthf.com

RECEIVED
JUL - 9 2009
RESOURCE CONCEPTS, INC.

July 7, 2009

Resource Concepts, Inc.
Bruce Scott, Principal
Todd Connelly, Senior Engineer
340 N. Minnesota Street
Carson City, NV 89703

Re:   Wastewater Sewer Expansion - Capital Improvement Project
      Client: AMEC

Dear Messrs Scott and Connelly:

This office represents AMEC in regards to the above-referenced project (the "Project"). We have been forwarded Resource Concepts, Inc.'s ("RCI") June 12, 2009 Status Report to Richard Kaffenberger, Lake Havasu City Manager, and must make you aware of our client's legal concerns regarding the statements and accusations contained therein.

While AMEC understands that RCI's role is to provide observations and recommendations to the Lake Havasu City (the "City"), such statements should remain factual, and should not be based on speculation or some other malicious intent. Accusations that AMEC is failing to provide accurate information and attempting to mislead the City are unprofessional, malicious, and libelous.

Further, RCI's insinuation that AMEC has been dismissive of certain technical considerations and has failed to provide professional and technically sound services is purely opinionated, and should not be asserted as fact.

We expect that in the future RCI will keep its representations factual, and will withhold speculative, willfully misleading, defaming and libelous accusations concerning AMEC from its reports. If RCI's tortuous actions continue, AMEC will seek legal recourse.

Very truly yours,

Justin L. Watkins

JW

LASVEGAS 8736.1 9999.009

Irvine, CA          McLean, VA          San Francisco, CA          Frankfurt, Germany

**RCI Comments to the July 2, 2009 Letter**
**RE:  Lake Havasu City WWSE Program Assumptions and Methods**

The following represents comments and concerns related to the July 2, 2009 letter.

<u>WWSE Boundaries</u>

The following citations are taken from the July 2, 2009 letter regarding WWSE boundaries and its relationship to design flow determinations.

- (p. 1 of 16) *Until recently, the WWSE program was based entirely on using the City Limits as the service boundary.  Previous designs and construction efforts were based on this service boundary.*
- (p. 3 of 16) *Prior to the submission of the 2009 Draft Master Plan Update, all design was based on the area bounded by the City Limits.  The 2009 Draft Master Plan Update recommends extending the service boundary to coincide with the Section 208 Plan.*
- (p. 4 of 16) *For the detailed design of the collection system, AMEC applied these design criteria assuming full build out of all contributing areas and 100 percent occupancy thereby ensuring that the gravity pipes being designed will have sufficient carrying capacity for the projected full build-out condition peak flows.*
- (p. 8 of 16) Table 1, Detailed Design Assumptions column, regarding Boundaries:  *City Limits/208 Plan*
- (p. 10 of 16) Table 1A, regarding Boundaries, Footnote 3, ...*Prior to and including the Palm Tree area City limits were utilized to size the sewers in the design area under review...*
- (p. 15 of 16) *Until recently, the WWSE program was based entirely on using the City Limits as the service boundary.  Previous designs and construction efforts were based on the service area boundary.*

The Draft Master Plan Update, dated May 1, 2009 states on pages 4, 12, 54, and 67 that the WWSE program boundary is the Expanded Water Service Area boundary.  The Draft Master Plan Update also states the source of the information as the 1998 Phase II Comprehensive Wastewater Master Plan and the 2001 Phase II Comprehensive Wastewater Master Plan Update.

In **Appendix 7** of the Draft Master Plan Update, the land use tables indicate 25,633 total acres for the City Limits, 29,483 total acres for the Expanded Water Service Area, and 36,501 total acres for the 208 Plan area.  There is a 42.4% increase in land use area from the City Limits to the 208 Plan area.  There is a 23.8% increase in land use area from the Expanded Water Service Area to the 208 Plan area.  The July 2, 2009 boundary discrepancy offers an explanation for lower flows in previous detailed design reports.  The discrepancy also overstates increased City responsibility, and possible costs, when considering expansion to the 208 Plan boundary.  This "factual" information is inaccurate and untrue.

*[Note: Inaccurate depictions of important information have occurred in the past.  For example, information from the 2006 CIP Update stated, on multiple occasions, that a hydraulic model was developed*

1

*and used to produce information and provide guidance for the WWSE. Modeling analyses justified some of the 2006 CIP Update's recommendations. In April 2007, it was proposed by RCI to use the model to assess capacity impacts due to an impasse in design flows and peaking factor considerations. It was discovered that a functional hydraulic model did not exist.]*

<u>Variability in Design Parameters</u>

The July 2, 2009 letter changes five design factors, compared to design factors used in modeling for the Draft Master Plan Update. Two other factors have changed to represent differences between detailed design and planning level modeling (City Limits Boundary and multiple family land use densities). Little to no information is provided to justify the changes, other than an assumption that ADEQ design requirements are conservative.

The July 2, 2009 letter's changes to design parameters are:

1. The Sewer System Planning Boundary is changed.
2. Peaking Factors are changed.
3. Population (unit flows): Unplatted Property Density is changed.
4. Population (unit flows): Persons per Household is changed.
5. Population (unit flows): Occupancy rates are changed.
6. Population (unit flows): Multiple Family Land Use Densities are changed.
7. Unit Flows: Gallons per Capita per Day (GPCD) units are changed.

Other than the change in the serve area boundary, there are only three factors where the changes appear to be based on factual information. The three factors are described as follows.

1. **Peaking Factors**. The draft Master Plan Update used a diurnal peaking factor of **1.795** for hydraulic modeling. The July 2, 2009 report uses peaking factors derived from the November 2008 to March 2009 flow monitoring project. A maximum peaking factor is defined as a ratio between a <u>maximum</u> flow (typically a peak hour flow) and the average flow (over, or at, a specific time interval). For design purposes, the maximum peak represents the maximum condition throughout the useful life of the improvement.

   Although there is no correlation between the areas that were not monitored in the November 2008 through March 2009 study and the FM7 area, the July 2, 2009 report assigns a new peaking factor of **1.304** to the vast majority of the sewer system. From an assumption perspective, the 1.304 peaking factor is one of several documented factors that could be applied to the sewer system, therefore the assumption may be valid. It is not clear whether the 1.304 factor is derived from an assumption or derived from some type of analytical methodology. The following information is related to the 1.304 peaking factor determination.
   o The 1.304 peaking factor is depicted in the "Flow Meter 7 Raw Data" tabulations in **Appendix 9** of the draft Master Plan Update. The 1.304 factor represents the average Weekday Diurnal peak for the 11:00 time interval.

This factor is obtained by dividing the average data from the 11:00 interval by the average of the average weekday flows.

o  **Appendix 9** also depicts the average Weekend Diurnal peak for the 11:00 time interval is 1.415.

o  **Table 7-1**, on page 78 of the Draft Master Plan Update lists the actual FM 7 weekday and weekend peak factors as 1.307 and 1.415, respectively. The Draft Master Plan Update and the July 2, 2009 letter do not describe why the 1.304 peaking factor is selected over the 1.415 peaking factor to represent a maximum condition.

o  Based on the FM 7 data depicted in **Appendix 9**, the maximum flow of 1.2440 MGD occurs at the 11:00 interval on December 16, 2008. The calculated average flow for the monitoring period is 0.6870 MGD. The maximum peaking factor from the data is **1.811** (1.244 / 0.687).

o  In Table 7-1 of the Draft Master Plan Update, the ADEQ peaking factor (representing detailed design conditions) is **1.784** for the FM 7 service area.

Supporting information does not indicate that 1.304 represents a peak factor, let alone a representative maximum peaking factor. In **Appendix 9** of the Draft Master Plan Update, the daily peak flows from the FM 7 tabulations exceed the 0.8950 MGD peak flow (represented by the 1.304 peaking factor) on 88 of the 91 days in the flow monitoring analysis. Appropriate calculations indicate the maximum peak observed in the monitoring analysis is slightly higher than the ADEQ peak for dry weather base design flows.

Similar to the information derived from FM 7 data, the information derived from FM 13 (a portion of the Sweetwater Area) indicates a recommended weekday peaking factor of 1.513. Table 7-1 in the Draft Master Plan Update also depicts a weekend peaking factor of 1.680. After reviewing the data for FM 13 in **Appendix 9** of the Draft Master Plan Update, the data indicates a maximum peaking factor of 2.065. This value is slightly lower than the ADEQ peak of 2.123 depicted in Table 7-1.

The assumption that ADEQ criteria are conservative (based on information depicted in Table 7-1 of the Draft Master Plan Update and Table 3 of the July 2, 2009 letter) is not substantiated when appropriate data is used for comparisons. *(Based on the ADEQ criteria for determining dry weather peaks - that is adopted by the WWSE, it would require a population in excess of two million to derive a peaking factor of 1.304.)* The 1.304 maximum peaking factor is an unrealistic value from an engineering practice perspective, as well as from the database used to derive the value.

2.  **Persons per Household (pphh) Factor**. The 2.32 persons per household (pphh) factor is depicted in 2000 Census information. The 2.32 pphh factor represents the average number of persons per household. The 2000 Census also depicts there were 17,911 households and there were 12,716 families. The average family size is 2.69 pphh. The 2000 Census indicates 71% of the households were

occupied by families. This information indicates approximately 83% of the total 2000 Census population of 41,938 is based on families.

Since the majority of high density households (i.e. multiple family land uses) are served by the original District; and the vast majority of the WWSE CIP involves connecting single family residential units; and the majority of the population is represented by families; and the average persons per household factor accommodates the observed vacancy rate, the 2.69 pphh may be a more appropriate planning factor than the 2.32 pphh recommended in the July 2, 2009 report, or the 2.47 pphh used for the WWSE.

3. **Occupancy Rates**. Section 6.0, page 66 of the Draft Master Plan Update describes occupancy rates for residential housing. The Draft Master Plan Update and the July 2, 2009 letter assume a 75% occupancy rate. The assumption may have validity as it pertain to residential characteristics, but it does not describe a maximum condition. Further, the occupancy rate is applied to the service area as a whole. There is no information to suggest that non-residential properties (i.e. commercial, residential, public, and mixed land uses) have a 75% occupancy rate.

## Design Flow Methodology

The primary engineering concern is related to the WWSE's methodology for deriving design flows/peaking factors. On page 12 of 16 in the July 2, 2009 report, the note suggests that the peaks represent peak hour conditions. Maximum peaking factor assessments generally consist of several steps to arrive at a representative maximum (peak hour) peaking factor. The Draft Master Plan Update assesses three steps.

a. A typical daily diurnal curve is assumed for the wastewater system in the Draft Master Plan Update. The diurnal curve assumes a 1.795 peak at the 9:00 time interval.

b. The Draft Master Plan Update assesses the variation in seasonal (monthly) flow characteristics for peaking variations. Although variability is detected from data presented in the document, the impact is dismissed as insignificant. The monthly peaking factor is assumed to be 1.0.

c. The Draft Master Plan Update assesses inflow and infiltration impacts. Although the December 17, 2006 monitoring data demonstrates inflow impacts, the impact of inflow to the sewer system is dismissed as irrelevant, and inflow and infiltration once again assumed to be zero. The impacts depicted at other flow monitoring sites (charts in **Appendix 9**) are more dramatic than the one depicted in the body of the report. The inflow and infiltration peaking factor is assumed to be 1.0.

d. The draft Master Plan Update and the July 2, 2009 report do not examine the daily variability in flows within any given month. Current wastewater treatment data indicates that maximum daily flows within each of the past three months vary

from 1.13 to 1.18. Daily variability and a "maximum day" condition, was not assessed. By default, the "maximum day" factor is 1.0.

e. The draft Master Plan Update and the July 2, 2009 report do not examine the diurnal peak for the maximum day condition (i.e. the peak hour). By default, the peak hour factor (to the diurnal curve consideration) is 1.0.

Peaking factor considerations were examined in the flow monitoring project, assessed in the Draft Master Plan Update, and modified in the July 2, 2009 letter. The July 2, 2009 letter represents the progress in design flow considerations through Program Year 7 of the WWSE CIP. The progress is assumed to have contributions from at least two prominent, resourceful engineering firms and several engineers from the City. It is difficult to understand how a monthly peaking factor of 1.27 can exist, then not exist, within the span of few days. It is puzzling that inflow can be detected and quantified with actual flow information but is determined to be irrelevant and assigned a value of zero, based on assumptions. It is difficult to comprehend how five factors, affecting the design flow criteria, can be modified within the course of a few weeks.

Relationship to the Draft Master Plan Update

The July 2, 2009 letter adopts the same maximum peaking factor considerations as the Draft Master Plan Update, but changes the maximum peaking factor in the calibrated modeling from 1.795 to 1.304.

As represented in Table 3 of the July 2, 2009 letter, the 208 calibrated model results in a peak flow rate of approximately 3.177 MGD. The 208 calibrated model from the Draft Master Plan Update indicates approximately 3.4 MGD from the same Sweetwater and Hagen areas. A reduction in the peaking factor, a reduction in the persons per household, and a reduction in density for unplatted areas result in a slightly lower flow than what is depicted in the Draft Master Plan Update. Although the peak flows for the 208 calibrated model in the Draft Master Plan Update could not be independently derived, the July 2, 2009 letter appears to substantiate very low flows in the calibrated modeling.

The conclusions and recommendations in the July 2, 2009 are similar to those contained in the Draft Master Plan Update. However, the results in Table 4 of the July 2, 2009 letter indicate that the magnitude of surcharging and manhole flooding reported in the Draft Master Plan Update is based on modeling that is no longer current or meaningful. On page 13 of 16, the data in column three is reported to represent a worst case analysis.

Summary

The information pertaining to some of the changed factors in the July 2, 2009 letter should indicate that low flow assumptions are, or may be, unsubstantiated assumptions. Appropriate selections/calculations from documented information suggest risk when relying on information based on the July 2, 2009 letter's assumptions and methods.

*RCI Comments to AMEC's July 2, 2009 Letter*

Particular concern continues to be related to the feasibility for constructing and operating the proposed Sweetwater / Hagen Pump Station based on engineering calculations and analyzes reported to date. Operating costs and serial pumping system costs (i.e. costs that are not anticipated until well in the future or many decades from now), have not been clearly identified or quantified. Based on the new variability in peak flows presented in Table 3 in the July 2, 2009 letter and the logic for deriving the flows, the City does not have the ability to assess the costs and the risks associated with the recommended project. A crude life-cycle analysis that includes power and sulfide treatment costs suggests the project obligates the City to considerable, undisclosed operating costs. When coupling information related to design flows and the timing outlined in the Draft Master Plan Update and the July 2, 2009 letter, the City does not have sufficient information to prepare for undisclosed costs within an undisclosed timeframe.

The July 2, 2009 letter and e-mail recommend sharing this information with PBS&J for continuity of design. PBS&J proposed to conduct an independent assessment of design flows and downstream capacity as fundamental and prudent task for their scope of work. RCI does not believe it is in the City's best interests to promote the recommended continuity of design, and potentially influence an independent assessment.

The July 2, 2009 e-mail from Dr. Garcia to the Mayor Nexsen, Dennis Schilling, and Martha Bennett dismisses RCI's concerns, based on RCI's use of information that is no longer current or meaningful. AMEC's reply to RCI's concerns is reflected in the July 7, 2009 letter from AMEC's legal representative. A review of the methodology for determining some of the recommended factors from the July 2, 2009 letter, reaffirms RCI concerns for similar methodologies for representing and using information in the Palm Tree Design Report, the 30% Sweetwater / Hagen Pump Station Design Report, and modeling for the Draft Master Plan Update.

RCI does not believe that information used to formulate or support conclusions and recommendations to a public body is meaningless. Until AMEC and project representatives are willing to address and resolve the concerns outlined at the June 9, 2009 and the June 16, 2009 Oversight Committee Meetings (in a timely fashion), RCI would like to strongly reiterate the recommendations in our June 12, 2009 correspondence. RCI suspects AMEC's threats, through legal representatives, are as stated. Nevertheless, RCI continues to believe that recommendations to Lake Havasu City should be based on factual information that can be substantiated, and is consistent with similar factual information contained in other WWSE documents.

Despite the claims on page 4 of 16 in the July 2, 2009 letter, and the July 7, 2009 letter from AMEC's legal representative, the change to a calibrated peaking factor of 1.304, and the assumptions related to selecting the peaking factor, do not represent technically sound, accepted engineering practice. It is unprofessional and unethical, on the part of RCI, to not point out this concern to Lake Havasu City, as well as other similar concerns that are related to technical, logical, and/or mathematical discrepancies in WWSE documents and work products.

## ADDENDUM

RCI is raising concerns to the July 2, 2009 letter, not only for the technical, logical, and mathematical considerations, but the conclusions derived from the technical assumptions and analyses. The following citations from the July 2, 2009 letter are noteworthy.

*(p. 4 of 16)  Knowing that the ADEQ design process results in unused capacity (fully developed focused), this method is of little use when trying to predict the timing of capacity improvements.  The addition of a calibrated model provides a framework to assess current operational characteristics and, based on in-system flow projection is used to make informed decisions about system improvement alternatives.*

*(p. 6 of 16)  Table 2 provides a comparison of the observed Diurnal Peak Factor in the measured flows to the similar value that would be calculated using the ADEQ Peak Factor algorithm for the same population.  In all cases the observed Diurnal Peak Factor is less than the result of the ADEQ method.  This comparison is important to consider when discussing other additive factors that are subjective in nature.*

*(p. 10 of 16)  Table 1A, Footnote 2 – "Per the flow monitoring results collected by AMEC from November 2009 thru March 201 Infiltration and Inflow was determined to be irrelevant this along with the a majority of the sewers in LHC being new PVC pipes; sealed manhole lids, no groundwater interface with installed pipes establishes the reasoning for I/I = 1.0."*

*(p. 12 of 16)  Columns 4 and 5 of Table 3 are similarly constructed but this time using the Section 208 Boundary.  It will take many decades to reach full build out conditions to the Section 208 Boundary.*

*(p. 13 of 16)  Data are shown for both service areas previously discussed, WWSE limits and Section 208.  These conditions represent the future many decades from now.*

*(p. 13 of 16)  The worst case analysis (column three) is developed by applying Section 208 service areas boundary to the total system that was design and constructed using either the original service area or city limits.  In the worst case analysis, less than 3 percent of the 8 inch system is identified as having capacity limitations.  It is interesting to note that the analysis using the calibrated model shows far fewer capacity limitations.*

*(p. 15 of 16) 4. Initial calibrated model results indicate that, with minor exceptions, the current ADEQ Design methodology provides sufficient conveyance capacity for build-out conditions (Section 208 Boundary).*

*(p. 15 of 16) 7. The serial pump and forcemain system is adequate for WWSE build out under Planning Level assumptions.*

**PLAINTIFF'S**

**EXHIBIT 9**

**From:** Ford, Stacy D
**Sent:** Monday, October 06, 2008 10:01 PM
**To:** Bokaie, Nick
**Cc:** Wesanen, Jeffrey
**Subject:** Neptune

**Importance:** High

**Attachments:** city council minutes lhc.PDF
Nick,

I spoke with Jeff earlier about this issue and he is aware of my concerns.

I am making an ethical decision based on the laws and oath I took when I became an E.I.T. of not preparing the ADEQ Engineering Report (which also includes the IFB plans and specs) as requested by Darin that he wants out the door tomorrow. The project should have never gone out to bid without QA/QC and I have found several discrepancies on the plans and with quantities on sheet CS04 that are also in the bid package. Darin told me to leave everything the way it is and go with the numbers that are on the IFB plans, not correct mistakes, and he will figure out how to deal with it later because we have until the 20th to submit an addendum to the City and actually wanted to get the ADEQ submittal out Friday to meet a deadline requested by the City. **Well, these mistakes have your stamp on them!!**

I cannot do the ADEQ submittal until the design is done for IFB, which was just Wednesday morning. I have been working on the quantities and redlining plans to do the addendum for the Neptune ADEQ submittal for 14 over hours the weekend and 12 hours today. There are several problems with the plans and quantities to the point that I am questioning everything, including the fact that Jim Satterwhite raised the sewer laterals in areas after meeting with the City addressing the 100% comments for changes to the IFB plans. I know that Jeff/Mesa had done calcs to make sure that everyone could connect. I have found several errors and did calculations for corrections and have gotten only half way through the plans. Darin is only concerned with deadlines and the City is already questioning AMEC's competency which was on television at a City Council Meeting who agreed to pay $15,000 for a review committee to determine if we have competent technical staff in this office (I attached the article in the paper from the meeting, just in case you didn't know). Darin just wanted me to push out the report that your stamp will be on and I made him aware of discrepancies that he blew off as no big deal. To me accuracy and attention to detail is the backbone of a good engineer. These plans have already gone out to the City and the project was advertised yesterday in the paper. Jim and Darin are not allowing me to do my job properly and to me it is completely unacceptable that no QA/QC has been done on the IFB plans and the quantities are incorrect. The plans and specs with your stamp on everything need to be revised and resubmitted. That alone is disturbing to me and I am sure you are not happy to hear this because it reflects on your reputation as well. Darin was supposed to of done the engineering QA/QC as well as update CS04 prior to the plans going out the door and he told me Friday that the CS04 was not completely updated...but don't worry about it. I have yet to attend one single design meeting with the City, but Jim goes. I mentioned wanting to attend the meeting for the 100% comments that were addressed and Jim told me no, he didn't think I should be there that it might hold things up and they wanted to get in and out as quickly as possible. I was also told by Ron Shipley that Tim Coker takes bids for other side jobs to the local survey competitor asking if it is a good bid prior to submitting it and then AMEC loses the bid. I do believe that AMEC is being sabotaged. I know from some legal issues involving my husband that the corruption runs so deep in this little town that it is unbelievable. I too question Darin's competency given the fact that he refuses to report truthfully as to what is going on or address mistakes that I have found on the plans from previous projects for the sewer model, namely Hillside which we have already discussed, prior to my employment that never got passed on. I am doing my job, Darin's job and Pete's job. I am proud to be an employee of AMEC and do not want my competency to be in question or the reputation of AMEC to be tarnished in any way. I take my job seriously, but am being prevented from doing my best when I get the information I need to do my job properly just days before it is supposed to go out.

I am going to tell you a little bit about myself, and I do not usually get on the soap box because I was raised a navy brat, tom boy, down to earth person that doesn't have to be the center of attention and actually get embarrassed when a family member tells people this, but here it goes.

FYI - I didn't go to college until I was 31 in 2002, worked 2-3 jobs to get my 40-50 hours a week in to arrange my life around classes at Boise State University, finished my B.S.C.E. in 4 years and went straight into grad school part time. Currently I am only 5 or 6 classes short of a Master's in Civil Engineering specializing in wastewater and water treatment facility design with an emphasis in hydrology and hydrogeology. I actually have enough credits to be a professional geologist and have received a total of 12 awards, most requiring a nomination from faculty or the Dean, for my academic achievements while pursuing my B.S.C.E., including the 2005 International Mission on Engineering which took me to China

for 3 weeks at the end of my Junior year. My first year in the Master's program I got an award for Who's Who Amongst Executive & Professional Women in Engineering.

I will be out of the office possibly all day tomorrow, which was already arranged. I will try to make it to the 1:00 meeting for the Tan Area that Jeff said he was going to be here for. I am going to send Darin an email letting him know that I have made a decision based on ethics to not comply with his requests and I will BCC you. I am sure he is going to be mad, and I will suffer for this decision, but I know it is the right thing to do.

My cell phone number is 928-486-9371. If I do not answer right away leave a message with a number to contact you at and I will return your call.

Sincerely,

*Stacy D. Ford, E.I.T.*

Design Engineer
ASEC Environmental & Energy
91 Acoma Blvd. S., Suite 148
Lake Havasu City, AZ 86403
Phone: (928) 855-4646
Fax: (928) 855-4643
sford@asecee.com

**From:** Ford, Stacy D
**Sent:** Monday, October 06, 2008 10:33 PM
**To:** Miller, Darin
**Subject:** Neptune ADEQ Submittal

Darin,

I have made a decision based on laws and ethics to not comply with your request of me regarding preparation and submittal of the Neptune ADEQ report because it is known by both of us that the quantities and other information it would contain if submitted tomorrow is inaccurate and needs revision prior to submittal. Nick Bookie's official stamp and signature would have been electronically placed on the report and is already on the IFB plans that you were requesting I use the information off of for the report and include with the submittal. I refuse to submit plans and numbers that are known to be inaccurate for the sake of meeting a deadline, especially knowing that none of the information has been reviewed by Nick.

*Stacy D. Ford, E.I.T.*
Design Engineer
ADEQ Environmental & Earth
94 Acoma Blvd. S   Suite 300
Lake Havasu City, AZ 86403
Phone (928) 854-6070
Fax (928) 854-8035

# PLAINTIFF'S

# EXHIBIT 10

**Ford, Stacy D**

| | |
|---|---|
| From: | Ford, Stacy D |
| Sent: | Thursday, August 28, 2008 11:13 AM |
| To: | Bokaie, Nick |
| Cc: | Peterson, David E |
| Subject: | FW: Schedule Notification |
| Importance: | High |

lick,

/hat is this????? There was no conversation last week!!!! I bust my rear to get things done and never have I missed a deadline! I as going to come in yesterday and called Darin at noon to let him know that we were still taking care of legal matters due to the eath of my father-in-law.  Policy is 3 days bereavement leave and I used even less than that because of working on Sunday for five ours. My family and I got in to California at 11:30 pm on Sunday night, Ray passed away at 12:52am Monday morning. After the proner came and took the body from the home I worked two more hours after being up all night to finish up my design report and mailed it to Darin at 6:07am so he could get everything out the door to ADEQ on time for me. This is his way of covering his ass and acing the blame on someone else and I am so upset that I am crying. Why was I the only one sent this email? When the air onditioning was out we all worked through the heat until it got too hot, but Sean pretty much took the whole week off with pay. He isses work because he didn't sleep the night before, too much sun over the weekend, the excuses are endless and nobody seems think it is a problem. And Sean has been out for two weeks and I was told they don't know when he will be back. I am so frustrated nd do not know what to do. I am being singled out and it is not right. Svetlana goes through the same things I do and even when head of schedule Darin rides her. In the last three weeks I worked 51 hours by Thursday(10 of those hours was on my daughters' rthday 8/9) and took Friday of to go to California so my husband and kids could be with their father/grandfather, the next week I as sick on Thursday. Then this week my father-in-law died and I was in communication with Darin on Sunday while in the office and ok Pete's laptop to work while taking care of family matters. I requested emails of the city comments for Neptune so I could have em done today and Darin never replied by phone or email. The design team is falling apart and Darin shows favoritism to his ends, namely Sean. Pete is also very upset about me being prevented from doing the QA/QC things he asked I be allowed to do r him while on vacation. Canyon Oak IFB went out the door with me only having time to flip through the pages to see if I noticed ything wrong. I had no original check prints or City comments. Neptune is a mess from what I have been told this morning. Hillside, I explained earlier, had serious errors on the design, Sean simply put in 1.12% slope on the shallower lines when they were in me cases half that amount and it was constructed that way. When I told Darin what I had discovered he just said "Not good" and ere wasn't much we could do about it. I have also had someone messing with the files I work in and causing me extra work (on my vn time) to keep myself from looking incompetent. I know I am being sabotaged.

ease advise ASAP, to be honest I would even transfer to another AMEC office that would appreciate my abilities and dedication.

*tacy D. Ford, E.I.T.*
sign Engineer
IEC Environmental & Earth
Acoma Blvd. S., Suite 100
e Havasu City, AZ 86403
one: (928) 854-8030
x: (928) 854-8036
cy.ford@amec.com

om: Miller, Darin
nt: Thursday, August 28, 2008 9:51 AM
: Ford, Stacy D
bject: Schedule Notification

acy:

per our conversation last week, please make ensure that you notify me personally preferably by email and/or a phone ll of your absence from work first thing in the morning- latest by 9am. Ideally, I would like a heads up on your schedule week before, but do understand that there are unforeseen circumstances that come up occasionally requiring you to take ne off the same day. In such cases please notify me ASAP.

you are aware we have had and will have several deadlines and if I don't know your schedule or whereabouts it makes

very difficult to assign you work in order to meet our deadlines without any delays.

ince you are a member of the design team, I would require a weekly update of the status of work assigned to you, in an ffort to keep track of all our upcoming deadlines and schedules.

et's further discuss your tasks and schedule from here on.  Does 1pm this afternoon work?

hanks,

arin Miller
MEC
ake Havasu City, Arizona
hone 1 928 854 8030
ax 1 928 854 8036
arin.miller@amec.com

28/2008

**PLAINTIFF'S**

**EXHIBIT 11**

Richard E. Kaffenberger, Plaintiff-appellant, v. the City of Bullhead City, Arizona, an Incorporated Arizonacity; Steven R. Buck, Member of City Council; Husband Todoris Anne Buck; John L. Day, Member of City Council;husband to E. Darlene Day; Dean Hackett, Member of Citycouncil; Husband; Martin Kooken, Member of City Council;husband to Barbara; Robert C. Rogge, Member of Citycouncil; Husband to Cecile P.; Glen E. Tudor, Member Ofcity Council, Defendants-appellees

United States Court of Appeals, Ninth Circuit. - 978 F.2d 715

Submitted Oct. 13, 1992.*Decided Oct. 16, 1992

Before BEEZER, CYNTHIA HOLCOMB HALL and WIGGINS, Circuit Judges.

1 MEMORANDUM**

2 Former Bullhead City Manager Richard E. Kaffenberger appeals pro se the district court's order granting summary judgment in favor of the City of Bullhead ("City") in his employment discrimination action. He contends that the district court erred by finding that his discharge did not violate "public policy" under Arizona law. Specifically, Kaffenberger argues that he was discharged for his "whistleblowing" regarding the alleged improper actions of the City Attorney. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

3 We review de novo a district court's grant of summary judgment. Fuller v. Frank, 916 F.2d 558, 561 (9th Cir.1990). We review the evidence in the light most favorable to the nonmoving party to determine whether there was any issue of material fact and whether the substantive law was applied correctly. Americana Trading Inc. v. Berrie & Co., 966 F.2d 1284, 1287 (9th Cir.1992).

4 Arizona law recognizes a public policy exception to the at-will employee doctrine. Wagner v. City of Globe, 722 P.2d 250, 255-56 (Ariz.1986) (en banc); Wagenseller v. Scottsdale Memorial Hosp., 710 P.2d 1025, 1031 (Ariz.1985) (en banc). While an employer may discharge an employee for good cause or for no cause, he cannot

discharge for bad cause—in violation of public policy. Wagenseller, 710 P.2d at 1033. Reporting known or suspected illegality, i.e. whistleblowing, which serves a public purpose, is protected activity under the public policy exception. Wagner, 722 P.2d at 256-57. To establish a claim of wrongful discharge, a plaintiff must prove: (1) he engaged in protected activity; and (2) he was discharged because he engaged in protected activity. Id., at 257. An employee's actions which are "merely private or proprietary" do not constitute protected activity. Id.

5  Here, the City council voted to remove a parcel of land from a flood plain, in order to build a shopping mall. City Attorney Stephen Avila had recommended a three-year term to complete the removal, but the council voted to complete the removal in two years. On August 20, 1987, Avila sent a final version of the deed of trust to the County Clerk's office for filing. An addendum to the deed, however, incorrectly indicated that the City would complete the removal within three years instead of two years. Avila contemporaneously mailed a letter to David Kruetzberg, the mall developer's attorney, indicating that the City would complete the removal within two years.

6  On August 27, 1987, Kruetzberg sent Avila a letter indicating that the deed of trust erroneously contained a three-year term. Kruetzberg wrote that he assumed the three-year term was a clerical error in light of Avilla's letter indicating a two-year term. Between September 7 and 11, 1987, Avila informed several of the City council members about the clerical error. He also mailed a letter, apologizing for the error, and corrected addendum to Kruetzberg, on September 10, 1987. Avila instructed his secretary to make copies of the letter for each of the City council members.

7  Prior to September 10, 1987, Kaffenberger, then-City Manager, received a copy of the erroneous addendum to the deed of trust. It is undisputed that animosity existed between Kaffenberger and Avila. Kaffenberger took the erroneous addendum to the City Chief of Police and requested that inspectors question the mall developers regarding the mistake. An inspector discovered a copy of Kruetzberg's letter, dated August 27, 1987, indicating that the addendum contained a mistake. Kaffenberger then instructed the police chief to brief selected council members about the discrepancy. The secret briefings took place on September 10 and 11, 1987. In addition, on the evening

of September 10, 1987, Kaffenberger, the police chief and other individuals searched Avila's office without a search warrant. Kaffenberger insisted that they were searching for the deed of trust. Nonetheless, they removed cassettes from Avila's brief case, which were unrelated to the deed of trust.[1] Kaffenberger told an individual to copy the tapes. Others items were also seized.

8  On September 11, 1987, a police inspector, present during the initial search, obtained a search warrant alleging that Avila had been or was attempting to tamper with public records. No evidence, however, indicated that Avila tampered with the deed of trust after it was filed. The inspector and others conducted a second search of Avila's office and again seized items.

9  The previously-briefed selected council members held an emergency meeting on September 11, 1987, and voted to suspend Avila, based on Kaffenberger's representations. On September 15, 1987, the full City council met and Avila informed them about Kaffenberger's actions and the seizure of tapes from his office. Previously-unbriefed council members chastised their colleagues for holding the prior secret meeting and indirectly criticized Kaffenberger for his role in the search and seizure.

10  The City council members terminated both Kaffenberger and Avila because they were uncertain whether any criminal conduct had occurred. Based on Kaffenberger's search of his office, Avila threatened to sue the City. The City, however, avoided litigation by settling with Avila for $40,000.00.

11  Kaffenberger contends that "the termination was pretextural [sic] and in retaliation for carrying out my duties as city manager and that ... [he] was wrongfully discharged in violation of public policy." See Appellant's Opening Brief at 4. We disagree.

12  Kaffenberger's involvement of the police, prior to confronting Avila, showed that he sought to advance private interests as opposed to carrying out a job-related function. He also found Avila's letter to Kruetzberg, the mall developer's attorney, explaining that an error had been made in the addendum and that it would be corrected. We agree with the district court's finding that "Kaffenberger's actions demonstrate his overzealousness

in pursuing his investigation and turning a simple mistake into a full-blown investigation." See Order 7/22/91 at 11. Therefore the district court did not err by finding that Kaffenberger did not engage in the type of whistleblowing protected by public policy, see Wagner, 722 P.2d at 257, and properly granted summary judgment, see Fuller, 916 F.2d at 563.

13  Because Kaffenberger stated an arguable claim, irregardless of his misperception of the law, we deny appellee's request for costs, damages, and attorney fees.

14  AFFIRMED.

1  The cassettes contained interviews conducted by Avilla regarding Kaffenberger's alleged connection to unrelated improper activities

# PLAINTIFF'S

# EXHIBIT 12



Stacy Ford
Engineer in Training
6712 - SW Lake Havasu City Infrastructure

April 21, 2009                                    <u>Private & Confidential</u>

Dear Ms. Ford:

The purpose of this letter is to confirm our conversation in which you were
informed that effective April 21, 2009, your employment with AMEC Earth &
Environmental will cease.

In recognition of your service and to assist you while seeking alternate
employment, AMEC Earth and Environmental is prepared to provide to you, upon
the signing of a full and final release, (enclosed), the following:

**Severance:**  You are being offered a severance payment equal to **two (2) weeks**
of pay-in-lieu of notice.  This amount is taxed at the IRS supplemental rate.  In
addition, you are being offered payment equal to one month's COBRA costs.

**Benefits:**   If you are enrolled in the Health Insurance program your Health
Insurance coverage will continue through **April 30, 2009.**  After that date, you will
be eligible to continue health plan benefits at your own cost for up to 18 months
under the COBRA program.  You will receive further information in writing from
CIGNA about your COBRA options and sign-up requirements (i.e. you have 60
days from your termination date to elect COBRA coverage) for health plan
continuation.

If you are enrolled in a health care or dependent care reimbursement account,
you may submit claims for expenses incurred up to your termination date.  All
claims for dependent care must be submitted by March 31st of the following year
and all claims for health care within 90 days of termination date or funds will be
forfeited.   You may also elect to continue contributing to your health care
reimbursement account at your own cost under the COBRA program.  You will
receive further information in writing from CIGNA about your COBRA options and
sign-up requirements.   COBRA coverage is not available for dependent care
accounts.

Your Accidental Death and Dismemberment, Long Term Disability, and Life
Insurance coverages will cease effective on **April 21, 2009**.

If you are enrolled in the 401(k) program, your contributions will also cease effective **April 21, 2009.** A packet explaining all of your 401(k) options will be mailed to your home.

**Unemployment Compensation:** Please be aware that you may be eligible for unemployment compensation through the local state offices. You may apply after **April 21, 2009.**

**Employee Assistance Program (EAP):** Counseling services have been arranged through LifeWorks, a Ceridian Service. You are eligible for five visits without cost to you anytime during the months of **April and May** under AMEC's agreement with LifeWorks. You may call them at 888-267-8126.

**Job Openings:**
If you are interested in future employment opportunities with AMEC, please be sure to look on www.amec.com for open job postings.

**Final Pay:** Your final paycheck will be issued on **April 24, 2009.** The paycheck includes the entire pay period through **April 21, 2009** as well as any accrued, unused vacation.

In exchange for the severance described above, we require you to confirm your acceptance by executing the attached Final Release and Indemnity within 21 days. Please forward a signed original of the document to **Melinda Knott, AMEC Earth & Environmental, 11810 North Creek Parkway North, Bothell, WA 98011** no later than May 12, 2009.

We thank you for your efforts on behalf of E&E and wish you much success for the future. Should you have any questions please contact Human Resources.

AMEC Earth & Environmental, Inc.

Mike Lywood
Unit Manager—Lake Havasu, AZ

## CONFIDENTIAL SEPARATION
## AGREEMENT AND GENERAL RELEASE

AMEC Earth & Environmental ("AMEC") and Stacy Ford, Employee's heirs, executors, administrators, successors, and assigns (collectively referred to throughout this Confidential Separation Agreement and General Release ("Agreement") as "Employee"), agree that:

      1.    **Last Day of Employment.**  Employee's last day of employment with AMEC is <u>April 21, 2009.</u>

      2.    **Consideration.**  In consideration for signing this Agreement, and complying with its terms, AMEC agrees:

      a.    to pay to Employee, Stacy Ford, $3,818.66, representing two (2) weeks of salary at Employee's base rate of pay, less lawful deductions, and one (1) month of COBRA costs (grossed up) within fourteen business days after AMEC receives a signed original of this Agreement.

      3.    **No Consideration Absent Execution of this Agreement.**  Employee understands and agrees that Employee would not receive the monies and/or benefits specified in paragraph "2" above, except for Employee's execution of this Agreement and the fulfillment of the promises contained herein.

      4.    **General Release of All Claims.**  Employee knowingly and voluntarily releases and forever discharges AMEC, its parent corporation, affiliates, subsidiaries, divisions, predecessors, insurers, successors and assigns, and their current and former employees, attorneys, officers, directors and agents thereof, both individually and in their business capacities, and their employee benefit plans and programs and their administrators and fiduciaries (collectively referred to throughout the remainder of this Agreement as "Releasees"), of and from any and all claims, known and unknown, asserted or unasserted, which the Employee has or may have against Releasees as of the date of execution of this Agreement, including, but not limited to, any alleged violation of:

- Title VII of the Civil Rights Act of 1964;

- Sections 1981 through 1988 of Title 42 of the United States Code;

- The Employee Retirement Income Security Act of 1974 ("ERISA") (except for any vested benefits under any tax qualified benefit plan);

- The Immigration Reform and Control Act;

- The Americans with Disabilities Act of 1990;

- The Workers Adjustment and Retraining Notification Act;

- The Fair Credit Reporting Act;

- Arizona Civil Rights Act – Ariz. Rev. Stat. §41-1401 et seq.

- Arizona AIDS Testing and Confidentiality Act - Ariz. Rev. Stat. Art. 4, Tit. 36, §36-661, 664-668

- Arizona Equal Pay Law – Ariz. Rev. Stat. Art. 6.1, Ch. 2, Tit. 23, §23-340 et seq.

- Arizona Genetic Testing Laws – Title 12, Ch. 19, Art. 1, Ariz. Rev. Stat. §12-2801 and Title 20, Art. 6, Ariz. Rev. Stat. §20-448.02

- Arizona Employment Protections Act – Title 23, Ch. 9, Art. 1, Ariz. Rev. Stat. §23-1501

- Arizona Constructive Discharge Law – Title 23, Ch. 9, Art. 1, Ariz. Rev. Stat. §23-1502

- Arizona Wage Payment and Work Hour Laws

- Arizona Occupational Safety and Health Act, as amended

- Arizona Political Activities of Employees Law – Ariz. Rev. Stat. §16-1012 et seq.

- Arizona Drug Testing Law – Ariz. Rev. Stat. §23-493
- any other federal, state or local law, rule, regulation, or ordinance;

- any public policy, contract, tort, or common law; or

- any basis for recovering costs, fees, or other expenses including attorneys' fees incurred in these matters.

5. **Acknowledgments and Affirmations.**

Employee affirms that Employee has not filed, caused to be filed, or presently is a party to any claim against AMEC, except _____.

Employee also affirms that Employee has been paid and/or has received all compensation, wages, bonuses, commissions, and/or benefits to which Employee may be entitled. Employee affirms that Employee has been granted any leave to which Employee was entitled under the Family and Medical Leave Act or related state or local leave or disability accommodation laws.

Employee further affirms that Employee has no known workplace injuries or occupational diseases.

Employee also affirms that Employee has not divulged any proprietary or confidential information of AMEC and will continue to maintain the confidentiality of such information consistent with AMEC's policies and Employee's agreement(s) with AMEC and/or common law.

Employee further affirms that Employee has not been retaliated against for reporting any allegations of wrongdoing by AMEC or its officers, including any allegations of corporate fraud. Both Parties acknowledge that this Agreement does not limit either party's right, where applicable, to file or participate in an investigative proceeding of any federal, state or local governmental agency. To the extent permitted by law, Employee agrees that if such an administrative claim is made, Employee shall not be entitled to recover any individual monetary relief or other individual remedies.

6. **Confidentiality and Return of Property.** Employee agrees not to disclose any information regarding the underlying facts leading up to or the existence or substance of this Agreement, except to Employee's spouse, tax advisor, and/or an attorney with whom Employee chooses to consult regarding Employee's consideration of this Agreement.

Employee affirms that Employee has returned all of AMEC's property, documents, and/or any confidential information in Employee's possession or control. Employee also affirms that Employee is in possession of all of Employee's property that Employee had at AMEC's premises and that AMEC is not in possession of any of Employee's property.

7. **Governing Law and Interpretation.** This Agreement shall be governed and conformed in accordance with the laws of the state in which Employee worked at the time of Employee's last day of employment without regard to its conflict of laws provision. In the event of a breach of any provision of this Agreement, either party may institute an action specifically to enforce any term or terms of this Agreement and/or to seek any damages for breach. Should any provision of this Agreement be declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, excluding the general release language, such provision shall immediately become null and void, leaving the remainder of this Agreement in full force and effect.

8. **Nonadmission of Wrongdoing.** The Parties agree that neither this Agreement nor the furnishing of the consideration for this Agreement shall be deemed or construed at any time for any purpose as an admission by Releasees of wrongdoing or evidence of any liability or unlawful conduct of any kind.

9.    **Amendment**.  This Agreement may not be modified, altered or changed except in writing and signed by both Parties wherein specific reference is made to this Agreement.

10.    **Entire Agreement**.  This Agreement sets forth the entire agreement between the Parties hereto, and fully supersedes any prior agreements or understandings between the Parties.  Employee acknowledges that Employee has not relied on any representations, promises, or agreements of any kind made to Employee in connection with Employee's decision to accept this Agreement, except for those set forth in this Agreement.

**EMPLOYEE IS ADVISED THAT EMPLOYEE HAS A REASONABLE 21 DAYS TO CONSIDER THIS AGREEMENT.**

**EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST RELEASEES.**

The Parties knowingly and voluntarily sign this Agreement as of the date(s) set forth below:

AMEC EARTH & ENVIRONMENTAL

By:_____

Stacy Ford

Date:_____

By:_____

Mike Lywood

Unit Manager—Lake Havasu, AZ

Date: _April 21, 2009_

# PLAINTIFF'S

# EXHIBIT 13

**Earth & Environmental**

**Employee Action Form**


amec

| DATE 04-21-09 | EFFECTIVE DATE 04-21-098 | UNIT 6712D | EMPLOYEE NO. 506536 |

NAME OF THE EMPLOYEE Stacy Ford
EMAIL ADDRESS stacy.ford@amec.com                New Hire ☐ Rehire ☐ -enter 1st day worked ☐ Term ☒

## New Hires/Offer Proposal Information (Mark off all applicable boxes)

Level Title _____         Work Location _____
Job Title _____           Hours/week _____
☐ Regular, Full-Time (24 - 40 hr/wk)     ☐ Exempt (salaried)      ☐ Nonexempt (hourly)
☐ Temporary, Full-Time (24 - 40 hrs/wk – Max. 6 mo.)*   Pay $ _____ (biweekly if exempt / hourly if nonexempt)
☐ Regular, Part-Time (Max. 23 hr/wk)     Unit Billable (average 70% unit pricing work) ☐ Yes   ☐ No
☐ Temporary, Part-Time (Max. 23 hr/wk – Max. 6 mo.)*   Timesheet Approver /Supervisor _____
☐ On-Call (no set schedule or hours / no benefits)* *not eligible for Choices benefits   Participation in: ☐ Driving Program  ☐ Medical Surv. Program
Vacation Exception: ☐ 3 weeks  ☐ 4 weeks   ☐ Signing Bonus: $_____  ☐ Moving Allowance: $_____
*Please attach applicant resume or application

## Changes (Mark off all applicable boxes)

☐ New Level Title _____      ☐ New Job Title _____
☐ New Location _____         ☐ New Supervisor/Manager _____
☐ New Unit _____             ☐ New Timesheet Approver _____
☐ Regular  or  ☐ Temporary                 ☐ Exempt to Nonexempt
☐ PT to FT (24 - 40 hr/wk) _____ hrs/wk   ☐ Nonexempt to Exempt (attach job description; prior HR approval)
☐ FT to PT (Max. 23 hr/wk / no benefits) _____ hrs/wk   ☐ New Hours per Week _____
☐ FT/PT to On-Call (no set schedule or hours / no benefits)   ☐ On-Call to FT or PT (circle one) _____ hrs/wk
   ☐ Employee requested  or  ☐ Employer requested, if due to lack of work contact HR

☐ Base Pay Change   Current Pay $ _____   New Pay $ _____ (biweekly if exempt / hourly if nonexempt)
Reason for Change**   ☐ Merit Increase   ☐ Promotion   ☐ Market Adjustment   _____% Increase
** Attach appropriate documentation (i.e., market data if this is a adjustment) or use explanation area below

## Leave of Absence (Start – use first day not working. Return – use first day back. Attach appropriate documentation)

☐ Start Leave of Absence   Date: _____   Type: ☒ FMLA       ☐ Military
☒ Return from Leave of Absence   Date: 04-21-09          ☐ Personal   ☐ Lack of Work (Temporary Layoff)

## Terminations (Attach resignation letter/form. For separations attach documentation and final timesheets.)

☐ Resignation
☐ Involuntary Separation – Term with cause    Separation Code  |0|     (reference leave codes)
☒ Involuntary Separation – Layoff             Eligible for rehire? ☒ Yes  or  ☐ No (If No is checked, please attach or provide explanation)

**Explanations/Notes:** 2 weeks sev. / 1 mo COBRA 1379.46 *

Ms. Ford has been on an extended FMLA leave beginning on 12-16-08. She has medial approval to return to work tomorrow, 04-21-09. Since Ms Ford has been absent, her duties have been redistributed to other personnel, and there is no need to reinstate her subsequent to her leave. She is being laid off coincidental with her return.

* Dental E/F 120.82, * OAP IN E/F 1240.93 * VISION E/F ~~$20.00~~ 1771

| AUTHORIZATIONS | WHEN REQUIRED | SIGNATURE | DATE |
|---|---|---|---|
| Unit Manager | All Changes | Msigned | April 20, 2009 |
| Area Manager | See Limits of Authority | attached | |
| Regional Manager | See Limits of Authority | | |
| Human Resources | Reviews All Changes; Concurrence per Limits of Authority | attached | |
| Exec. Vice-President | See Limits of Authority | | |

| For Office Use Only: revised March 2006   ENTERED BY HR | Billing Class Code _____ | EEO Code _____ |
|---|---|---|
| ☐ New Hire  ☐ Promotion | 254 Title _____ | Headcount Title _____ |
| ☐ Rehire  ☐ Other   APR 17 2009 | Accrual Rate _____% | Continued Service date _____ |

| HR/Payroll Use Only | HR Initial AO | ADP Initial | RST Initial |

## Knott, Melinda R

| | |
|---|---|
| **From:** | Galchenko, Maya I |
| **Sent:** | Monday, April 20, 2009 4:42 PM |
| **To:** | Bennion, David B |
| **Cc:** | Knott, Melinda R |
| **Subject:** | RE: Stacy ford Layoff APPROVAL NEEDED |

Approved.

**From:** Bennion, David B
**Sent:** Monday, April 20, 2009 4:39 PM
**To:** Peterson, David E; Brickey, William J; Galchenko, Maya I
**Cc:** Leon, Lisa; Cleland, Teresa L; Knott, Melinda R
**Subject:** Stacy ford Layoff APPROVAL NEEDED
**Importance:** High

Hello:

I am attaching an EAF for the layoff of Stacy Ford.  Stacy was slated for the 01-11-09 layoff, but since she was on an active FMLA leave, it was decided to hold off on her layoff until after she was allowed to return to full duty.

She will be returning to work tomorrow, and we want to do the layoff coincidental with her return to work.  Stacy's work has been redistributed to several other people.

Stacy has exhausted her 12-week FMLA leave job protection, and thus we are not obligated to return her to work.   Since her workload has already been reallocated, it makes sense to do this layoff at this time.  Please respond to Melinda Knott, cc to me with an approval of this layoff.  Please do this ASAP, as we need to generate the paperwork for the layoff today.  Thank you.

Dave Bennion
SW Region HR Manager
Mesa, AZ
480-648-5331

04/20/2009

.Glacier                                                                Page 1 of 1

## Knott, Melinda R

| | |
|---|---|
| **From:** | Peterson, David E |
| **Sent:** | Monday, April 20, 2009 4:59 PM |
| **To:** | Bennion, David B; Brickey, William J; Galchenko, Maya I |
| **Cc:** | Leon, Lisa; Cleland, Teresa L; Knott, Melinda R |
| **Subject:** | RE: Stacy ford Layoff APPROVAL NEEDED |

ok by me
DEP

**From:** Bennion, David B
**Sent:** Monday, April 20, 2009 4:39 PM
**To:** Peterson, David E; Brickey, William J; Galchenko, Maya I
**Cc:** Leon, Lisa; Cleland, Teresa L; Knott, Melinda R
**Subject:** Stacy ford Layoff APPROVAL NEEDED
**Importance:** High

Hello:

I am attaching an EAF for the layoff of Stacy Ford.  Stacy was slated for the 01-11-09 layoff, but since she was on an active FMLA leave, it was decided to hold off on her layoff until after she was allowed to return to full duty.

She will be returning to work tomorrow, and we want to do the layoff coincidental with her return to work.  Stacy's work has been redistributed to several other people.

Stacy has exhausted her 12-week FMLA leave job protection, and thus we are not obligated to return her to work.   Since her workload has already been reallocated, it makes sense to do this layoff at this time.  Please respond to Melinda Knott, cc to me with an approval of this layoff.  Please do this ASAP, as we need to generate the paperwork for the layoff today.  Thank you.

**Dave Bennion**
SW Region HR Manager
Mesa, AZ
480-648-5331

04/21/2009

**PLAINTIFF'S**

**EXHIBIT 14**

**Earth & Environmental**



| Disability Leave of Absence Request |
| Non-FMLA |

Last Name _Ford_  First Name _Stacy_  Employee # _506536_

Unit Number and Work Location _6712 Lake Havasu City, AZ_

Supervisor Name _Darin Miller_  Work Phone # _928-854-8030_

I request approval of a disability leave of absence for the period of (month/day/year) _12/15/08_ through

(month/day/year) _?_ , for an injury or illness which is eligible for AMEC's Short Term Disability Program.
_To waiting for authorization for testing & then Dr. release_

- I understand I need to discuss the status of my benefits (including my potential eligibility for AMEC's STD or LTD benefits) with Human Resources.
- I understand that I will receive a letter from Human Resources that will explain my eligibility to continue company benefits such as health insurance and short term disability.
- I understand that I do not currently meet the eligibility criteria for Family Medical Leave.
- Prior to returning to work I will provide Human Resources with a doctors release to return to work.

Employee Signature: _Stacy D. Ford_  Date: _1/22/09_

**Disability Leave of Absence  (Non-FMLA Eligible)**

Written disability leave of absence (DLOA) requests for non-FMLA eligible should be submitted as soon as the need for leave becomes known to the employee.  Initial notification may be verbal, but employees must also submit a written DLOA Request Form for supervisory approval.

- Immediate supervisors should consider the request and, upon approval, assign the appropriate level of reinstatement on this form.
  *(Note:  see back of form for details.)*
- The employee must provide a signature acknowledging the reinstatement level recommended by the immediate supervisor.  Once the employee's signature is obtained, the approved form should be forwarded to: 1) the appropriate second level per the Limits of Authority Chart (i.e. Business Unit Manager, Vice President or Senior Vice President), 2) Human Resources
- Once a non-FMLA disability leave is approved by Human Resources, the department initiates an EAF placing the employee on a "disability" leave status.
- Employee is responsible for paying the employee costs associated with eligible benefits program.  All employee costs for benefits will be deducted from the employee's disability checks upon approval of disability pay by Aetna.

**Reinstatement Levels** *(Supervisors check the appropriate box)*

- [X] Level I - Return to same position, at same rate of pay if business conditions permit
- [ ] Level II - Return to similar position, at similar rate of pay, if business conditions permit.
- [ ] Level III - Consideration as internal applicant for any vacant position for which you are qualified.
- [ ] Level IV - Other.  Reinstatement level defined by the attached written agreement.

**Supervisory Approval & Employee Acknowledgment** *(Employee acknowledges supervisor's recommendation for reinstatement)*

| Business Unit Manager Approval (up to 4 weeks): | Date | Employee Acknowledgment: _Stacy D. Ford_ | Date: _1/22/09_ |
| Group Manager (VP) Approval (up to 8 weeks): or Regional Manager (SVP) Approval  (up to 6 months): | Date | Executive Vice President Approval (> 6 months): | Date |

* **Levels of Reinstatement**

The purpose of leave without pay is to provide the employee flexibility outside of leave accruals while maintaining AEEI's ability to manage the impact of such leave within a department or business unit. For this reason, part of the DLOA approval process includes assigning a level of reinstatement. The level of reinstatement communicates the circumstances under which an employee may return to work. In designating a reinstatement level, supervisors should consider the nature of the request, the needs of the department during the period of requested leave and the impact the temporary loss of the position (i.e., hiring a temporary employee, reassigning work to current employees, etc.) would have on maintaining business operations. Before forwarding this form to the second level supervisor, the employee must sign to acknowledge the level of reinstatement recommended by the supervisor (any change in the level of reinstatement must also be initialed by the employee).

- Level I – Return to same position, at same rate of pay if business conditions permit
- Level II – Return to similar position, at similar rate of pay, if business conditions permit
- Level III – Consideration as internal applicant for any vacant position for which you are qualified
- Level IV - Other. Reinstatement level defined by the attached written agreement.

Note: Because the business needs of a department change (i.e., peak periods, funding, restructuring, etc.), a level of reinstatement should be assigned on a case-by-case basis. Please consult with Human Resources.

* **Approvals**

All requests must be approved according to the Limits of Authority chart. Requests that are equal to or less than 4 weeks require a <u>DLOA Request</u> form that must be approved by a Unit Manager. Requests that exceed 4 weeks and are equal to or less than 8 weeks must be approved by a Group (Area) Manager/VP. Requests that exceed 8 weeks and are equal to or less than 6 months must be approved by a Regional Manager/SVP. Requests that exceed 6 months must be have Executive Vice President approval.

* **Benefits**

Employee premium costs for benefits will be deducted from the employee's disability checks upon approval of disability pay by Aetna.

# Short Term Disability Payment

**Paydate** _2/27/09_

**W/E** _12/26/08 - 2/20/09_

**Employee Name** _Stacy Ford_

**File #** _506536_

**Scheduled Hours** _RGFT_

**Hourly** _____

**Salary** _✓_

**Cancel Auto Pay** _✓_

**Rate Code 2** _✓_

_taxed@8_

_w/e 1/2/09 ee pd_
_(8) H reduces_
_(32) V reduces_

_w/e 12/26/08 ee pd_
_8 H_
_V_
_Ho_
_reduces_
_(10) H_
_(8)_

PAYDATA BATCH # _37_

| Hours Code | # of Hours | Entered |
|---|---|---|
| 25 | 32 + 40 + 40 + 40 + 272 +24 +24 +24 +24 = 276 | 20 |

**Hours Entered by** _____ **Date** _2/23/09_

**Entry Audited by** _____ **Date**

**POSTED**
**FEB 23 2009**

_asst. miller 4_

# Short Term Disability Payment

Paydate  _3/13/09_

W/E  _2/27/09 , 3/6/09_

Employee Name  _Stacy Ford_

File #  _506536_

Scheduled Hours  _LGFT_

Hourly  _____

Salary  ____✓_____

Cancel Auto Pay  ___✓_____

Rate Code 2  _____

PAYDATA BATCH #  _31_

| Hours Code | # of Hours | Entered |
|------------|------------|---------|
| 25 | 24 + 24 = 48 | ✓ |

Hours Entered by  _____  Date  _3/6/09_

POSTED

MAR 09 2009

Entry Audited by  _____  Date  _____

**PLAINTIFF'S**

**EXHIBIT 15**

January 12th, 2009

Stacy D. Ford
1561 Mohican Dr.
Lake Havasu City, AZ 86406

Dear Stacy,

**Re: Short-Term Disability due to your qualifying event**

Effective December 22nd, 2008 you will be eligible to apply for AMEC Earth & Environmental Inc.'s (AEEI) short-term disability (STD) program.   While you are out on disability leave you will be placed on a Disability Leave of Absence (DLOA) as you are not eligible for Family Medical Leave (FML).  Please complete and return the attached DLOA form to me in the Bothell office. To be eligible for FML you must have been employed with AEEI for more than one year.

**To report your claim you will need to call Aetna at 1-800-488-2386.** They will get all the information that is needed from you to start processing your claim.  Please note the length of your short-term disability is determined based upon the length of your actual disability.   The table below indicates the level of benefit provided by week.

**Illness**

| Weeks Out | Benefit |
|---|---|
| Week 1 | STD waiting period, 5 consecutive working days |
|  | - must use sick leave/vacation/leave without pay |
| Weeks 2 – 5 | 100% of your salary |
| Weeks 6 – 26 | 60% of your salary |

As of the week ending January 7th, you have 6.92 hours of sick and 20.88 hours of vacation time.  You will be responsible for submitting a timesheet for the waiting period.  If you are unable to submit a timesheet in the appropriate time frame please contact me so that a timesheet can be submitted on your behalf.

Disability payments are paid through AEEI's payroll based on approval and length from Aetna. You will receive your disability payments biweekly with the regularly scheduled pay dates and will be direct deposited if you have it established.  If not, the checks will be mailed to your home.

Your health care benefits continue while you are on STD leave. The employee share of your benefits will be deducted from your disability check.  Please note that vacation and sick leave will NOT accrue while you are on short term disability.

When you are released back to work by your doctor please have your physician fax a release to work note to Human Resources at 425-368-1005.

If you have any questions about LWOP or short-term disability or any portion of the paperwork, please feel free to contact me at 425-368-1000.

Sincerely,

Dave Bennion
HR Manager

cc: DLOA File

/attachments

**PLAINTIFF'S**

**EXHIBIT 16**

**TODAY'S**

# News-Herald

Havasunews.com

Print Page

**Serving Lake Havasu City & The Lower Colorado River Area**

## City, AMEC review claims
### Say 'no evidence' to support allegations

*By NATHAN BRUTTELL*
Thursday, November 19, 2009 6:22 AM MST

Lake Havasu City staff and AMEC recently reviewed allegations, finding "no evidence to support" a former employee's claims.

Former AMEC employee Stacy Ford-Kelly made statements Nov. 10 during a public comments portion of the City Council regular meeting. Ford-Kelly claimed she was terminated from AMEC after "finding errors" in the sewer project. She also said her comments were "disregarded" by her superiors at AMEC when she worked as an engineer in training in 2008. AMEC representatives said an outside, unnamed ethics auditor evaluated the claims and found nothing substantial.

"The results of the investigation yielded no evidence to support any of Ms. Ford's claims of corruption or misconduct and no further action was deemed necessary," AMEC Senior Vice President David Peterson and Executive Vice President William Brickey wrote in a memo to city staff.

The memo also states the outside firm "performed an extensive audit of documents, files and computer hard drives for any evidence of misconduct" and also interviewed Ford-Kelly and AMEC staff.

Ford-Kelly said she did not feel the outside auditing staff was adequate.

"The problem I had was they're accountants," she said. "They can balance the books but they're not engineers. They didn't look at drawings or specific things I was talking about."

Interim City Manager Charlie Cassens stated city staff researched the claims as well and so far have received no documents or a notice of claim against the city.

"Despite (Ford-Kelly's) expressed willingness to share this information with staff and the city attorney, she has not been forthcoming with any documentation," Cassens said in the memo. "In the absence of any verifiable information to support her claims, staff can only rely on information contained in existing files and reports. Based on the information currently at hand, we feel Ms. Ford's allegations are unfounded and can find no cause to pursue this matter any further."

Ford-Kelly said she filed claims regarding her employment with AMEC to the Environmental Protection Agency, Arizona Department of Environmental Quality, the Internal Revenue Service and the Arizona Board of Professional Registrants.

"I am sure this is why I was 'laid off' from AMEC because I had brought these issues to the attention of my superiors and they did nothing," she wrote in an e-mail to PBS&J. "The more problems I found and reported, the worse things got for me."

Ford-Kelly said she plans to pursue the matter further.

"Just from the time I spent at the Wastewater Treatment Plant, my notes on that have nearly 100 lines that are not to specifications," she said, adding that her intention is to correct errors on the project. "From the beginning, all I've wanted is for the sewer to be correct and nobody would listen. As an engineer, your first duty is to the public."

Interim Public Works Director Mark Clark said he first heard the claims in May.

"AMEC shared with us those issues and we felt comfortable that they addressed the issues," he said. "As far as we're concerned, it's an employment issue related to (AMEC's) employees."

Clark added that he would also review and investigate any possible errors in the Wastewater System Expansion Program.

"City staff does review plans with the project to make sure we're comfortable with the work being done and ADEQ also signs off on plans to make sure they meet their requirements," he said. "Any information that indicated any problems would be looked into immediately."

Ford-Kelly also made accusations claiming former City Manager Richard Kaffenberger was responsible for "blackballing" her from a position with PBS&J. Cassens said city staff reviewed police reports involving Ford-Kelly and "her husband James Kelly."

"After reviewing the various reports and hearing what her former employers had to say, we can find no evidence to support her claim that she was 'blackballed' from a prospective position at PBS&J," Cassens wrote in a memo.

Ford-Kelly also claimed earlier this month that her residence was illegally searched in July 2008.

"I believe (Kaffenberger) was also a part of the search warrant," she said Nov. 10, "which was looking for the documentation that would prove illicit activities."

Ford-Kelly also said she has documents which show the search was performed illegally and plans to release them following federal investigation.

"That's a whole other issue that I can prove," she said.

Cassens said city staff researched the "alleged 'thefts' from her home by police in March 2008 and the subsequent retention of what Ms. Ford refers to as '$60,000 in contraband,'" according to the memo.

"We believe these are cases relating to a large number of assault-type weapons that were seized during the execution of a search warrant on her home in July 2008," the memo stated. "We believe the weapons cases have no bearing on Ms. Ford's present employment condition, and according to documents on file with the U.S. Bureau of Alcohol, Tobacco and Firearms, the seized weapons (excepting three that Mr. Kelly allegedly converted to full auto capability), will remain in their custody until the federal case against Mr. Kelly is resolved."

Ford-Kelly said she does not plan to provide documents with city staff because of the search.

"If they're going to allow an illegal search on my house, and not care about their corruption and help me in that way then why should I help them," she said, adding that she does plan on filing lawsuits against AMEC, the city and the police department.

You can contact the reporter at nbruttell@havasunews.com.

---

What is RSS?

All original content Copyright © 2009 Todays News Herald and may not be reprinted without permission. Todays News Herald Online is a service of Todays News Herald, Inc. By using the site, you agree to abide and be bound by the site Terms of Use, which prohibit commercial use of any information on the site. Todays News Herald is a publication of River City Newspapers Inc. All Rights Reserved.

**PLAINTIFF'S**

**EXHIBIT 17**



# Code of Business Conduct



# Contents

Letter from Samir Brikho — 2

**Our responsibility to our customers** — 3
Ensuring quality performance
Allowing fair and honest competition
Respecting contractual obligations
Making no improper payments

**Our responsibility to our business partners** — 4
Ensuring fair and honest relationships
Setting high ethical standards
Disclosing relevant, material information to the financial community
Making no improper payments to agents, sponsors and consultants

**Our responsibility to each other** — 5
Giving mutual respect
Allowing open communication
Promoting diversity
Avoiding harassment
Working in a safe and healthy environment

**Our responsibility to the company** — 7
Safeguarding assets
Protecting trade secrets and confidential information
Preventing insider trading
Managing conflicts of interest

**Our responsibility to governments** — 10
Setting the highest ethical standards
Committing to full co-operation

**Our responsibility to the wider social environment** — 11
Promoting sustainable development
Encouraging volunteering
Ensuring strict compliance with the law

**Upholding the Code** — 12

# Our responsibility to each other

AMEC employees come from many countries with different backgrounds and cultures. Every employee contributes to AMEC and contributions are maximised if we provide a suitable work environment. We value the diversity of our people and we respect and uphold their right to work in a safe and healthy environment of mutual respect and open communication, free from harassment and offering equal opportunity for advancement and promotion.

■ Giving mutual respect means treating others with civility and courtesy, accepting differences without necessarily agreeing with them, listening to what others have to say and refraining from ridiculing or embarrassing others. We should observe the highest standards of courtesy and respect when interacting with one another.

■ Allowing open communication means open and honest communication between an employee and their manager on a day-to-day basis. Employees' input should be welcome, advice freely given and issues raised and shared candidly. Such open communication is essential to resolve concerns quickly, to recognise and address business issues as they arise and to address the ever-changing global environment. Open communication includes an annual review of every employee's performance by their line manager, to assess progress and propose plans for development and improvement.

◙ Ensuring equal opportunity means that all employees and job applicants are afforded fair and non-discriminatory treatment for both employment and advancement, irrespective of race, ethnic or national origin, age, gender, religion, sexual orientation, disability or other qualities and traits irrelevant to performing the tasks required. Employment, advancement and termination or retirement must be based on aptitude, abilities, skills and qualifications.

■ Promoting diversity means that we value the national and cultural heritage and many differences of our people.

■ Avoiding harassment means not behaving in a way that another person may find intimidating, upsetting, embarrassing, humiliating or offensive irrespective of the intent.
  Harassment can take many forms, including:
  - Slurs, insults, name calling, ridicule, mockery
  - Unwanted physical contact, assaults or threats, intimidation, stalking or spying
  - Offensive or obscene comments, jokes, songs, posters, graffiti or gestures
  - Improper and repeated isolation or exclusion from social activities, meetings or conversations
  - Coercion for favours
  - Bullying or deliberately setting unrealistic targets and/or deadlines, public criticism, undervaluing effort and substituting responsible tasks with menial or trivial ones.

Harassment creates a hostile or abusive work environment and will not be tolerated in any form, whether occurring openly, covertly or in oral, written or physical form.

☐ Working in a safe and healthy environment means protecting the lives and health of AMEC employees. Nothing we do is so important that we cannot take the time to do it safely. We all have a responsibility to work safely and to protect ourselves, others and the environment. Each employee has the right to halt work at any time if health or safety is being compromised.

AMEC is committed to protecting and supporting employees, business partners and the environment by implementing robust health and safety management systems, adopting best practices and engaging in continuous performance improvement. It is the responsibility of each of us to understand the work in which we are involved, to be aware of the risks and to take the necessary and appropriate precautions for the health and safety of all, and for the protection of the environment. Our safety, health and environmental standards can be found on our intranet and in other business unit or project communications.



To work safely, effectively and productively, and to remain alert and responsive to instruction and aware of the consequences of our actions, we must maintain a drug and alcohol-free workplace. The use of illegal drugs or the inappropriate use of legal drugs or alcohol is not permitted while carrying out company business nor is it condoned at other times. Further details can be found on our intranet.

It is crucial that any unsafe conditions or breach of the AMEC standards in health, safety and environment are reported immediately to an appropriate person.

Code of Business Conduct

# PLAINTIFF'S

# EXHIBIT 18

EEOC Form 161 (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Stacy D. Ford<br>1990 McCulloch Boulevard<br>D128<br>Lake Havasu City, AZ 86403 | From: | Phoenix District Office<br>3300 North Central Ave<br>Suite 690<br>Phoenix, AZ 85012 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 540-2010-00908 | Jason J. Brown,<br>Investigator | (602) 640-5030 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
#### (See the additional information attached to this form.)

Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act: This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

Equal Pay Act (EPA): EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

_Rayford O. Irvin_                                         APR 30 2010

Rayford O. Irvin,
Acting District Director                                    (Date Mailed)

Enclosures(s)

cc:    David Bennion
       Reg. HR Manager
       AMEC
       1405 W. Auto Drive
       Tempe, AZ 85284