Peter Strojnik, Esq. – Arizona Bar No. 006464
**STROJNIK, P.C.**
2415 East Camelback, Suite 700
Phoenix, Arizona 85016
Telephone: 602-524-6602
Facsimile: 602-296-0135
E-mail: strojnik@aol.com
*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| STACY D. FORD-KELLY, ) | NO.  3:12-CV-08085-NVW |
| ) | |
| Plaintiff, ) | **FIRST AMENDED COMPLAINT** |
| vs. ) | |
| ) | |
| <u>AMEC ENVIRONMENT &</u> ) | |
| <u>INFRASTRUCTURE, INC.</u>, a Nevada ) | **JURY TRIAL DEMANDED** |
| <u>corporation</u> *fka* AMEC EARTH & ) | |
| ENVIRONMENTAL, INC. *fka* <u>AMEC</u> ) | |
| <u>INFRASTRUCTURE, INC.</u>; AMEC ) | |
| <u>PLC, a British Company,</u> ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## INTRODUCTION

1.    <u>Plaintiff/Employee    Stacy    Ford-Kelly    was    employed    by
Defendant/Employer under a guaranteed six-year written employment contract. Exhibit
1. During her first year of employment with Defendant, Plaintiff uncovered that
Defendant    was    intentionally    overestimating    material    quantities    and    recklessly
miscalculating the drainage slopes with respect to Defendant's public contract for the</u>

construction of the Lake Havasu City's Wastewater Treatment Plant. Plaintiff reported these instances of malfeasance to Defendant, and when Defendant did not take action, she reported it to the authorities as required by her ethics rules. Following her reporting of Defendant's malfeasances to the authorities, she was fired in violation of the written employment agreement.  Defendant refused to pay Plaintiff the balance due on the employment contract in direct breach of the clear terms thereof.

2.    At the time of the firing, Defendant offered Plaintiff a plain envelope stuffed with cash and other benefits in exchange for her silence regarding Defendant's fraudulent and negligent activities. Defendant also presented Plaintiff with a Confidential Separation Agreement and General Release, but Plaintiff refused to sign or accept the cash bribe. Plaintiff alleges that she was extorted and attempted to be bribed by Defendant and that Defendant committed a "pattern or unlawful activity" as this term is defined in ARS 13-2314.04 (S) (2)).

3.    Defendant also violated the FMLA because her termination took place on the same day she returned to work from FMLA leave.  The facts are clear that Defendant had no intention of ever reinserting Plaintiff into her same or equivalent position upon her return from FMLA leave.

4.    In addition, Defendant issued Plaintiff a Form 1099 that indicated settlement of Plaintiff's *pro se* complaint in State Court in the amount of $25,000,000.00.  Plaintiff understood this to be an offer which she accepted.  Plaintiff

claims, in the alternative, that the 1099 represents an offer of settlement and that she detrimentally relied on this offer by reporting income in the amount of $25,000,000.00 to the IRS and that Defendant is estopped from denying the existence of the contract by the application of the doctrine of "promissory estoppel".

     5.    Plaintiff further alleges, in the alternative, that Form 1099 contains false statements of material fact upon which she justifiably relied to her damage.

     6.    On the breach of employment contract claim, Plaintiff claims damages for breach of the employment agreement in the amount of $480,702.76 (as outlined in employment contract) trebled to $1,442,108.28 pursuant to A.R.S. §§ 23-353, 355. On the breach of settlement claim, alternatively the promissory estoppel claim, alternatively common law fraud claim, Plaintiff claims damages in the amount of $25,000,000.00. On the civil extortion, bribery and "pattern of unlawful activity" claims Plaintiff seeks damages in an amount to be proven at trial. On the FMLA count Plaintiff claims damages in an amount to be proven at trial. Plaintiff claims attorney's fees on the contract claim pursuant to A.R.S. § 12-341.01 and on the FMLA claim pursuant to 29 U.S.C. § 2617(a) (3). Additionally, Plaintiff claims that Defendant's actions were intentionally designed to cause her harm and, on that basis, seeks punitive damages in an amount commensurate with Defendant's wealth sufficient to deter this and similarly situated employers from engaging in like misconduct.

## PARTIES AND JURISDICTION

7.    Plaintiff Stacy Ford-Kelly is a married woman residing in Lake Havasu City, Arizona.

8.    Defendant AMEC Environment and Infrastructure, Inc., *formerly known as* AMEC Earth & Environmental, Inc., *formerly known as* AMEC Infrastructure, Inc., is a Nevada corporation doing business in the State of Arizona. AMEC Environment and Infrastructure, Inc., *formerly known as* AMEC Earth & Environmental, Inc., *formerly known as* AMEC Infrastructure, Inc., are purported divisions of AMEC, PLC, ,which is a company organized under the laws of the United Kingdom. Defendant parties are cumulatively referred to as "Defendant".

9.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1332.

10.    Venue is proper in this Court.

## ALLEGATIONS COMMON TO ALL COUNTS

CONTRACT OF EMPLOYMENT

11.    In or around January 2008, Plaintiff Ford-Kelly came into contact with Chris Hassert, the Unit Manager of Defendant's Lake Havasu, Arizona office.  Mr. Hassert invited Plaintiff to Lake Havasu for an interview for Defendant's open design engineer job.

12.    On January 21, 2008, Mr. Hassert delivered to Ms. Ford-Kelly an offer of employment.  ("*I am pleased to offer you the position of Design Engineer, reporting to me in the Lake Havasu, AZ office, effective January 28, 2008*") (emphasis supplied).

13.    The employment contract was for a term of six (6) years.  Exhibit 1. Pursuant to the terms thereof, if Plaintiff's employment was terminated "due to no fault of your own" and is "initiated by AMEC after the three-month probationary period", Plaintiff is due the balance of the employment contract within three business days of termination, to wit:

- The balance of monetary compensation of this contract due to you shall be paid in full within three business days if employment with AMEC ceases due to no fault of your own and is initiated by AMEC after the three-month probationary period. Balance of compensation is to include any accrued and future benefits ending December 31, 2013 for both vacation time and sick leave as outlined below. If such action takes place by AMEC you will also receive payment equivalent to 18 months of COBRA costs which will be included with the balance of this contract compensation due to you. If the remainder of contract is less than 18 months COBRA costs to be paid will be adjusted accordingly.

14.    After receipt of the offer, Plaintiff immediately executed and relocated to Lake Havasu, Arizona thereby forcing her to leave her two children with their father in Boise to further support her family.  During her first two months working as a design engineer for Defendant, Plaintiff lived out of hotel rooms.  In further reliance on the six-year employment term, Plaintiff formally withdrew from Boise State University's Master's program thereby postponing her graduate studies in civil engineering.

15.    Plaintiff's acceptance of the lucrative, guaranteed six-year employment term completely altered her life.

## LAKE HAVASU CITY SEWER PROJECT AND FORD-KELLY'S EXEMPLARY JOB PERFORMANCE

16.     The Lake Havasu Sewer Project was a $500 million taxpayer-funded project encompassing the complete design and implementation of a new sewer system in Lake Havasu.  Defendant was charged with the design of a sewer system directing all waste on a slope to the water treatment plant, which would then of course treat the waste into gray water for irrigation, seepage into the Earth or release into Lake Havasu or other bodies of water.

17.     As a design engineer, Plaintiff was charged with using Geographic Information System and three-dimensional modeling to design the sewer system.  She was also charged with overseeing the drafters and inspecting in the field.  Plaintiff's pre-disability leave employment was so exemplary that she was given a raise on January 5, 2009 and was commended by Mike Lywood.  ("*We thank you for being a significant part of our success in 2008 and look forward to our continued collaboration as we move into 2009*") (emphasis supplied).

18.     Six days after Mr. Lywood's commendation, Defendant slated Plaintiff for layoff. *Infra*.

## FORD-KELLY'S DISCHARGE OF ETHICAL AND CIVIC OBLIGATIONS

19.     During the term of her employment with Defendant, Plaintiff learned that Defendant engaged in intentional overestimating of material quantities and reckless miscalculations of drainage slopes on the Lake Havasu Sewer project.  Plaintiff was

aware that overestimation is illegal and fraudulent and that miscalculation of drainage slopes would cause widespread sewer problems. Accordingly, Plaintiff had ethical obligations to report this misconduct.

20.    Plaintiff initially advised her supervisors of the problems with the construction contract, plans, specifications and performance. Defendant took no action to rectify these problems. Thereafter, Plaintiff made formal disclosures of Defendant's malfeasance to the authorities, including the Criminal Division of the EPA, Arizona Department of Environmental Quality and the Arizona Board of Professional Registrants.

21.    On April 16, 2009 Plaintiff's immediate supervisors discovered that Plaintiff had lodged formal complaints about the incidents involving overpriced construction costs/bid rigging by Defendant to the Criminal Division of the EPA, Arizona Department of Environmental Quality and the Arizona Board of Professional Registrants because Defendant did nothing to correct the matters that they are legally liable for as described below. Plaintiff's complaints of design errors that led to overpriced construction costs/bid rigging are supported by the oversight engineering firm RCI, Inc.:

      a. The first incident was notifying superior Nick Bokaie via telephone and then reiterated in an email dated August 28, 2008 that Plaintiff had discovered Defendant inspectors missed serious errors in the plans during

construction of the Hillside Area of Lake Havasu City Wastewater Expansion Project that had already been completed. When Plaintiff brought her findings to her immediate supervisor, Darin Miller, he just said "Not good" and that there wasn't much we could do about it. The design errors were in violation of Arizona Department of Environmental Quality (ADEQ) minimum slope design requirements/standards.

b. The second incident occurred October 6, 2008 when Plaintiff had notified superior Nick Bokaie, whose PE stamp was on all documents and construction plans, via email, that her immediate supervisor, Darin Miller, was insisting that the Engineering Report she was preparing for the Neptune Area of the Lake Havasu City Wastewater Sewer Expansion Project be submitted to ADEQ with construction material quantities that were known by Darin Miller and Plaintiff to be incorrect. Plaintiff refused to submit the Engineering Report because it was unethical and illegal. Plaintiff also notified Nick Bokaie in the same email that the Issue for Bid (IFB) plans and quantities in the Bid Package, which were to be included in the ADEQ submittal with the Engineering Report, had already been submitted to the Lake Havasu City Public Works Department and were currently being advertised for bid.

22.    On or about November 10, 2009, Plaintiff also made an oral report of Defendant's malfeasance at the Lake Havasu City Council Meeting.

### FORD-KELLY'S SHORT TERM DISABILITY LEAVE AND SUBSEQUENT FMLA LEAVE

23.    Beginning in December 2008, Plaintiff began experiencing debilitating migraines and frequent dizzy spells, which were qualifying events for a short term disability and precluded her from operating in any work function.

24.    Consequently, Plaintiff took a leave of absence and was placed on "Disability Leave of Absence (DLOA) as [she was] not eligible for Family Medical Leave (FML)" in accordance with Defendant's short term disability (STD) program.

25.    Plaintiff was approved for short term disability leave until March 6, 2009, at which point she would be placed on FMLA leave because by that point she had been employed for the requisite twelve months and therefore qualified for FMLA leave pursuant to statute.

26.    As part of the approval process for the DLOA, Mr. Bennion (human resources) of Defendant required Plaintiff to complete the "Non-FMLA Disability Leave of Absence Request. ("*Please complete and return the attached DLOA form to me in the Bothell office*.")

27.    Ford-Kelly completed and executed the required form, which explicitly states that she would "**return to same position, at same rate of pay**" upon her reinstatement. (Emphasis supplied)

28.    On April 16, 2009 (the day Defendant's discovered Plaintiff's reports of malfeasance), while Plaintiff was still on her FMLA leave, she visited Defendant's office and advised Mr. Lywood and Darin Miller (her supervisor) that she would be obtaining a physician's note on April 20, 2009 that would enable her to return to work. During her visit to the office, Plaintiff noticed that another employee had moved into her workspace.

29.    As promised, on April 20, 2009 Plaintiff delivered the physician's note to Mr. Miller.  She noticed that her computer had been removed from her workspace, and all of her credentials and certificates were missing.  Plaintiff's computer was in Mr. Lywood's office.   Mr. Miller advised that Plaintiff could use Sean Anderson's workspace the following day when she returned for work because Mr. Anderson was on disability leave as well.  On the same day, Plaintiff telephoned Mr. Bennion, advised him of the physician's note, and he deceitfully welcomed her back despite the fact Mr. Bennion had already arranged for Plaintiff's termination.

**AMEC'S THEFT OF FORD-KELLY'S CREDENTIALS, CONCURRENT ILLEGAL TERMINATION AND BRIBERY**

30.    At 7:30 a.m. on Tuesday, April 21, 2009, Plaintiff arrived at Defendant's offices ready to resume her work duties at her same rate of pay.  Plaintiff immediately went to Mr. Anderson's workspace and unsuccessfully attempted to log into the computer system.  After the IT department advised that she was locked out of the

system, she went to Mr. Miller's office to report this.    Mr. Miller then asked Mr. Lywood to join them in the former's office.

31.    Mr. Lywood immediately advised Plaintiff that Defendant was "letting you go" due to the "economic downfall" and presented her with duplicate originals of the following two documents:

      a.    4-21-09 Correspondence from Mr. Lywood to Plaintiff "confirm[ing] our conversation in which you were informed that effective April 21, 2009, your employment with AMEC Earth & Environmental will cease".

      b.    4-21-09 Separation and Release Agreement executed by Mr. Lywood offering Plaintiff two weeks' severance pay in exchange for her release of any and all claims.

32.    In addition to presenting Plaintiff with the two aforementioned documents, Mr. Lywood showed Plaintiff all of her original credentials on his desk and presented her with an unmarked envelope stuffed with cash.  Mr. Lywood advised that she would get "that back" (meaning her credentials) if she signed the Separation Agreement and accepted the undisclosed cash bribe on top of the two-week severance payment called for in the Agreement.

33.    Mr. Lywood promised to return Plaintiff's credentials only if she signed the Separation Agreement and accepted the cash bribe.

34.    Strangely, Mr. Lywood further advised that Plaintiff was eligible for rehire.

35.    Plaintiff inquired whether she would be paid the balance of her contract since her employment with Defendant was terminated through no fault of her own after the three-month probationary period.

36.    Mr. Lywood advised he was unaware of any contract and advised that she telephone human resources.  Plaintiff refused to sign the Separation Agreement, refused to take the cash bribe and demanded the return of her credentials.  Mr. Lywood refused her request.

### FORD-KELLY'S DISCUSSION WITH BENNION AND THE DOCUMENTS RELATING TO HER UNLAWFUL TERMINATION

37.    Immediately following the meeting with Mr. Lywood, Plaintiff called Mr. Bennion to inquire whether Defendant would honor their contractual obligation to pay the balance on the fully executed employment contract.  Mr. Bennion stated that Plaintiff had used all of her FMLA leave and as a result, Defendant was not required to fulfill their obligation under the employment contract.  Mr. Bennion further advised that "we don't need you anymore."

38.    Mr. Bennion's decision to terminate Plaintiff came well before her actual termination.  Supra ("*deceitfully welcomed her back*").  The Employee Action Form, which was dated April 21, 2009 but entered into the relevant system by HR on April 17, 2009 (one day after Defendant discovered Plaintiff's reports of malfeasance), combined Plaintiff's termination with her return from FMLA:

## Employee Action Form

DATE 04-21-09                    EFFECTIVE DATE 04-21-098

-----------------------------------------------------------------

☒ Return from Leave of Absence    Date: 04-21-09

-----------------------------------------------------------------

☒    Involuntary Separation -- Layoff

Exhibit 2.

39.    The EAF form further states:

**Explanations/Notes:** Ms. Ford has been on an extended FMLA leave beginning on 12-16-08. She has medial approval to return to work tomorrow, 04-21-09. Since Ms Ford has been absent, her duties have been redistributed to other personnel, and there is no need to reinstate her subsequent to her leave. She is being laid off coincidental with her return.

Id.

40.    The EAF notes are intentionally and obviously erroneous because it was impossible for Plaintiff to begin FMLA leave on December 16, 2008 because at that time she had not been employed for a period of twelve months. The notes are also salient because the fact that she is "being laid off coincidental with her return" demonstrates Defendant did not put her into the same or equivalent position upon her return from FMLA leave.

41.    In seeking management's approval to terminate Plaintiff, Mr. Bennion wrote the following e-mail to management:

**From:** Bennion, David B
**Sent:** Monday, April 20, 2009 4:39 PM
**To:** Peterson, David E; Brickey, William J; Galchenko, Maya I
**Cc:** Leon, Lisa; Cleland, Teresa L; Knott, Melinda R
**Subject:** Stacy ford Layoff APPROVAL NEEDED
**Importance:** High

Hello:

I am attaching an EAF for the layoff of Stacy Ford. Stacy was slated for the 01-11-09 layoff, but since she was on an active FMLA leave, it was decided to hold off on her layoff until after she was allowed to return to full duty.

She will be returning to work tomorrow, and we want to do the layoff coincidental with her return to work. Stacy's work has been redistributed to several other people.

Stacy has exhausted her 12-week FMLA leave job protection, and thus we are not obligated to return her to work. Since her workload has already been reallocated, it makes sense to do this layoff at this time. Please respond to Melinda Knott, cc to me with an approval of this layoff. Please do this ASAP, as we need to generate the paperwork for the layoff today. Thank you.


Dave Bennion
SW Region HR Manager
Mesa, AZ
480-648-5331

42.    The strategically factual inaccuracies are abounding in this e-mail. For example, Mr. Bennion advises that Plaintiff was on active FMLA leave as of January 11, 2009. This is erroneous because at that time she was not eligible for FMLA leave. She was on short term disability leave as late as March 13, 2009. Mr. Bennion thereafter supports the employment termination by this factual inaccuracy. ("*Stacy has exhausted her 12-week FMLA leave job protection, and thus we are not obligated to return her to work*") (emphasis supplied). In the e-mail, Mr. Bennion further confirms that at no time did Defendant intend on reinstating her to her same job or an equivalent job. ("*[W]e*

*want to do the layoff coincidental with her return to work*") (emphasis added); ("*Stacy's work has been redistributed to several other people*") (emphasis added).

43.    Since Plaintiff's termination, she has been actively seeking alternative, replacement employment to no avail due to the economy, Defendant's disparaging, public comments about her, Defendant's blacklisting, and Defendant's theft of her original transcripts and credentials.

**THE 1099; FORD-KELLY ACCEPTANCE OF THE OFFER; DETRIMENTAL RELIANCE AND FRAUD**

44.    After Defendant's unlawful termination of Plaintiff's employment, Plaintiff commenced suit in the Mojave County Superior Court under cause number CV 201007063 seeking damages in the amount of $25,000,000.00.

45.    On or about January 31, 2011, Plaintiff received from Defendant a Form 1099 which is reproduced below:



46. <u>The 1099 was sent from Defendant's Washington State office on January 29, 2011:</u>



47. <u>Plaintiff understood the 1099 to represent a confirmation of a settlement or, at a minimum, an offer of settlement. Plaintiff advised the Mojave Superior Court of the Settlement as follows:</u>

///

///

///

///

///

///

///

///

FILED
TIME 4:30 M

APR 6 2011

WESLYNN TRINNELL
CLERK SUPERIOR COURT
BY: _____ DEPUTY

Stacy D. Ford-Kelly
1561 Mohican Dr
Lake Havasu City, AZ 86406
928-505-4963
Plaintiff Pro Per

## SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MOHAVE

|  |  |
|---|---|
| STACY D. FORD-KELLY,<br>Plaintiff<br><br>v.<br><br>AMEC EARTH & ENVIRONMENTAL, INC.,<br>Defendant | Case No: CV-2010-07063<br><br>NOTICE |

COMES NOW, Stacy D. Ford-Kelly, in pro per to give the Court Notice of Partial Settlement received by her on January 31, 2011 in the form of IRS 1099-MISC (Exhibit 1). This Settlement has not been paid by the IRS to Plaintiff and her taxes were filed on February 26, 2011(Exhibit 2).

Respectfully submitted this 06 day of April 2011.

Stacy D. Ford-Kelly, Plaintiff

### OATH OR AFFIRMATION

STATE OF ARIZONA        )
                                           )ss.
County of Mohave        )

I, Stacy D. Ford-Kelly, declare under penalty of perjury that the information contained herein is true and correct to the best of my knowledge and belief.

Stacy D. Ford-Kelly, Plaintiff                                    04/06/2011
                                                                                      Date

Subscribed, sworn to (or affirmed) before me on this 6 day of April 2011.

By: Stacy D. Ford-Kelly

My commission Expires: _____                    Deputy Clerk / Notary Public

−17−

48.    <u>Plaintiff subsequently, through counsel, affirmed the acceptance of the settlement.</u>

49.    <u>Plaintiff relied on the Form 1099 and reported the "income" on her tax returns to the IRS.</u>

50.    <u>Subsequently, the IRS sanctioned and fined Plaintiff for reporting this income because Defendant had not tendered the $25,000,000.00 to the IRS as misrepresented on the 1099 form.</u>

## COUNT ONE
### (Breach of Employment Contract)

51.    Plaintiff realleges all allegations heretofore set forth.

52.    Plaintiff and Defendant entered into the employment contract for a fixed term of years.

53.    Defendant breached the employment contract.

54.    Plaintiff has been damaged in the amount of $480,702.76 trebled to $1,442,108.28 pursuant to A.R.S. §§ 23-353, 23-355.

55.    Plaintiff further claims special and consequential damages, including but not limited to costs associated with moving to Lake Havasu City from Boise, Idaho, the loss of companionship of her husband and children, the postponement of her studies in the Boise State Master's program and other damages to be determined as the investigation progresses.

56.    This claim arises out of contract thereby entitling Plaintiff to an award of attorney's fees pursuant to ARS § 12-341.01.

WHEREFORE, Plaintiff prays for judgment on this count as follows:

A. For damages in the sum of $480,702.76 trebled to $1,442,108.28 pursuant to statute; and

B. For special and consequential damages in an amount to be proven at trial; and

C. For an award of attorney's fees pursuant to ARS § 12-341.01; and

D. For costs incurred in this action; and

E. For such other and further relief as the Court may deem just and proper.

## COUNT TWO
### (Breach of Covenant of Good Faith and Fair Dealing – Employment Contract)

57.    Plaintiff realleges all allegations heretofore set forth.

58.    The contract between Plaintiff and Defendant contained a covenant of good faith and fair dealing as a matter of law, which provides that neither party would do anything to impede the benefits of the contract to the other.

59.    Defendant breached the covenant of good faith and fair dealing.

60.    Plaintiff further claims special and consequential damages, including but not limited to costs associated with moving to Lake Havasu City from Boise, Idaho, the loss of companionship of her husband and children, the postponement of her studies in the Boise State Master's program and other damages to be determined as the investigation progresses.

61.    This claim arises out of contract thereby entitling Plaintiff to an award of attorney's fees pursuant to ARS § 12-341.01.

WHEREFORE, Plaintiff prays for judgment on this count as follows:

A. For damages in the sum of $480,702.76 trebled to $1,442,108.28 pursuant to statute; and

B. For special and consequential damages in an amount to be proven at trial; and

C. For an award of attorney's fees pursuant to ARS § 12-341.01; and

F. For costs incurred in this action; and

G. For such other and further relief as the Court may deem just and proper.

## COUNT THREE
### (Civil Extortion)

62.    In Arizona, extortion or attempted extortion ("extortion") is a predicate offense to racketeering. Accordingly, it provides a private cause of action. *MacCollum v. Perkinson*, 185 Ariz. 179, 913 P.2d 1097, 211 Ariz. Adv. Rep. 44 (App.1996)

63.    Defendant committed extortion as that term is defined by statute (A.R.S. 13-1804) and by common law.

64.    Defendant committed extortion under either definition by attempting to obtain money or benefit by means of a threat.

65.    Defendant's extortion harmed Plaintiff.

66.     Defendant conduct was particularly egregious and malicious in that Defendant intended to cower Plaintiff, cause Plaintiff to become fearful of the consequences of the extortion, and intentionally cause Plaintiff emotional distress.

WHEREFORE, Plaintiff prays for judgment as follows:

A. For judgment on this count in an amount to be proven at trial; and

B. For punitive damages in an amount sufficient to deter Defendant and others in Defendant's position from repeating extortionate behaviour, but in no event less than sufficient to deter this and other similarly situated employers from engaging in like conduct; and

C. For such other and further relief as the Court may deem just and proper.

**COUNT FOUR**
**(FMLA)**

67.     Plaintiff realleges all allegations heretofore set forth.

68.     Plaintiff is a covered employee who was employed for at least 1,250 hours and for a period of twelve months when she was converted to FMLA leave.

69.     Prior to the expiration of her twelve-week leave, Plaintiff returned to work and was terminated by Defendant and therefore was not put into her same position or equivalent position at the same rate of pay.

70.     Defendant's termination of Plaintiff upon her return from FMLA leave was done in bad faith for the reasons set forth herein and Defendant had no reasonable grounds for believing its termination of Plaintiff was not a violation.

71.    As a result of Defendant's unlawful termination, Plaintiff was damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment as follows:

A. For backpay, front pay and liquidated damages in an amount to be proven at trial;

B. For attorneys' fees and costs of suit;

C. For other economic damages available to Plaintiff at law and as the Court deems just and appropriate.

## COUNT FIVE
### (Breach of Settlement Agreement)

72.    Plaintiff realleges all allegations heretofore set forth.

73.    Plaintiff and Defendant entered into a settlement agreement for $25,000,000.00.

74.    Defendant did not pay the settlement amount, causing Plaintiff damages in the amount of $25,000,000.00.

75.    This claim arises out of contract entitling Plaintiff to an award of attorney's fees pursuant to ARS § 12-341.01.

WHEREFORE, Plaintiff prays for judgment on this count as follows:

A. For damages in the sum of $25,000,000.00; and

B. For special and consequential damages in an amount to be proven at trial; and

C. For an award of attorney's fees pursuant to ARS § 12-341.01; and

D. For costs incurred in this action; and

E. For such other and further relief as the Court may deem just and proper.

## COUNT SIX
### (Promissory Estoppel)

76.    Plaintiff realleges all allegations heretofore set forth.

77.    Defendant's statement in its Form 1099 represents a promise which Defendant should have reasonably expected to induce action or forbearance on the part of the Plaintiff.

78.    The Form 1099 induced Plaintiff to rely on the Form 1099 and reported the Form 1099 to the IRS in her tax filings.

79.    Form 1099 is clear and unambiguous in its terms.

80.    Plaintiff actually relied on Form 1099.

81.    Plaintiff's reliance was both reasonable and foreseeable.

82.    Plaintiff has been damaged by her reliance.

83.    This matter arises out of contract entitling Plaintiff to reasonable attorney's fees pursuant to A.R.S. § 12-341.01.

WHEREFORE, Plaintiff prays for judgment on this count as follows:

A. For damages in the sum of $25,000,000.00; and

B. For special and consequential damages in an amount to be proven at trial; and

C. For an award of attorney's fees pursuant to ARS § 12-341.01; and

D. For costs incurred in this action; and

E.  For such other and further relief as the Court may deem just and proper.

## COUNT SEVEN
### (Fraud – 1099)

84.     Plaintiff realleges all allegations heretofore set forth.

85.     Form 1099 contained material statements of fact, to wit, that the dispute between the parties has been settled for $25,000,000.00 and that the settlement amount of $25,000,000.00 has been withheld by Defendant.

86.     Defendant's statements on Form 1099 were false when made.

87.     Defendant's statements on Form 1099 were knowingly false when made.

88.     Defendant made the false statements on Form 1099 for the express purpose of having Plaintiff rely thereon.

89.     Plaintiff justifiably relied on Defendant's false statements, all to her damage.

WHEREFORE, Plaintiff prays for judgment on this count as follows:

A.  For damages in the sum of $25,000,000.00; and

B.  For special and consequential damages in an amount to be proven at trial; and

C.  For costs incurred in this action; and

D.  For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial pursuant to Rule 38.

RESPECTFULLY SUBMITTED this 27th day of August, 2012.

**PETER STROJNIK, P.C.**

_____
Peter Strojnik
Attorney for Plaintiff

1
2
3
4
## VERIFICATION

5
6       I verify that I have reviewed the above allegations and that to the best of my
knowledge, information and belief, the same is true and correct.

7
8   Stacy Ford-Kelly                          Date  8/21/12
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 1

amec

January 21, 2008

*Private & Confidential*

Stacy Ford
1720 Dearborn St. #4
Caldwell, ID 83605

Dear Ms. Ford,

On behalf of AMEC Infrastructure (AMEC), I am pleased to offer you the position of Design Engineer, reporting to me in the Lake Havasu, AZ office, effective January 28, 2008. If you need to change the date, we will be pleased to discuss one that is mutually acceptable.

The following will outline the terms and conditions of employment:

**Compensation Agreement**

- Status – Exempt; Contracted and salaried full-time employee.
- Contract of employment beginning January 28, 2008 and expires December 31, 2013.
- Starting salary is $2,384.62 payable on a bi-weekly basis, which annualizes to $62,000.12.
- Salary to increase to $85,000.00 beginning January 1, 2010, ending December 31, 2013 with a 2.25% annual minimum cost of living increase beginning January 1, 2011.
- The balance of monetary compensation of this contract due to you shall be paid in full within three business days if employment with AMEC ceases due to no fault of your own and is initiated by AMEC after the three-month probationary period. Balance of compensation is to include any accrued and future benefits ending December 31, 2013 for both vacation time and sick leave as outlined below. If such action takes place by AMEC you will also receive payment equivalent to 18 months of COBRA costs which will be included with the balance of this contract compensation due to you. If the remainder of contract is less than 18 months COBRA costs to be paid will be adjusted accordingly.
- You will receive a relocation allowance in the amount of $4,500.00 – the terms of this allowance are attached. Please sign and return with this employment agreement.

**Benefits**

Enclosed, please find the *Choices* Benefits Package that explains the benefits currently offered to AMEC regular, full-time employees. Upon your employment you will be immediately eligible for:
- Health insurance coverage, including medical, vision, dental and prescription drug.
- Participation in AMEC's 401(k) program.
- Flexible Spending Account.
- Employee Assistance Plan.
- Short Term Disability, Long Term Disability, Life Insurance, Accidental Death & Dismemberment Insurance.
- You will accrue annual vacation leave at a rate of 15 days per year or 4.62 hours bi-weekly.
- Holidays – AMEC observes 7 holidays per year plus 3 floating holidays throughout the year, the details of which are provided in the Employee Handbook.

**Background Screening and Employment Documentation**

It is AMEC's policy to provide a safe and secure work environment for both our employees and our clients. To that end it is the policy of AMEC that all offers of employment are contingent upon the successful completion of a background screening, drug screening and educational credentials

AMEC Infrastructure
94 Acoma Blvd South # 100
Lake Havasu City, AZ 86403
Phone: 928-854-8030
Fax: 928-854-8036                    www.amec.com

confirmation (where applicable). If any of the screenings returned are found to be in conflict with AMEC's policy we will discuss the results with you and determine if employment will continue. All screenings will be conducted within the guidelines of all state and federal legislation.

Employees are required to complete the Employment Eligibility Verification Form (I-9) attesting to their employment eligibility and must provide documentation to support their statement. Examples of acceptable proof of employment eligibility include a U.S. Passport, or both a valid State Driver's License and Social Security Card. Please bring these documents with you on the first day of your employment. If you do not have the documents mentioned you may contact the Human Resources Department for further information.

### Probationary Period and Employment Termination

AMEC has a three-month probationary period for all newly hired contracted and non-contracted regular, full-time and part-time employees during which time an employee's work performance and/or general suitability for AMEC employment will be evaluated. While we are confident that your employment with us will be a positive and mutually rewarding experience please understand that your employment, both during and after the probationary period, is not guaranteed for any specific amount of time and is terminable at will, which means that either you or AMEC may end the employment relationship at any time for any reason. Your employment relationship with AMEC is not terminable at will after the three-month probationary period if a contract of employment is outlined within the Compensation Agreement section on the first page of this offer of employment and will be in accordance with the Compensation Agreement.

### Severability

If any part of this offer of employment is held to be invalid, illegal, or unenforceable, the remaining provisions of this agreement will be enforced.

Further information regarding AMEC, its policies and programs will be provided during your orientation. Upon acceptance of the above and enclosed, please sign and return the enclosed copy of this letter, a completed application for employment and any other enclosed documents within seven business days to the Lake Havasu, AZ location. Please feel free to contact me should you have any questions.

We look forward to having you join us and wish you much success in your new position.

Sincerely,
**AMEC Infrastructure, Inc.**

**Chris Hassett**
**Unit Manager – Lake Havasu, AZ**

I have read and accept the offer of employment contained in this letter, including the referenced attachments.

_January 21, 2008_
Date

Employee Signature

-29-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

## Earth & Environmental
### Employee Action Form



| DATE 04-21-09 | EFFECTIVE DATE 04-21-098 | UNIT 6712D | EMPLOYEE NO. 506536 |
|---|---|---|---|

**NAME OF THE EMPLOYEE** Stacy Ford
EMAIL ADDRESS stacy.ford@amec.com                    New Hire ☐ Rehire ☐ -enter 1st day worked ☒ Term)

### New Hires/Offer Proposal Information (Mark off all applicable boxes)

Level Title _____
Job Title _____
☐ Regular, Full-Time (24 - 40 hr/wk)
☐ Temporary, Full-Time (24 - 40 hrs/wk -- Max. 6 mo.)*
☐ Regular, Part-Time (Max. 23 hr/wk)*
☐ Temporary, Part-Time (Max. 23 hr/wk -- Max. 6 mo.)*
☐ On-Call (no set schedule or hours / no benefits)  *not eligible for Choices benefits
Vacation Exception: ☐ 3 weeks ☐ 4 weeks
*Please attach applicant resume or application

Work Location _____
Hours/week _____
☐ Exempt (salaried)    ☐ Nonexempt (hourly)
Pay $_____ (biweekly if exempt / hourly if nonexempt)
Unit Billable (average 70% unit pricing work) ☐ Yes  ☐ No
Timesheet Approver /Supervisor _____
Participation in: ☐ Driving Program ☐ Medical Surv. Program
☐ Signing Bonus: $_____  ☐ Moving Allowance: $_____

### Changes (Mark off all applicable boxes)

☐ New Level Title _____
☐ New Location _____
☐ New Unit _____
☐ Regular  or  ☐ Temporary
☐ PT to FT (24 - 40 hr/wk) _____hrs/wk
☐ FT to PT (Max. 23 hr/wk / no benefits) _____hrs/wk
☐ FT/PT to On-Call (no set schedule or hours / no benefits).
   ☐ Employee requested or ☐ Employer requested, if due to lack of work contact HR

☐ New Job Title _____
☐ New Supervisor/Manager _____
☐ New Timesheet Approver _____
☐ Exempt to Nonexempt
☐ Nonexempt to Exempt (attach job description; prior HR approval)
☐ New Hours per Week _____
☐ On-Call to FT or PT (circle one) _____ hrs/wk

☐ Base Pay Change   Current Pay $_____           New Pay $_____      (biweekly if exempt / hourly if nonexempt)
Reason for Change**  ☐ Merit Increase  ☐ Promotion  ☐ Market Adjustment      _____% Increase
** Attach appropriate documentation (i.e., market data if this is a adjustment) or else explanation in area below

### Leave of Absence (Start -- use first day not working. Return -- use first day back. Attach appropriate documentation)

☐ Start Leave of Absence    Date: _____      Type: ☒ FMLA    ☐ Military
☒ Return from Leave of Absence  Date: 04-21-09          ☐ Personal    ☐ Lack of Work (Temporary Layoff)

### Terminations (Attach resignation letter/form. For separations attach documentation and final timesheets.)

☐ Resignation
☐ Involuntary Separation -- Term with cause
☒ Involuntary Separation -- Layoff

Separation Code _IO_   (reference leave codes)
Eligible for rehire? ☒ Yes or ☐ No  (If No is checked, please attach or provide explanation)

**Explanations/Notes:** 2weeks Sev. / 1mo COBRA 1379.46* Ms. Ford has been on an extended FMLA leave beginning on 12-16-08. She has medial approval to return to work tomorrow, on 04-21-09. Since Ms Ford has been absent, her duties have been redistributed to other personnel, and there is no need to reinstate her subsequent to her leave. She is being laid off coincidental with her return.

* Dental F/F 120.82, + OAP IND F/F 1240.93 + Vision E+F _____ 77H

| AUTHORIZATIONS | WHEN REQUIRED | SIGNATURE | DATE |
|---|---|---|---|
| Unit Manager | All Changes | Nilywood | April 20, 2009 |
| Area Manager | See Limits of Authority | attached | |
| Regional Manager | See Limits of Authority | | |
| Human Resources | Reviews All Changes; Concurrence per Limits of Authority | attached | |
| Exec. Vice- President | See Limits of Authority | | |

| For Office Use Only: revised March 2006 | Billing Class Code _____ | EEO Code _____ |
|---|---|---|
| ☐ New Hire  ☐ Promotion | ENTERED BY HR  254 Title | Headcount Title _____ |
| ☐ Rehire  ☐ Other | APR 1 7 2009 Accrual Rate _____% | Continued Service date _____ |

| HR/Payroll Use Only | HR Initial AO | ADP Initial | RCT Initial |
|---|---|---|---|