Peter Strojnik, Esq. – Arizona Bar No. 006464
Peter Kristofer Strojnik, Esq. – Arizona Bar No. 026082
2415 East Camelback, Suite 700
Phoenix, Arizona 85016
Telephone: 602-524-6602; 602-510-9409
Facsimile: 602-296-0135; 602-532-7572
E-mail: ps@strojnik.com,
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| STACY D. FORD-KELLY, ) | NO.  3:12-CV-08085-NVW |
| ) | |
| Plaintiff, ) | **FIRST AMENDED COMPLAINT** |
| vs. ) | |
| ) | |
| AMEC ENVIRONMENT & ) | |
| INFRASTRUCTURE, INC., a Nevada ) | |
| corporation *fka* AMEC EARTH & ) | |
| ENVIRONMENTAL, INC. *fka* AMEC ) | |
| INFRASTRUCTURE, INC.; AMEC ) | **JURY TRIAL DEMANDED** |
| PLC, a British Company, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## SUMMARY OF ACTION

1) In January of 2008, the parties entered into a 6 year employment contract. Exhibit 1.

2) Plaintiff worked as a design engineer on a $5 million taxpayer funder Lake Havasu City Wastewater Treatment Plant. During the term of her employment, Plaintiff found out that Defendant was overestimating material quantities and

pricing and recklessly miscalculating sewage drainage slopes. She brought these matters to the attention of Defendant, but Defendant took no corrective action. In early 2009, Plaintiff was placed upon FMLA but, upon her return on April 21, 2009, her employment was terminated.

3) Subsequently to her termination, Defendant created a fraudulent "employment agreement" in defense to Plaintiff's demand for payment on the remainder of her contract. Exhibit 2.  Creation of documents for financial gain is a historically established business model for Defendant.  On numerous occasions,  Defendant who has been found guilty, liable or responsible for fraud against the United States, for presenting false and fraudulent bond claims, for creating and submitting falsified invoices, for creating and submitting false documents and false statements and for kickbacks and in various Federal Courts in the United States and in Great Britain.

4) Subsequent to termination, Defendant issued an IRS form 1099 indicating that its dispute with Plaintiff had been settled for $25,000,000.00.  Plaintiff accepted the settlement, but the settlement was never paid.

5) Plaintiff brings the following claims: (1) breach of the employment agreement, (2) breach of the implied covenant of good faith and fair dealing, (3) civil extortion, (4) FMLA, (5) Breach of the Settlement Agreement, (6) Promissory Estoppel, (7) Fraud (8) Extrinsic and Intrinsic Fraud, (9) Civil Scheme or Artifice to Defraud,

(10) Asserting False Claims, (11) Pattern of Unlawful Activity in Violation of State Statute A.R.S. 13-2314.04, (12) Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and (13) Defamation.

## PARTIES AND JURISDICTION

6) Plaintiff Stacy Ford-Kelly is a married woman residing in Lake Havasu City, Arizona.

7) Defendant AMEC Environment and Infrastructure, Inc., *formerly known as* AMEC Earth & Environmental, Inc., *formerly known as* AMEC Infrastructure, Inc., is a Nevada corporation doing business in the State of Arizona. AMEC Environment and Infrastructure, Inc., *formerly known as* AMEC Earth & Environmental, Inc., *formerly known as* AMEC Infrastructure, Inc., are purported divisions of AMEC, PLC, ,which is a company organized under the laws of the United Kingdom. Defendant parties are cumulatively referred to as "Defendant".

8) This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1332.

9) Venue is proper in this Court.

## ALLEGATIONS COMMON TO ALL COUNTS

**DEFENDANT'S *MODUS OPERANDI* RELATING GENERALLY TO PLAINTIFF'S COUNTS 8, 9, 10, 11 AND 12.**

10)     Plaintiff hereafter makes a claim for fraud (extrinsic and intrinsic), a civil cause of action for fraudulent schemes or artifices, false claims, a pattern of

unlawful activity in violation of state statute and racketeer influenced and corrupt organizations act (RICO), 18 U.S.C. §§ 1961-1968, and makes the following allegations relative to Defendant's conduct which demonstrates a substantial similarity in purpose, modus operandi, the methods of wrongful commissions and distinguishing characteristics of the Defendant's enterprise, underlying predicate offenses and common external organizing principle including the affairs of the entire AMEC enterprise.

11)    AMEC's business model permits, encourages and authorizes creation of documents and assertion of false claims based on created documents for financial benefit. Defendant's creation of false documents and assertions of false claims for the purposes of this First Amended Verified Complaint (all of which shall be supplemented and further disclosed during the discovery process) Plaintiff references criminal convictions, civil judgments and governmental agency findings, all of which are continuous or exhibit the threat of being continuous, and the last of which occurred within 5 years within the last act of racketeering activity including, but not limited to:

a.    USA v. AMEC in which Defendant pled guilty to presenting false and fraudulent bond claims to the US Government in the construction of the federal courthouse in St. Louis using falsified invoices, false documents and false statements; and

b. USA v. AMEC in which Defendant pled guilty to presenting falsified invoices to US Government in AMEC's construction of a federal courthouse in California. AMEC front-loaded over 2 million dollars in contract value using falsified invoices, false documents and false statements; and

c. USA v. AMEC, Eastern District of California cause number Case No. 2:01-cr-00502, in which the Court entered criminal judgment for violation of 18 U.S.C. § 1031(major fraud against the United States); and

d. USA v. AMEC, U.S. Court of Federal Claims Case No. 99-279C, in which the Court entered Summary Judgment against Defendant under the False Claims Act and Anti-Kickback Act counts for a total judgment of $7,292,213.00; and

e. USA v. AMEC in which the United States Government recovered $19 million for AMEC's fraud, false claims and kickbacks relating to AMEC's construction and remodeling of four federal courthouses; and

f. United Kingdom Serious Fraud Office in which UK Government settled with AMEC in the amount of £4.9 million for AMEC's "irregular receipts" relating to their construction of a bridge in Korea; and

g. Creation of a false and fraudulent "letter agreement" ostensibly dated January 21, 2008 and supposedly signed by Plaintiff ("Fraudulent Agreement") (Exhibit 2); and

h. Extortion against Plaintiff as more fully alleged below; and

i. Assertion of false claims against Plaintiff as more fully alleged below; and

j. A scheme or artifice to defraud as more fully alleged below; and

k. Others instances of predicate offenses to be disclosed during the discovery process.

**CONTRACT OF EMPLOYMENT**

12)    In or around January 2008, Plaintiff Ford-Kelly came into contact with Chris Hassert, the Unit Manager of Defendant's Lake Havasu, Arizona office. Mr. Hassert invited Plaintiff to Lake Havasu for an interview for Defendant's open design engineer job.

13)    On January 21, 2008, Mr. Hassert delivered to Ms. Ford-Kelly an offer of employment effective January 28, 2008.

14)    The employment contract was for a term of six (6) years.  Exhibit 1. Pursuant to the terms thereof, if Plaintiff's employment was terminated "due to no fault of your own" and is "initiated by AMEC after the three-month probationary period", Plaintiff is due the balance of the employment contract within three business days of termination, to wit:

> - The balance of monetary compensation of this contract due to you shall be paid in full within three business days if employment with AMEC ceases due to no fault of your own and is initiated by AMEC after the three-month probationary period. Balance of compensation is to include any accrued and future benefits ending December 31, 2013 for both vacation time and sick leave as outlined below. If such action takes place by AMEC you will also receive payment equivalent to 18 months of COBRA costs which will be included with the balance of this contract compensation due to you. If the remainder of contract is less than 18 months COBRA costs to be paid will be adjusted accordingly.

15) After receipt of the offer, Plaintiff immediately executed the letter agreement, Exhibit 1, and relocated to Lake Havasu, Arizona.

16) In order to accept Defendant's offer of employment, Plaintiff was separated from her children to support her family. During her first two months working as a design engineer for Defendant, Plaintiff lived out of hotel rooms. In further reliance on the six-year employment term, Plaintiff formally withdrew from Boise State University's Master's program thereby postponing her graduate studies in civil engineering.

**LAKE HAVASU CITY SEWER PROJECT AND FORD-KELLY'S EXEMPLARY JOB PERFORMANCE**

17) The Lake Havasu Sewer Project was a $500 million taxpayer-funded project encompassing the complete design and implementation of a new sewer system in Lake Havasu. Defendant was charged with the design of a sewer system directing all waste on a slope to the water treatment plant, which would then of course treat the waste into gray water for irrigation, seepage into the Earth or release into Lake Havasu or other bodies of water. As a design engineer, Plaintiff was charged with using Geographic Information System and three-

dimensional modeling to design the sewer system. She was also charged with overseeing the drafters and inspecting in the field.

18)    Plaintiff's pre-disability leave employment was exemplary, and she was given a raise on January 5, 2009. Defendant found Plaintiff to be a "significant part of [Defendant's] success in 2008 and look[ed] forward to [Plaintiff's and Defendant's] continued collaboration as we move into 2009")

19)    During the term of her employment with Defendant, Plaintiff learned that Defendant engaged in intentional overestimating of material quantities and reckless miscalculations of drainage slopes on the Lake Havasu Sewer project. Plaintiff was aware that overestimation is illegal and fraudulent and that miscalculation of drainage slopes would cause widespread sewer problems. Accordingly, Plaintiff initially advised her supervisors of the problems with the construction contract, plans, specifications and performance. Defendant took no action to rectify these problems. Thereafter, Plaintiff made formal disclosures of Defendant's malfeasance to the authorities, including the Criminal Division of the EPA, Arizona Department of Environmental Quality and the Arizona Board of Professional Registrants.

20)    Plaintiff's complaints of design errors that led to overpriced construction costs/bid rigging are supported by the oversight engineering firm RCI, Inc.:

a. The first incident was notifying superior Nick Bokaie via telephone and then reiterated in an email dated August 28, 2008 that Plaintiff had discovered Defendant inspectors missed serious errors in the plans during construction of the Hillside Area of Lake Havasu City Wastewater Expansion Project that had already been completed. When Plaintiff brought her findings to her immediate supervisor, Darin Miller, he just said "Not good" and that there wasn't much we could do about it. The design errors were in violation of Arizona Department of Environmental Quality (ADEQ) minimum slope design requirements/standards.

b. The second incident occurred October 6, 2008 when Plaintiff had notified superior Nick Bokaie, whose PE stamp was on all documents and construction plans, via email, that her immediate supervisor, Darin Miller, was insisting that the Engineering Report she was preparing for the Neptune Area of the Lake Havasu City Wastewater Sewer Expansion Project be submitted to ADEQ with construction material quantities that were known by Darin Miller and Plaintiff to be incorrect. Plaintiff refused to submit the Engineering Report because it was unethical and illegal. Plaintiff also notified Nick Bokaie in the same email that the Issue for Bid (IFB) plans and quantities in the Bid Package, which were to be included in the ADEQ submittal with the Engineering Report, had already been submitted to the

Lake Havasu City Public Works Department and were currently being advertised for bid.

    c.   On or about November 10, 2009, Plaintiff also made an oral report of Defendant's malfeasance at the Lake Havasu City Council Meeting.

21)    On April 16, 2009 Plaintiff's immediate supervisors discovered that Plaintiff had lodged formal complaints as indicated above. Upon information and belief, Defendant took no actions to rectify these problems.

**FORD-KELLY'S SHORT TERM DISABILITY LEAVE AND SUBSEQUENT FMLA LEAVE**

22)    Beginning in December 2008, Plaintiff began experiencing debilitating migraines and frequent dizzy spells, which were qualifying events for a short term disability and precluded her from operating in any work function.

23)    Consequently, Plaintiff took a leave of absence and was placed on "Disability Leave of Absence (DLOA) as [she was] not eligible for Family Medical Leave (FML)" in accordance with Defendant's short term disability (STD) program.

24)    Plaintiff was approved for short term disability leave until March 6, 2009, at which point she would be placed on FMLA leave because by that point she had been employed for the requisite twelve months and therefore qualified for FMLA leave pursuant to statute.

25)    As part of the approval process for the DLOA, Mr. Bennion (human resources) of Defendant required Plaintiff to complete the "Non-FMLA Disability Leave of Absence Request. ("*Please complete and return the attached DLOA form to me in the Bothell office.*")

26)    Ford-Kelly completed and executed the required form, which explicitly states that she would "return to same position, at same rate of pay" upon her reinstatement.

27)    On April 16, 2009 (the day Defendant's discovered Plaintiff's reports of malfeasance), while Plaintiff was still on her FMLA leave, she visited Defendant's office and advised Mr. Lywood and Darin Miller (her supervisor) that she would be obtaining a physician's note on April 20, 2009 that would enable her to return to work. During her visit to the office, Plaintiff noticed that another employee had moved into her workspace.

28)    As promised, on April 20, 2009 Plaintiff delivered the physician's note to Mr. Miller. She noticed that her computer had been removed from her workspace, and all of her credentials and certificates were missing. Plaintiff's computer was in Mr. Lywood's office. Mr. Miller advised that Plaintiff could use Sean Anderson's workspace the following day when she returned for work because Mr. Anderson was on disability leave as well. On the same day, Plaintiff telephoned

Mr. Bennion, advised him of the physician's note, and welcomed her back despite the fact Mr. Bennion had already arranged for Plaintiff's termination.

**DEFENDANT'S TERMINATION OF PLAINTIFF'S EMPLOYMENT**

29)    At 7:30 a.m. on Tuesday, April 21, 2009, Plaintiff arrived at Defendant's offices ready to resume her work duties at her same rate of pay.    Plaintiff immediately went to Mr. Anderson's workspace and unsuccessfully attempted to log into the computer system.    After the IT department advised that she was locked out of the system, she went to Mr. Miller's office to report this.    Mr. Miller then asked Mr. Lywood to join them in the former's office.

30)    Mr. Lywood immediately advised Plaintiff that Defendant was "letting you go" due to the "economic downfall" and presented her with duplicate originals of the following two documents:

a.    4-21-09 Correspondence from Mr. Lywood to Plaintiff "confirm[ing] our conversation in which you were informed that effective April 21, 2009, your employment with AMEC Earth & Environmental will cease".

b.    4-21-09 Confidential Separation and Release Agreement executed by Mr. Lywood offering Plaintiff two weeks' severance pay in exchange for her release of any and all claims.

31)    In addition to presenting Plaintiff with the two aforementioned documents, Mr. Lywood showed Plaintiff all of her original credentials on his desk and

presented her with an unmarked envelope stuffed with cash.  Mr. Lywood advised that she would get "that back" (meaning her credentials) if she signed the Confidential Separation Agreement and Mutual Release and if she accepted an undisclosed cash bribe on top of the two-week severance payment called for in the Confidential Separation Agreement and Mutual Release.

32)      Plaintiff refused to sign the Confidential Separation Agreement and General Release or accept the cash bribe.

33)      Mr. Lywood promised to return Plaintiff's credentials only if she signed the Confidential Separation Agreement and Mutual Release and accepted the cash bribe.

34)      Mr. Lywood further advised that Plaintiff was eligible for rehire.

35)      Plaintiff inquired whether she would be paid the balance of her contract since her employment with Defendant was terminated through no fault of her own after the three-month probationary period.

36)      Mr. Lywood advised he was unaware of any contract and advised that she telephone human resources.  Plaintiff refused to sign the Confidential Separation Agreement and Mutual Release, refused to take the cash bribe and demanded the return of her credentials.  Mr. Lywood refused to return her credentials to her.

37)      Defendant violated the FMLA because her termination took place on the same day she returned to work from FMLA leave and that Defendant had no

intention of ever reinserting Plaintiff into her same or equivalent position upon her return from FMLA leave.

**FORD-KELLY'S DISCUSSION WITH BENNION AND THE DOCUMENTS RELATING TO HER UNLAWFUL TERMINATION**

38)     Immediately following the meeting with Mr. Lywood, Plaintiff called Mr. Bennion to inquire whether Defendant would honor their contractual obligation to pay the balance on the fully executed employment contract.  Mr. Bennion stated that Plaintiff had used all of her FMLA leave and as a result, Defendant was not required to fulfill their obligation under the employment contract.  Mr. Bennion further advised that "we don't need you anymore."

39)     Mr. Bennion's decision to terminate Plaintiff came well before her actual termination.  The Employee Action Form, which was dated April 21, 2009 but entered into the relevant system by HR on April 17, 2009 (one day after Defendant discovered Plaintiff's reports of malfeasance), combined Plaintiff's termination with her return from FMLA:

**Employee Action Form**

DATE 04-21-09 _____     EFFECTIVE DATE 04-21-098 ____

-----------------------------------------------------------------------

☒ Return from Leave of Absence    Date: **04-21-09** _____

-----------------------------------------------------------------------

☒     Involuntary Separation – Layoff

40)    The EAF form further states:

Explanations/Notes: Ms. Ford has been on an extended FMLA leave beginning on 12-16-08. She has medial approval to return to work tomorrow, 04-21-09. Since Ms Ford has been absent, her duties have been redistributed to other personnel, and there is no need to reinstate her subsequent to her leave. She is being laid off coincidental with her return.

41)    The EAF notes are intentionally and obviously erroneous because it was impossible for Plaintiff to begin FMLA leave on December 16, 2008 because at that time she had not been employed for a period of twelve months. The notes are also salient because the fact that she is "being laid off coincidental with her return" demonstrates Defendant did not put her into the same or equivalent position upon her return from FMLA leave.

42)    In seeking management's approval to terminate Plaintiff, Mr. Bennion wrote the following e-mail to management:

From: Bennion, David B
Sent: Monday, April 20, 2009 4:39 PM
To: Peterson, David E; Brickey, William J; Galchenko, Maya I
Cc: Leon, Lisa; Cleland, Teresa L; Knott, Melinda R
Subject: Stacy ford Layoff APPROVAL NEEDED
Importance: High

Hello:

I am attaching an EAF for the layoff of Stacy Ford.  Stacy was slated for the 01-11-09
layoff, but since she was on an active FMLA leave, it was decided to hold off on her
layoff until after she was allowed to return to full duty.

She will be returning to work tomorrow, and we want to do the layoff coincidental with
her return to work.  Stacy's work has been redistributed to several other people.

Stacy has exhausted her 12-week FMLA leave job protection, and thus we are not
obligated to return her to work.   Since her workload has already been reallocated, it
makes sense to do this layoff at this time.  Please respond to Melinda Knott, cc to me
with an approval of this layoff.  Please do this ASAP, as we need to generate the
paperwork for the layoff today.  Thank you.


Dave Bennion
SW Region HR Manager
Mesa, AZ
480-648-5331

43)      The statements and opinions expressed in the above e-mail are erroneous

and false.  For example, Mr. Bennion advises that Plaintiff was on active FMLA

leave as of January 11, 2009.  This is erroneous because at that time she was not

eligible for FMLA leave.  She was on short term disability leave as late as March

13, 2009.  Mr. Bennion thereafter supports the employment termination by this

factual inaccuracy.  ("*Stacy has exhausted her 12-week FMLA leave job

protection, and thus we are not obligated to return her to work*") (emphasis

supplied).   In the e-mail, Mr. Bennion further confirms that at no time did

Defendant intend on reinstating her to her same job or an equivalent job.  ("*[W]e*

*want to do the layoff coincidental with her return to work*") (emphasis added); ("*Stacy's work has been redistributed to several other people*") (emphasis added).

### POST TERMINATION EVENTS GIVING RISE TO CAUSES OF ACTION

44) Defendant terminated Plaintiff's employment on April 20, 2009.

45) On April 15, 2010, Plaintiff filed a pro-per complaint in the Mojave County Superior Court under cause number CV 2010-07063 seeking $25 million in damages.

46) This lawsuit was dismissed for failure to comply with Rule 8 of the Arizona Rules of Civil Procedure, with leave to amend.

47) On January 14, 2011, Plaintiff filed First Amended Complaint in the Mojave Superior Court and served Defendant's statutory agent, president and vice president.

48) By sworn declaration, Defendant claimed that it did not become aware of the Mojave County Superior Court action until it reviewed the Mojave County Superior Court website on January 28, 2011.

49) On the day following Defendant's "discovery" of the Mojave County lawsuit, on January 29, 2011, Defendant created and mailed to Plaintiff  IRS Form 1099 which is reproduced below:

50)    The 1099 was sent from Defendant's Washington State office on January 29, 2011:



51)    On March 3, 2011, Defendant filed a "Motion to Dismiss Plaintiff's First Amended Complaint with Prejudice for Fraud upon the Court and Other Grounds".

52)    Despite having an affirmative opportunity to do so, Defendant made no claim that the employment contract on which Plaintiff's claims are based was "fraudulent".

53)    On April 4, 2011, Plaintiff filed a Notice of Settlement based on IRS Form 1099 in the Mojave County Superior Court. Subsequently, Plaintiff, through counsel, affirmed the acceptance of the settlement.

54)    Plaintiff relied on the Form 1099 and reported the $25 million in "income" on her tax returns to the IRS.

55)    Subsequently, the IRS sanctioned and fined Plaintiff for reporting this income because Defendant had not tendered the $25,000,000.00 to the IRS as misrepresented on the 1099 form.

**DEFENDANT CREATED FALSE "EMPLOYMENT AGREEMENT"**

56)    On December 12, 2008, the Mojave Superior Court dismissed Plaintiff's pro-per Complaint with leave to refile.

57)    On March 3, 2012, Plaintiff refiled her pro-per Complaint in the Mojave County Superior Court under cause number CV2012-07021. On May 1, 2012, Defendant removed the action to the United States District Court.

58)    On July 7, 2012, Defendant filed its Answer in the current litigation. Defendant did not assert that the 6 year employment contract (Exhibit 1) was "fraudulent" as it asserts presently.

59)    Defendant's allegation of "fraud", if fraud truly existed, would have been pled pursuant to Federal Rules of Civil Procedure 8(b)(1)(A) (the responsive pleading must "state in short and plain terms its defenses to each claim asserted against it" and 8(c)(1) ("a party must affirmatively state any avoidance or affirmative defense, including…fraud").

60)    Plaintiff alleges that subsequently prepared (false) letter agreement (Exhibit 2) is a created document and that the creation of this document, upon information and belief, occurred after July 7, 2012.

## COUNT ONE
### (Breach of Employment Contract)

61)    Plaintiff realleges all allegations heretofore set forth.

62)    Plaintiff and Defendant entered into the employment contract for a fixed term of years.

63)    Defendant breached the employment contract.

64)    Plaintiff has been damaged in the amount of $480,702.76 trebled to $1,442,108.28 pursuant to A.R.S. §§ 23-355.

65)    Plaintiff further claims special and consequential damages, including but not limited to costs associated with moving to Lake Havasu City from Boise, Idaho, the loss of companionship of her husband and children, the postponement of her studies in the Boise State Master's program and other damages to be determined as the investigation progresses.

66)     This claim arises out of contract thereby entitling Plaintiff to an award of attorney's fees pursuant to ARS § 12-341.01.

## COUNT TWO
**(Breach of Covenant of Good Faith and Fair Dealing – Employment Contract and Settlement Agreement)**

67)     Plaintiff realleges all allegations heretofore set forth.

68)     The contracts between Plaintiff and Defendant contained a covenant of good faith and fair dealing as a matter of law, which provides that neither party would do anything to impede the benefits of the contract to the other.

69)     Defendant breached the covenant of good faith and fair dealing.

70)     Plaintiff further claims special and consequential damages, including but not limited to costs associated with moving to Lake Havasu City from Boise, Idaho, the loss of companionship of her husband and children, the postponement of her studies in the Boise State Master's program and other damages to be determined as the investigation progresses.

71)     This claim arises out of contract thereby entitling Plaintiff to an award of attorney's fees pursuant to ARS § 12-341.01.

## COUNT THREE
**(Civil Extortion)**

72)     Plaintiff realleges all allegations heretofore set forth.

73)     In Arizona, extortion or attempted extortion ("extortion") is a predicate offense to racketeering. Accordingly, it provides a private cause of action.

-21-

*MacCollum v. Perkinson*, 185 Ariz. 179, 913 P.2d 1097, 211 Ariz. Adv. Rep. 44 (App.1996)

74)     Defendant committed extortion as that term is defined by statute (A.R.S. 13-1804) and by common law.

75)     Defendant committed extortion under either definition by attempting to obtain money or benefit by means of a threat.

76)     Defendant's extortion harmed Plaintiff.

77)     Defendant conduct was particularly egregious and malicious in that Defendant intended to cower Plaintiff, cause Plaintiff to become fearful of the consequences of the extortion, and intentionally cause Plaintiff emotional distress.

78)     Defendant's extortion was motivated without reckless disregard to the rights of Plaintiff, entitling Plaintiff to an award of punitive damages.

**COUNT FOUR**
**(FMLA)**

79)     Plaintiff realleges all allegations heretofore set forth.

80)     Plaintiff was a covered employee who was employed for at least 1,250 hours and for a period of twelve months when she was converted to FMLA leave.

81)     Prior to the expiration of her twelve-week leave, Plaintiff returned to work and was terminated by Defendant and therefore was not put into her same position or equivalent position at the same rate of pay.

82)     Defendant's termination of Plaintiff upon her return from FMLA leave was done in bad faith for the reasons set forth herein and Defendant had no reasonable grounds for believing its termination of Plaintiff was not a violation.

83)     As a result of Defendant's unlawful termination, Plaintiff was damaged in an amount to be proven at trial.

## COUNT FIVE
### (Breach of Settlement Agreement)

84)     Plaintiff realleges all allegations heretofore set forth.

85)     Plaintiff and Defendant entered into a settlement agreement for $25,000,000.00.

86)     Defendant did not pay the settlement amount, causing Plaintiff damages in the amount of $25,000,000.00.

87)     This claim arises out of contract entitling Plaintiff to an award of attorney's fees pursuant to ARS § 12-341.01.

## COUNT SIX
### (Promissory Estoppel – Alternative Claim to Count 5)

88)     Plaintiff realleges all allegations heretofore set forth.

89)     Defendant's statement in its Form 1099 represents a promise which Defendant should have reasonably expected to induce action or forbearance on the part of the Plaintiff.

90)      The Form 1099 induced Plaintiff to rely on the Form 1099 and reported the

Form 1099 to the IRS in her tax filings.

91)      Form 1099 is clear and unambiguous in its terms.

92)      Plaintiff actually relied on Form 1099.

93)      Plaintiff's reliance was both reasonable and foreseeable.

94)      Plaintiff has been damaged by her reliance.

95)      This matter arises out of contract entitling Plaintiff to reasonable attorney's

fees pursuant to A.R.S. § 12-341.01.

## COUNT SEVEN
## (Fraud – 1099 - Alternative Claim to Counts 5 and 6)

96)      Plaintiff realleges all allegations heretofore set forth.

97)      Form 1099 contained material statements of fact, to wit, that the dispute

between the parties has been settled for $25,000,000.00 and that the settlement

amount of $25,000,000.00 has been withheld by Defendant.

98)      Defendant's statements on Form 1099 were false when made.

99)      Defendant's statements on Form 1099 were knowingly false when made.

100)    Defendant made the false statements on Form 1099 for the express purpose

of having Plaintiff rely thereon.

101)    Plaintiff justifiably relied on Defendant's false statements, all to her

damage.

## COUNT EIGHT
### (Extrinsic and Intrinsic Fraud)

102)    Plaintiff realleges all allegations heretofore set forth.

103)    The creation of the false employment agreement (Exhibit 2) was fraudulent.

104)    The false employment agreement has not been introduced by Defendant in the Mojave County Superior Court nor was it claimed as an affirmative defense in the current action.

105)    The fraudulent employment agreement has been distributed both extrinsically and intrinsically to this action.

106)    Plaintiff has been damaged by the creation and the publication of the false and fraudulent in an amount to be proven at trial.

## COUNT NINE
### (Civil Scheme or Artifice to Defraud)

107)     Plaintiff realleges the allegations heretofore set forth.

108)    The entire set of circumstances regarding Plaintiff's discovery of Defendant's fraud in the construction of the Lake Havasu City Wastewater Treatment project, the subsequent creation of a false and fraudulent "employment agreement", Exhibit 2, and the creation and mailing of the IRS Form 1099, along with the allegations of all other misconduct stated herein, represents a scheme or artifice to defraud.

109)    Plaintiff has been damaged by Defendant's schemes or artifices.

## COUNT TEN
### (Asserting False Claims)

110)    Plaintiff realleges all allegations heretofore set forth.

111)    Defendant made a false claim that the false and fraudulent "employment agreement", Exhibit 2, is the only true and subsisting employment agreement between the parties.

112)    Defendant made a false claim that the actual employment agreement between the parties, Exhibit 2, is false.

113)    Plaintiff has been damaged by Defendant's assertions of false claims.

## COUNT ELEVEN
### (Pattern of Unlawful Activity in Violation of State Statute A.R.S. 13-2314.04)

114)    Plaintiff realleges all allegations heretofore set forth.

115)    Defendant committed acts involving acts described in A.R.S. §13-2301(D)(4)(b) including  (iv) (Forgery of Defendant-created letter dated January 21, 2008, Exhibit 2) (ix) (attempted) extortion as more fully alleged below, (xiii) participation in a criminal syndicate, (xv) asserting false claims though the creation of forged letter (Exhibit 2) and IRS Form 1099 reproduced above, and (xx) (scheme or artifice to defraud). Defendant's acts were committed for financial gain.

116)    Defendant's *modus operandi* as set forth above discloses a course of illegal conduct with common external organizing principle including the affairs of the

entire Defendant enterprise, to wit:    Defendants create documents, including invoices and letters in order to gain financial benefits.

117)    The illegal acts committed by Defendants with respect to Plaintiff and others similarly situated are related in that they have the same or similar purposes, results, participants, victims or methods of commission and are otherwise interrelated by distinguishing characteristics as more fully described above.

118)    Plaintiff sustained a reasonably foreseeable injury to her person by a pattern of Defendant's racketeering activity, and/or by a violation of section 13-2312 involving a pattern of racketeering activity.

119)    Defendant's misconduct demonstrates a series of related predicates involving the Plaintiffs and others similarly situated extending over a substantial period of time that by their very nature project into the future with a threat of repetition.

120)    The last predicate act of racketeering occurred within 5 years of the acts complained of herein.

**COUNT TWELVE**
**(Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968)**

121)    Plaintiff realleges all allegations heretofore set forth and particularly the allegations in the preceding Count Eleven.

122)     The events, convictions, judgments and regulatory findings against third parties, along with the frauds, schemes, artifices, extortions against Plaintiff as described hereinabove, constitute violations of Title 18 of the United States Code as follows: U.S.C. §18-1341 relating to mail fraud; U.S.C. §18-1343 relating to wire fraud; and 18 U.S.C. §§ 1961-1968 relating to Racketeer Influenced and Corrupt Organizations Act (RICO).

123)     Plaintiff has been damaged by Defendant's acts of racketeering.

### COUNT THIRTEEN
(Defamation – Invasion of Privacy – False Light)

124)     Plaintiff realleges all allegations heretofore set forth.

125)     Following Plaintiff's disclosure of Defendant's intentional overestimating of material quantities and reckless miscalculations of drainage slopes, Defendant engaged in false publications that impeached Plaintiff's honesty, integrity, virtue, or reputation and brought Plaintiff into disrepute, contempt, and/or ridicule.

126)     Defendant knowingly or recklessly gave publicity to a matter that placed Plaintiff in a false light that a reasonable person would find highly offensive.

127)     Among other acts of defamation, Defendant revealed private information, a list of Plaintiff's former employers, without her consent, to Charlie Cassens, LHC Interim City Manager and Cassens took it upon itself to contact Plaintiff's former employers as stated in a memo from Mr. Cassens and publicized in the Today-News Herald newspaper article dated November 19, 2009.

128)    Plaintiff has been harmed by Defendant's defamation.

129)    Defendant's acts of defamation were intentional and designed to harm Plaintiff, entitling Plaintiff to an award of punitive damages.

## PRAYER FOR RELIEF

130)    On the breach of employment contract and Breach of Covenant of Good Faith and Fair dealing claim (Counts 1 and 2), Plaintiff prays for judgment as follows:

a. For direct damages for breach of the employment agreement in the amount of $480,702.76 (as outlined in employment contract) trebled to $1,442,108.28 pursuant to A.R.S. §§ 23-355; and

b. For special and consequential damages in an amount to be proven at trial; and

c. For an award of attorney's fees pursuant to ARS § 12-341.01; and

d. For costs incurred in this action; an

e. For such other and further relief as the Court may deem just and proper.

131)    On Civil Extortion claim (Count 3), Plaintiff prays for judgment as follows:

a. For judgment on this count in an amount to be proven at trial; and

b. For punitive damages in an amount sufficient to deter Defendant and others in Defendant's position from repeating extortionate behaviour, but in no

event less than sufficient to deter this and other similarly situated employers from engaging in like conduct; and

    c.  For costs incurred in this action; and

    d.  For such other and further relief as the Court may deem just and proper.

132)     On the FMLA claim (Count 4) Plaintiff prays for judgment as follows:

    a.  For back pay, front pay and liquidated damages in an amount to be proven at trial; and

    b.  For attorneys' fees and costs of suit; and

    c.  For other economic damages available to Plaintiff at law and as the Court deems just and appropriate; and

    d.  For such other and further relief as the Court may deem just and proper.

133)     On the breach of settlement claim, alternatively the promissory estoppel claim, alternatively common law fraud claim, Plaintiff prays for judgment as follows:

    a.  For damages in the sum of $25,000,000.00; and

    b.  For special and consequential damages in an amount to be proven at trial; and

    c.  For an award of attorney's fees pursuant to ARS § 12-341.01; and

    d.  For costs incurred in this action; and

    e.  For such other and further relief as the Court may deem just and proper.

134)    On the Fraud claim (Count 7), Plaintiff prays for judgment as follows:

    a.  For judgment on this count in an amount to be proven at trial; and

    b.  For punitive damages in an amount sufficient to deter Defendant and others in Defendant's position from repeating extortionate behaviour, but in no event less than sufficient to deter this and other similarly situated employers from engaging in like conduct; and

    c.  For costs incurred in this action; and

    d.  For such other and further relief as the Court may deem just and proper.

135)    On the Civil Schemes and Artifices claim (Count 8) Plaintiff prays for judgment as follows:

    a.  For judgment on this count in an amount to be proven at trial; and

    b.  For punitive damages in an amount sufficient to deter Defendant and others in Defendant's position from repeating extortionate behaviour, but in no event less than sufficient to deter this and other similarly situated employers from engaging in like conduct; and

    c.  For costs incurred in this action; and

    d.  For such other and further relief as the Court may deem just and proper.

136)    On the False Claim claim (Count 9) Plaintiff prays for judgment as follows:

    a.  For judgment on this count in an amount to be proven at trial; and

b. For punitive damages in an amount sufficient to deter Defendant and others in Defendant's position from repeating extortionate behaviour, but in no event less than sufficient to deter this and other similarly situated employers from engaging in like conduct; and

c. For costs incurred in this action; and

d. For such other and further relief as the Court may deem just and proper.

137)    On the Pattern of Unlawful Conduct and Federal RICO claims (Counts 11 and 12), Plaintiff prays for judgment as follows:

a. For damages in the amount of $25,000,000.00; and

b. Trebling of damages pursuant to A.R.S. § 13-2304.04(A) and 18 U.S.C. 1964(C) and the recovery of reasonable attorney's fees and costs; and

c. After a determination of liability an entry of orders by this Court pursuant to A.R.S. § 1302404.04 (D), as appropriate:

    i. Imposing reasonable restrictions on the future activities Defendant, including prohibiting Defendant from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect the laws of this state, to the extent the constitutions of the United States and this state permit; and

    ii. Ordering dissolution or reorganization of Defendant; and

    iii. Ordering prejudgment interest on damages; and

iv.  The imposition of an involuntary trusteeship against Defendant   to hold any property or other financial benefit gained as a result of Defendant's actions alleged herein for the benefit of Plaintiff; and

v.  Ordering a dissolution or reorganization of Defendant.

138)    On the Defamation – False Light claim (Count 13), Plaintiff prays for judgment as follows:

a.  For judgment on this count in an amount to be proven at trial; and

b.  For punitive damages in an amount sufficient to deter Defendant and others in Defendant's position from repeating extortionate behaviour, but in no event less than sufficient to deter this and other similarly situated employers from engaging in like conduct; and

c.  For costs incurred in this action; and

d.  For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial pursuant to Rule 38.

RESPECTFULLY SUBMITTED this 22nd day of October, 2012.

**PETER STROJNIK, P.C.**

_____
Peter Strojnik
Peter Kristofer Strojnik
Attorneys for Plaintiff

1
2
3
**VERIFICATION**

4        I verify that I have reviewed the above allegations and that to the best of my

5    knowledge, information and belief, the same is true and correct.

6
7    _Stacy Ford Kelly_                    _9/26/12_

8    Stacy Ford-Kelly                          Date

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 1

amec

January 21, 2008

*Private & Confidential*

Stacy Ford
1720 Dearborn St. #4
Caldwell, ID 83605

Dear Ms. Ford,

On behalf of AMEC Infrastructure (AMEC), I am pleased to offer you the position of Design Engineer, reporting to me in the Lake Havasu, AZ office, effective January 28, 2008. If you need to change the date, we will be pleased to discuss one that is mutually acceptable.

The following will outline the terms and conditions of employment:

**Compensation Agreement**

- Status – Exempt; Contracted and salaried full-time employee.
- Contract of employment beginning January 28, 2008 and expires December 31, 2013.
- Starting salary is $2,384.62 payable on a bi-weekly basis, which annualizes to $62,000.12.
- Salary to increase to $85,000.00 beginning January 1, 2010, ending December 31, 2013 with a 2.25% annual minimum cost of living increase beginning January 1, 2011.
- The balance of monetary compensation of this contract due to you shall be paid in full within three business days if employment with AMEC ceases due to no fault of your own and is initiated by AMEC after the three-month probationary period. Balance of compensation is to include any accrued and future benefits ending December 31, 2013 for both vacation time and sick leave as outlined below. If such action takes place by AMEC you will also receive payment equivalent to 18 months of COBRA costs which will be included with the balance of this contract compensation due to you. If the remainder of contract is less than 18 months COBRA costs to be paid will be adjusted accordingly.
- You will receive a relocation allowance in the amount of $4,500.00 – the terms of this allowance are attached. Please sign and return with this employment agreement.

**Benefits**

Enclosed, please find the *Choices Benefits Package* that explains the benefits currently offered to AMEC regular, full-time employees. Upon your employment you will be immediately eligible for:
- Health insurance coverage, including medical, vision, dental and prescription drug.
- Participation in AMEC's 401(k) program.
- Flexible Spending Account.
- Employee Assistance Plan.
- Short Term Disability, Long Term Disability, Life Insurance, Accidental Death & Dismemberment Insurance.
- You will accrue annual vacation leave at a rate of 15 days per year or 4.62 hours bi-weekly.
- Holidays – AMEC observes 7 holidays per year plus 3 floating holidays throughout the year, the details of which are provided in the Employee Handbook.

**Background Screening and Employment Documentation**

It is AMEC's policy to provide a safe and secure work environment for both our employees and our clients. To that end it is the policy of AMEC that all offers of employment are contingent upon the successful completion of a background screening, drug screening and educational credentials

AMEC Infrastructure
94 Acoma Blvd South # 100
Lake Havasu City, AZ 86403
Phone: 928-854-8030
Fax: 928-854-8036                        www.amec.com

confirmation (where applicable). If any of the screenings returned are found to be in conflict with AMEC's policy we will discuss the results with you and determine if employment will continue. All screenings will be conducted within the guidelines of all state and federal legislation.

Employees are required to complete the Employment Eligibility Verification Form (I-9) attesting to their employment eligibility and must provide documentation to support their statement. Examples of acceptable proof of employment eligibility include a U.S. Passport, or both a valid State Driver's License and Social Security Card. Please bring these documents with you on the first day of your employment. If you do not have the documents mentioned you may contact the Human Resources Department for further information.

### Probationary Period and Employment Termination

AMEC has a three-month probationary period for all newly hired contracted and non-contracted regular, full-time and part-time employees during which time an employee's work performance and/or general suitability for AMEC employment will be evaluated. While we are confident that your employment with us will be a positive and mutually rewarding experience please understand that your employment, both during and after the probationary period, is not guaranteed for any specific amount of time and is terminable at will, which means that either you or AMEC may end the employment relationship at any time for any reason. Your employment relationship with AMEC is not terminable at will after the three-month probationary period if a contract of employment is outlined within the Compensation Agreement section on the first page of this offer of employment and will be in accordance with the Compensation Agreement.

### Severability

If any part of this offer of employment is held to be invalid, illegal, or unenforceable, the remaining provisions of this agreement will be enforced.

Further information regarding AMEC, its policies and programs will be provided during your orientation. Upon acceptance of the above and enclosed, please sign and return the enclosed copy of this letter, a completed application for employment and any other enclosed documents within seven business days to the Lake Havasu, AZ location. Please feel free to contact me should you have any questions.

We look forward to having you join us and wish you much success in your new position.

Sincerely,
**AMEC Infrastructure, Inc.**

*Melodie Brott for*

**Chris Hassert**
**Unit Manager – Lake Havasu, AZ**

I have read and accept the offer of employment contained in this letter, including the referenced attachments.

_January 21, 2008_                _Stacy D Ford_
Date                                      Employee Signature

1
2
3
4
5
6
7

# EXHIBIT 2

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

January 21, 2008

*Private & Confidential*

Stacy Ford



Dear Ms. Ford:

On behalf of AMEC Infrastructure (AMEC), I am pleased to offer you the position of Engineer in Training, reporting to me in the Lake Havasu, AZ office, effective January 28, 2008.  If you need to change the date, we will be pleased to discuss one that is mutually acceptable.

The following will outline the terms and conditions of employment:

**Compensation**

- Status – exempt.
- Salary is $2,384.62 payable on a bi-weekly basis which annualizes to $62,000.12.  Direct Deposit is available if preferred.
- Extra compensation for additional hours worked <u>may be available</u> subject to manager approval.  Extra compensation is paid at straight time unless otherwise legislated.
- You will receive a relocation allowance in the amount of $4,500.00 – the terms of this allowance are attached.  Please sign and return a copy along with your signed copy of this letter.

**Benefits**

Enclosed, please find the *Choices* Benefits Package that explains the benefits currently offered to AMEC regular, full- time employees.  Upon your employment you will be immediately eligible for:

- Health insurance coverage, including medical, vision, dental and prescription drug.
- Participation in AMEC's 401(k) program.
- Flexible Spending Account.
- Employee Assistance Plan.
- Short Term Disability, Long Term Disability, Life Insurance, Accidental Death & Dismemberment Insurance.
- You will accrue annual vacation leave at a rate of 15 days per year or 4.62 hours bi-weekly.
- Holidays – AMEC observes 7 holidays per year plus 3 floating holidays throughout the year, the details of which are provided in the Employee Handbook.
- Sick day accrual.
- Tuition Reimbursement (with prior management approval).
- Health Club Membership Reimbursement.
- Company provided training including Code of Business Conduct (COBC), Safety Health & Environment (SHE) and more.  Your Manager will determine with you what training is appropriate.  Please be advised that successful completion of the COBC program is a condition of employment and you will be required to undergo an annual refresher.  Please complete the online training (available after hire), within the first week of employment.

**Background Screening/Employment Documentation**

It is AMEC's policy to provide a safe and secure work environment for both our employees and our clients.  To that end it is the policy of AMEC that all offers of employment are contingent upon the successful completion of a background screening, drug screening and educational credentials

AMEC Infrastructure
94 Acoma Blvd South #100
Lake Havasu City, AZ 86403
Phone: 928-854-8030
Fax: 928-854-8036                www.amec.com

confirmation (where applicable). If any of the screenings returned are found to be in conflict with AMEC's policy we will discuss the results with you and determine if employment will continue. All screenings will be conducted within the guidelines of all state and federal legislation.

Employees are required to complete the Employment Eligibility Verification form (I-9) attesting to their employment eligibility and must provide documentation to support their statement. Examples of acceptable proof of employment eligibility include a U.S. Passport, or both a valid State Driver's License and Social Security Card. Please bring these documents with you on the first day of your employment. If you do not have the documents mentioned you may contact the Human Resources department for further information at (425) 820-4669.

### Probationary Period and Employment at Will

AMEC has a three-month probationary period for newly hired regular, full-time and part-time employees during which time an employee's work performance and/or general suitability for AMEC employment will be evaluated. While we are confident that your employment with us will be a positive and mutually rewarding experience please understand that your employment, both during and after the probationary period, is not guaranteed for any specific length of time and is terminable at will, which means that either you or the Company may end the employment relationship at any time for any reason.

### Confidentiality Agreement Clause

Under the AMEC Code of Business Conduct and as an employee of AMEC, you hereby agree to keep all of AMEC's business secrets confidential at all times and after the term of your employment. AMEC's business secrets include any information regarding our clients, contractors, subcontractors, employees, finances or any other technical or business information. It is further agreed that you will not make any unauthorized copies of any of AMEC's secrets or information without the consent of AMEC, nor remove any business secrets or information from an AMEC facility.

### Severability

If any part of the Offer of Employment is held to be invalid, illegal, or unenforceable, the remaining provisions of the agreement will be enforced.

Further information regarding the Company, its policies and programs will be provided during your orientation. Upon acceptance of the above and enclosed, please sign and return the enclosed copy of this letter, a completed application for employment and any other completed documents within seven business days to the Lake Havasu, AZ location. Please feel free to contact me should you have any questions.

We look forward to having you join us and wish you much success in your new position.

Sincerely,
**AMEC Infrastructure**

**Chris Hassert**
**Unit Manager—Lake Havasu, AZ**

I have read and accept the offer of employment contained in this letter, including the referenced attachments.

_1/21/08_
Date

_(Employee)_

2