*and used to produce information and provide guidance for the WWSE. Modeling analyses justified some of the 2006 CIP Update's recommendations. In April 2007, it was proposed by RCI to use the model to assess capacity impacts due to an impasse in design flows and peaking factor considerations. It was discovered that a functional hydraulic model did not exist.]*

## Variability in Design Parameters

The July 2, 2009 letter changes five design factors, compared to design factors used in modeling for the Draft Master Plan Update. Two other factors have changed to represent differences between detailed design and planning level modeling (City Limits Boundary and multiple family land use densities). Little to no information is provided to justify the changes, other than an assumption that ADEQ design requirements are conservative.

The July 2, 2009 letter's changes to design parameters are:

1. The Sewer System Planning Boundary is changed.
2. Peaking Factors are changed.
3. Population (unit flows): Unplatted Property Density is changed.
4. Population (unit flows): Persons per Household is changed.
5. Population (unit flows): Occupancy rates are changed.
6. Population (unit flows): Multiple Family Land Use Densities are changed.
7. Unit Flows: Gallons per Capita per Day (GPCD) units are changed.

Other than the change in the serve area boundary, there are only three factors where the changes appear to be based on factual information. The three factors are described as follows.

1. **Peaking Factors**. The draft Master Plan Update used a diurnal peaking factor of 1.795 for hydraulic modeling. The July 2, 2009 report uses peaking factors derived from the November 2008 to March 2009 flow monitoring project. A maximum peaking factor is defined as a ratio between a <u>maximum</u> flow (typically a peak hour flow) and the average flow (over, or at, a specific time interval). For design purposes, the maximum peak represents the maximum condition throughout the useful life of the improvement.

   Although there is no correlation between the areas that were not monitored in the November 2008 through March 2009 study and the FM7 area, the July 2, 2009 report assigns a new peaking factor of **1.304** to the vast majority of the sewer system. From an assumption perspective, the 1.304 peaking factor is one of several documented factors that could be applied to the sewer system, therefore the assumption may be valid. It is not clear whether the 1.304 factor is derived from an assumption or derived from some type of analytical methodology. The following information is related to the 1.304 peaking factor determination.
   o The 1.304 peaking factor is depicted in the "Flow Meter 7 Raw Data" tabulations in **Appendix 9** of the draft Master Plan Update. The 1.304 factor represents the average Weekday Diurnal peak for the 11:00 time interval.

This factor is obtained by dividing the average data from the 11:00 interval by the average of the average weekday flows.

o   **Appendix 9** also depicts the average Weekend Diurnal peak for the 11:00 time interval is 1.415.

o   Table 7-1, on page 78 of the Draft Master Plan Update lists the actual FM 7 weekday and weekend peak factors as 1.307 and 1.415, respectively. The Draft Master Plan Update and the July 2, 2009 letter do not describe why the 1.304 peaking factor is selected over the 1.415 peaking factor to represent a maximum condition.

o   Based on the FM 7 data depicted in **Appendix 9**, the maximum flow of 1.2440 MGD occurs at the 11:00 interval on December 16, 2008. The calculated average flow for the monitoring period is 0.6870 MGD. The maximum peaking factor from the data is **1.811** (1.244 / 0.687).

o   In Table 7-1 of the Draft Master Plan Update, the ADEQ peaking factor (representing detailed design conditions) is **1.784** for the FM 7 service area.

Supporting information does not indicate that 1.304 represents a peak factor, let alone a representative maximum peaking factor. In **Appendix 9** of the Draft Master Plan Update, the daily peak flows from the FM 7 tabulations exceed the 0.8950 MGD peak flow (represented by the 1.304 peaking factor) on 88 of the 91 days in the flow monitoring analysis. Appropriate calculations indicate the maximum peak observed in the monitoring analysis is slightly higher than the ADEQ peak for dry weather base design flows.

Similar to the information derived from FM 7 data, the information derived from FM 13 (a portion of the Sweetwater Area) indicates a recommended weekday peaking factor of 1.513. Table 7-1 in the Draft Master Plan Update also depicts a weekend peaking factor of 1.680. After reviewing the data for FM 13 in **Appendix 9** of the Draft Master Plan Update, the data indicates a maximum peaking factor of 2.065. This value is slightly lower than the ADEQ peak of 2.123 depicted in Table 7-1.

The assumption that ADEQ criteria are conservative (based on information depicted in Table 7-1 of the Draft Master Plan Update and Table 3 of the July 2, 2009 letter) is not substantiated when appropriate data is used for comparisons. *(Based on the ADEQ criteria for determining dry weather peaks - that is adopted by the WWSE, it would require a population in excess of two million to derive a peaking factor of 1.304.)* The 1.304 maximum peaking factor is an unrealistic value from an engineering practice perspective, as well as from the database used to derive the value.

2.   **Persons per Household (pphh) Factor**. The 2.32 persons per household (pphh) factor is depicted in 2000 Census information. The 2.32 pphh factor represents the <u>average</u> number of persons per household. The 2000 Census also depicts there were 17,911 households and there were 12,716 families. The average family size is 2.69 pphh. The 2000 Census indicates 71% of the households were

occupied by families. This information indicates approximately 83% of the total 2000 Census population of 41,938 is based on families.

Since the majority of high density households (i.e. multiple family land uses) are served by the original District; and the vast majority of the WWSE CIP involves connecting single family residential units; and the majority of the population is represented by families; and the average persons per household factor accommodates the observed vacancy rate, the 2.69 pphh may be a more appropriate planning factor than the 2.32 pphh recommended in the July 2, 2009 report, or the 2.47 pphh used for the WWSE.

3. **Occupancy Rates**. **Section 6.0**, page 66 of the Draft Master Plan Update describes occupancy rates for residential housing. The Draft Master Plan Update and the July 2, 2009 letter assume a 75% occupancy rate. The assumption may have validity as it pertain to residential characteristics, but it does not describe a maximum condition. Further, the occupancy rate is applied to the service area as a whole. There is no information to suggest that non-residential properties (i.e. commercial, residential, public, and mixed land uses) have a 75% occupancy rate.

Design Flow Methodology

The primary engineering concern is related to the WWSE's methodology for deriving design flows/peaking factors. On page 12 of 16 in the July 2, 2009 report, the note suggests that the peaks represent peak hour conditions. Maximum peaking factor assessments generally consist of several steps to arrive at a representative maximum (peak hour) peaking factor. The Draft Master Plan Update assesses three steps.

a. A typical daily diurnal curve is assumed for the wastewater system in the Draft Master Plan Update. The diurnal curve assumes a 1.795 peak at the 9:00 time interval.

b. The Draft Master Plan Update assesses the variation in seasonal (monthly) flow characteristics for peaking variations. Although variability is detected from data presented in the document, the impact is dismissed as insignificant. The monthly peaking factor is assumed to be 1.0.

c. The Draft Master Plan Update assesses inflow and infiltration impacts. Although the December 17, 2006 monitoring data demonstrates inflow impacts, the impact of inflow to the sewer system is dismissed as irrelevant, and inflow and infiltration once again assumed to be zero. The impacts depicted at other flow monitoring sites (charts in **Appendix 9**) are more dramatic than the one depicted in the body of the report. The inflow and infiltration peaking factor is assumed to be 1.0.

d. The draft Master Plan Update and the July 2, 2009 report do not examine the daily variability in flows within any given month. Current wastewater treatment data indicates that maximum daily flows within each of the past three months vary

      from 1.13 to 1.18. Daily variability and a "maximum day" condition, was not
      assessed. By default, the "maximum day" factor is 1.0.

  e.  The draft Master Plan Update and the July 2, 2009 report do not examine the
      diurnal peak for the maximum day condition (i.e. the peak hour). By default, the
      peak hour factor (to the diurnal curve consideration) is 1.0.

Peaking factor considerations were examined in the flow monitoring project, assessed in
the Draft Master Plan Update, and modified in the July 2, 2009 letter. The July 2, 2009
letter represents the progress in design flow considerations through Program Year 7 of
the WWSE CIP. The progress is assumed to have contributions from at least two
prominent, resourceful engineering firms and several engineers from the City. It is
difficult to understand how a monthly peaking factor of 1.27 can exist, then not exist,
within the span of few days. It is puzzling that inflow can be detected and quantified
with actual flow information but is determined to be irrelevant and assigned a value of
zero, based on assumptions. It is difficult to comprehend how five factors, affecting the
design flow criteria, can be modified within the course of a few weeks.

### Relationship to the Draft Master Plan Update

The July 2, 2009 letter adopts the same maximum peaking factor considerations as the
Draft Master Plan Update, but changes the maximum peaking factor in the calibrated
modeling from 1.795 to 1.304.

As represented in Table 3 of the July 2, 2009 letter, the 208 calibrated model results in a
peak flow rate of approximately 3.177 MGD. The 208 calibrated model from the Draft
Master Plan Update indicates approximately 3.4 MGD from the same Sweetwater and
Hagen areas. A reduction in the peaking factor, a reduction in the persons per household,
and a reduction in density for unplatted areas result in a slightly lower flow than what is
depicted in the Draft Master Plan Update. Although the peak flows for the 208 calibrated
model in the Draft Master Plan Update could not be independently derived, the July 2,
2009 letter appears to substantiate very low flows in the calibrated modeling.

The conclusions and recommendations in the July 2, 2009 are similar to those contained
in the Draft Master Plan Update. However, the results in Table 4 of the July 2, 2009
letter indicate that the magnitude of surcharging and manhole flooding reported in the
Draft Master Plan Update is based on modeling that is no longer current or meaningful.
On page 13 of 16, the data in column three is reported to represent a worst case analysis.

### Summary

The information pertaining to some of the changed factors in the July 2, 2009 letter
should indicate that low flow assumptions are, or may be, unsubstantiated assumptions.
Appropriate selections/calculations from documented information suggest risk when
relying on information based on the July 2, 2009 letter's assumptions and methods.

Particular concern continues to be related to the feasibility for constructing and operating the proposed Sweetwater / Hagen Pump Station based on engineering calculations and analyzes reported to date. Operating costs and serial pumping system costs (i.e. costs that are not anticipated until well in the future or many decades from now), have not been clearly identified or quantified. Based on the new variability in peak flows presented in Table 3 in the July 2, 2009 letter and the logic for deriving the flows, the City does not have the ability to assess the costs and the risks associated with the recommended project. A crude life-cycle analysis that includes power and sulfide treatment costs suggests the project obligates the City to considerable, undisclosed operating costs. When coupling information related to design flows and the timing outlined in the Draft Master Plan Update and the July 2, 2009 letter, the City does not have sufficient information to prepare for undisclosed costs within an undisclosed timeframe.

The July 2, 2009 letter and e-mail recommend sharing this information with PBS&J for continuity of design. PBS&J proposed to conduct an independent assessment of design flows and downstream capacity as fundamental and prudent task for their scope of work. RCI does not believe it is in the City's best interests to promote the recommended continuity of design, and potentially influence an independent assessment.

The July 2, 2009 e-mail from Dr. Garcia to the Mayor Nexsen, Dennis Schilling, and Martha Bennett dismisses RCI's concerns, based on RCI's use of information that is no longer current or meaningful. AMEC's reply to RCI's concerns is reflected in the July 7, 2009 letter from AMEC's legal representative. A review of the methodology for determining some of the recommended factors from the July 2, 2009 letter, reaffirms RCI concerns for similar methodologies for representing and using information in the Palm Tree Design Report, the 30% Sweetwater / Hagen Pump Station Design Report, and modeling for the Draft Master Plan Update.

RCI does not believe that information used to formulate or support conclusions and recommendations to a public body is meaningless. Until AMEC and project representatives are willing to address and resolve the concerns outlined at the June 9, 2009 and the June 16, 2009 Oversight Committee Meetings (in a timely fashion), RCI would like to strongly reiterate the recommendations in our June 12, 2009 correspondence. RCI suspects AMEC's threats, through legal representatives, are as stated. Nevertheless, RCI continues to believe that recommendations to Lake Havasu City should be based on factual information that can be substantiated, and is consistent with similar factual information contained in other WWSE documents.

Despite the claims on page 4 of 16 in the July 2, 2009 letter, and the July 7, 2009 letter from AMEC's legal representative, the change to a calibrated peaking factor of 1.304, and the assumptions related to selecting the peaking factor, do not represent technically sound, accepted engineering practice. It is unprofessional and unethical, on the part of RCI, to not point out this concern to Lake Havasu City, as well as other similar concerns that are related to technical, logical, and/or mathematical discrepancies in WWSE documents and work products.

6                    *RCI Comments to AMEC's July 2, 2009 Letter*

## ADDENDUM

RCI is raising concerns to the July 2, 2009 letter, not only for the technical, logical, and mathematical considerations, but the conclusions derived from the technical assumptions and analyses. The following citations from the July 2, 2009 letter are noteworthy.

*(p. 4 of 16) Knowing that the ADEQ design process results in unused capacity (fully developed focused), this method is of little use when trying to predict the timing of capacity improvements. The addition of a calibrated model provides a framework to assess current operational characteristics and, based on in-system flow projection is used to make informed decisions about system improvement alternatives.*

*(p. 6 of 16) Table 2 provides a comparison of the observed Diurnal Peak Factor in the measured flows to the similar value that would be calculated using the ADEQ Peak Factor algorithm for the same population. In all cases the observed Diurnal Peak Factor is less than the result of the ADEQ method. This comparison is important to consider when discussing other additive factors that are subjective in nature.*

*(p. 10 of 16) Table 1A, Footnote 2 – "Per the flow monitoring results collected by AMEC from November 2009 thru March 201 Infiltration and Inflow was determined to be irrelevant this along with the a majority of the sewers in LHC being new PVC pipes; sealed manhole lids, no groundwater interface with installed pipes establishes the reasoning for I/I = 1.0."*

*(p. 12 of 16) Columns 4 and 5 of Table 3 are similarly constructed but this time using the Section 208 Boundary. It will take many decades to reach full build out conditions to the Section 208 Boundary.*

*(p. 13 of 16) Data are shown for both service areas previously discussed, WWSE limits and Section 208. These conditions represent the future many decades from now.*

*(p. 13 of 16) The worst case analysis (column three) is developed by applying Section 208 service areas boundary to the total system that was design and constructed using either the original service area or city limits. In the worst case analysis, less than 3 percent of the 8 inch system is identified as having capacity limitations. It is interesting to note that the analysis using the calibrated model shows far fewer capacity limitations.*

*(p. 15 of 16) 4. Initial calibrated model results indicate that, with minor exceptions, the current ADEQ Design methodology provides sufficient conveyance capacity for build-out conditions (Section 208 Boundary).*

*(p. 15 of 16) 7. The serial pump and forcemain system is adequate for WWSE build out under Planning Level assumptions.*

# PLAINTIFF'S

# EXHIBIT 9

**From:** Ford, Stacy D
**Sent:** Monday, October 6, 2008 10:01 PM
**To:** Bokaie, Nick
**Cc:** Wesanen, Jeffrey
**Subject:** Neptune

**Importance:** High

**Attachments:** city council minutes lhc.PDF
Nick,

I spoke with Jeff earlier about this issue and he is aware of my concerns.

I am making an ethical decision based on the laws and oath I took when I became an E.I.T. of not preparing the ADEQ Engineering Report (which also includes the IFB plans and specs) as requested by Darin that he wants out the door tomorrow. The project should have never gone out to bid without QA/QC and I have found several discrepancies on the plans and with quantities on sheet CS04 that are also in the bid package. Darin told me to leave everything the way it is and go with the numbers that are on the IFB plans, not correct mistakes, and he will figure out how to deal with it later because we have until the 20th to submit an addendum to the City and actually wanted to get the ADEQ submittal out Friday to meet a deadline requested by the City. **Well, these mistakes have your stamp on them!!**

I cannot do the ADEQ submittal until the design is done for IFB, which was just Wednesday morning. I have been working on the quantities and redlining plans to do the addendum for the Neptune ADEQ submittal for 14 over hours the weekend and 12 hours today. There are several problems with the plans and quantities to the point that I am questioning everything, including the fact that Jim Satterwhite raised the sewer laterals in areas after meeting with the City addressing the 100% comments for changes to the IFB plans. I know that Jeff/Mesa had done calcs to make sure that everyone could connect. I have found several errors and did calculations for corrections and have gotten only half way through the plans. Darin is only concerned with deadlines and the City is already questioning AMEC's competency which was on television at a City Council Meeting who agreed to pay $15,000 for a review committee to determine if we have competent technical staff in this office (I attached the article in the paper from the meeting, just in case you didn't know). Darin just wanted me to push out the report that your stamp will be on and I made him aware of discrepancies that he blew off as no big deal. To me accuracy and attention to detail is the backbone of a good engineer. These plans have already gone out to the City and the project was advertised yesterday in the paper. Jim and Darin are not allowing me to do my job properly and to me it is completely unacceptable that no QA/QC has been done on the IFB plans and the quantities are incorrect. The plans and specs with your stamp on everything need to be revised and resubmitted. That alone is disturbing to me and I am sure you are not happy to hear this because it reflects on your reputation as well. Darin was supposed to of done the engineering QA/QC as well as update CS04 prior to the plans going out the door and he told me Friday that the CS04 was not completely updated...but don't worry about it. I have yet to attend one single design meeting with the City, but Jim goes. I mentioned wanting to attend the meeting for the 100% comments that were addressed and Jim told me no, he didn't think I should be there that it might hold things up and they wanted to get in and out as quickly as possible. I was also told by Ron Shipley that Tim Coker takes bids for other side jobs to the local survey competitor asking if it is a good bid prior to submitting it and then AMEC loses the bid. I do believe that AMEC is being sabotaged. I know from some legal issues involving my husband that the corruption runs so deep in this little town that it is unbelievable. I too question Darin's competency given the fact that he refuses to report truthfully as to what is going on or address mistakes that I have found on the plans from previous projects for the sewer model, namely Hillside which we have already discussed, prior to my employment that never got passed on. I am doing my job, Darin's job and Pete's job. I am proud to be an employee of AMEC and do not want my competency to be in question or the reputation of AMEC to be tarnished in any way. I take my job seriously, but am being prevented from doing my best when I get the information I need to do my job properly just days before it is supposed to go out.

I am going to tell you a little bit about myself, and I do not usually get on the soap box because I was raised a navy brat, tom boy, down to earth person that doesn't have to be the center of attention and actually get embarrassed when a family member tells people this, but here it goes.

FYI - I didn't go to college until I was 31 in 2002, worked 2-3 jobs to get my 40-50 hours a week in to arrange my life around classes at Boise State University, finished my B.S.C.E. in 4 years and went straight into grad school part time. Currently I am only 5 or 6 classes short of a Master's in Civil Engineering specializing in wastewater and water treatment facility design with an emphasis in hydrology and hydrogeology. I actually have enough credits to be a professional geologist and have received a total of 12 awards, most requiring a nomination from faculty or the Dean, for my academic achievements while pursuing my B.S.C.E., including the 2005 International Mission on Engineering which took me to China

for 3 weeks at the end of my ~~nior~~ year. My first year in the Master's progra got an award for Who Amongst Executive & I ssional Women in Engineering.

I will be out of the office possibly all day tomorrow, which was already arranged. I will try to make it to the 1:00 meeting for the Tan Area that Jeff said he was going to be here for. I am going to send Darin an email letting him know that I have made a decision based on ethics to not comply with his requests and I will BCC you. I am sure he is going to be mad, and I will suffer for this decision, but I know it is the right thing to do.

My cell phone number is 928-486-9371. If I do not answer right away leave a message with a number to contact you at and I will return your call.

Sincerely,

*Stacy D. Ford, E.I.T.*

Senior Engineer
Arizona Department of Transportation
Phoenix AZ
Cell Phone (928) 486-9371

**From:** Ford, Stacy D
**Sent:** Monday, October    2008 10:33 PM
**To:** Miller, Darin
**Subject:** Neptune ADEQ Submittal

Darin,

I have made a decision based on laws and ethics to not comply with your request of me regarding preparation and submittal of the Neptune ADEQ report because it is known by both of us that the quantities and other information it would contain if submitted tomorrow is inaccurate and needs revision prior to submittal. Nick Bookie's official stamp and signature would have been electronically placed on the report and is already on the IFB plans that you were requesting I use the information off of for the report and include with the submittal. I refuse to submit plans and numbers that are known to be inaccurate for the sake of meeting a deadline, especially knowing that none of the information has been reviewed by Nick.

*Stacy D. Ford, E.I.T.*
Design Engineer
AMEC Environment & Earth
Mt Adams Blvd. S.   Suite 300
Lake Havasu City, AZ 86403
Phone: (928) 854-6073
Fax: (928) 854-8035
stacy.ford@amec.com

# PLAINTIFF'S

# EXHIBIT 10

**Ford, Stacy D**

| | |
|---|---|
| **From:** | Ford, Stacy D |
| **Sent:** | Thursday, August 28, 2008 11:13 AM |
| **To:** | Bokaie, Nick |
| **Cc:** | Peterson, David E |
| **Subject:** | FW: Schedule Notification |
| **Importance:** | High |

Nick,

That is this????? There was no conversation last week!!!!! I bust my rear to get things done and never have I missed a deadline! I as going to come in yesterday and called Darin at noon to let him know that we were still taking care of legal matters due to the eath of my father-in-law. Policy is 3 days bereavement leave and I used even less than that because of working on Sunday for five ours. My family and I got in to California at 11:30 pm on Sunday night, Ray passed away at 12:52am Monday morning. After the oroner came and took the body from the home I worked two more hours after being up all night to finish up my design report and mailed it to Darin at 6:07am so he could get everything out the door to ADEQ on time for me. This is his way of covering his ass and acing the blame on someone else and I am so upset that I am crying. Why was I the only one sent this email? When the air onditioning was out we all worked through the heat until it got too hot, but Sean pretty much took the whole week off with pay. He isses work because he didn't sleep the night before, too much sun over the weekend, the excuses are endless and nobody seems think it is a problem. And Sean has been out for two weeks and I was told they don't know when he will be back. I am so frustrated and do not know what to do. I am being singled out and it is not right. Svetlana goes through the same things I do and even when ead of schedule Darin rides her. In the last three weeks I worked 51 hours by Thursday(10 of those hours was on my daughters' rthday 8/9) and took Friday of to go to California so my husband and kids could be with their father/grandfather, the next week I as sick on Thursday. Then this week my father-in-law died and I was in communication with Darin on Sunday while in the office and ok Pete's laptop to work while taking care of family matters. I requested emails of the city comments for Neptune so I could have em done today and Darin never replied by phone or email. The design team is falling apart and Darin shows favoritism to his ends, namely Sean. Pete is also very upset about me being prevented from doing the QA/QC things he asked I be allowed to do r him while on vacation. Canyon Oak IFB went out the door with me only having time to flip through the pages to see if I noticed ything wrong. I had no original check prints or City comments. Neptune is a mess from what I have been told this morning. Hillside, s I explained earlier, had serious errors on the design, Sean simply put in 1.12% slope on the shallower lines when they were in me cases half that amount and it was constructed that way. When I told Darin what I had discovered he just said "Not good" and ere wasn't much we could do about it. I have also had someone messing with the files I work in and causing me extra work (on my vn time) to keep myself from looking incompetent. I know I am being sabotaged.

ease advise ASAP, to be honest I would even transfer to another AMEC office that would appreciate my abilities and dedication.

*tacy D. Ford, E.I.T.*
sign Engineer
IEC Environmental & Earth
Acoma Blvd. S., Suite 100
te Havasu City, AZ 86403
one: (928) 854-8090
x: (928) 854-8036
cy.ford@amec.com

---

om: Miller, Darin
nt: Thursday, August 28, 2008 9:51 AM
: Ford, Stacy D
bject: Schedule Notification

acy:

per our conversation last week, please make ensure that you notify me personally preferably by email and/or a phone ll of your absence from work first thing in the morning- latest by 9am. Ideally, I would like a heads up on your schedule week before, but do understand that there are unforeseen circumstances that come up occasionally requiring you to take ne off the same day. In such cases please notify me ASAP.

you are aware we have had and will have several deadlines and if I don't know your schedule or whereabouts it makes

28/2008

: very difficult to assign you work in o'    to meet our deadlines without any delay

ince you are a member of the design team, I would require a weekly update of the status of work assigned to you, in an ffort to keep track of all our upcoming deadlines and schedules.

et's further discuss your tasks and schedule from here on.  Does 1pm this afternoon work?
hanks,

arin Miller
MEC
ake Havasu City, Arizona
hone 1 928 854 8030
ax 1 928 854 8036
arin.miller@amec.com

28/2008

# PLAINTIFF'S

# EXHIBIT 11

Richard E. Kaffenberger, Plaintiff-appellant, v. the City of Bullhead City, Arizona, an Incorporated Arizonacity; Steven R. Buck, Member of City Council; Husband Todoris Anne Buck; John L. Day, Member of City Council;husband to E. Darlene Day; Dean Hackett, Member of Citycouncil; Husband; Martin Kooken, Member of City Council;husband to Barbara; Robert C. Rogge, Member of Citycouncil; Husband to Cecile P.; Glen E. Tudor, Member Ofcity Council, Defendants-appellees

United States Court of Appeals, Ninth Circuit. - 978 F.2d 715

Submitted Oct. 13, 1992.*Decided Oct. 16, 1992

Before BEEZER, CYNTHIA HOLCOMB HALL and WIGGINS, Circuit Judges.

1 MEMORANDUM**

2 Former Bullhead City Manager Richard E. Kaffenberger appeals pro se the district court's order granting summary judgment in favor of the City of Bullhead ("City") in his employment discrimination action. He contends that the district court erred by finding that his discharge did not violate "public policy" under Arizona law. Specifically, Kaffenberger argues that he was discharged for his "whistleblowing" regarding the alleged improper actions of the City Attorney. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

3 We review de novo a district court's grant of summary judgment. Fuller v. Frank, 916 F.2d 558, 561 (9th Cir.1990). We review the evidence in the light most favorable to the nonmoving party to determine whether there was any issue of material fact and whether the substantive law was applied correctly. Americana Trading Inc. v. Berrie & Co., 966 F.2d 1284, 1287 (9th Cir.1992).

4 Arizona law recognizes a public policy exception to the at-will employee doctrine. Wagner v. City of Globe, 722 P.2d 250, 255-56 (Ariz.1986) (en banc); Wagenseller v. Scottsdale Memorial Hosp., 710 P.2d 1025, 1031 (Ariz.1985) (en banc). While an employer may discharge an employee for good cause or for no cause, he cannot

discharge for bad cause—in violation of public policy. Wagenseller, 710 P.2d at 1033. Reporting known or suspected illegality, i.e. whistleblowing, which serves a public purpose, is protected activity under the public policy exception. Wagner, 722 P.2d at 256-57. To establish a claim of wrongful discharge, a plaintiff must prove: (1) he engaged in protected activity; and (2) he was discharged because he engaged in protected activity. Id., at 257. An employee's actions which are "merely private or proprietary" do not constitute protected activity. Id.

5  Here, the City council voted to remove a parcel of land from a flood plain, in order to build a shopping mall. City Attorney Stephen Avilla had recommended a three-year term to complete the removal, but the council voted to complete the removal in two years. On August 20, 1987, Avilla sent a final version of the deed of trust to the County Clerk's office for filing. An addendum to the deed, however, incorrectly indicated that the City would complete the removal within three years instead of two years. Avilla contemporaneously mailed a letter to David Kruetzberg, the mall developer's attorney, indicating that the City would complete the removal within two years.

6  On August 27, 1987, Kruetzberg sent Avilla a letter indicating that the deed of trust erroneously contained a three-year term. Kruetzberg wrote that he assumed the three-year term was a clerical error in light of Avilla's letter indicating a two-year term. Between September 7 and 11, 1987, Avilla informed several of the City council members about the clerical error. He also mailed a letter, apologizing for the error, and corrected addendum to Kruetzberg, on September 10, 1987. Avilla instructed his secretary to make copies of the letter for each of the City council members.

7  Prior to September 10, 1987, Kaffenberger, then-City Manager, received a copy of the erroneous addendum to the deed of trust. It is undisputed that animosity existed between Kaffenberger and Avilla. Kaffenberger took the erroneous addendum to the City Chief of Police and requested that inspectors question the mall developers regarding the mistake. An inspector discovered a copy of Kruetzberg's letter, dated August 27, 1987, indicating that the addendum contained a mistake. Kaffenberger then instructed the police chief to brief selected council members about the discrepancy. The secret briefings took place on September 10 and 11, 1987. In addition, on the evening

of September 10, 1987, Kaffenberger, the police chief and other individuals searched Avilla's office without a search warrant. Kaffenberger insisted that they were searching for the deed of trust. Nonetheless, they removed cassettes from Avilla's brief case, which were unrelated to the deed of trust.¹ Kaffenberger told an individual to copy the tapes. Others items were also seized.

8  On September 11, 1987, a police inspector, present during the initial search, obtained a search warrant alleging that Avilla had been or was attempting to tamper with public records. No evidence, however, indicated that Avilla tampered with the deed of trust after it was filed. The inspector and others conducted a second search of Avilla's office and again seized items.

9  The previously-briefed selected council members held an emergency meeting on September 11, 1987, and voted to suspend Avilla, based on Kaffenberger's representations. On September 15, 1987, the full City council met and Avilla informed them about Kaffenberger's actions and the seizure of tapes from his office. Previously-unbriefed council members chastised their colleagues for holding the prior secret meeting and indirectly criticized Kaffenberger for his role in the search and seizure.

10  The City council members terminated both Kaffenberger and Avilla because they were uncertain whether any criminal conduct had occurred. Based on Kaffenberger's search of his office, Avilla threatened to sue the City. The City, however, avoided litigation by settling with Avilla for $40,000.00.

11  Kaffenberger contends that "the termination was pretextural [sic] and in retaliation for carrying out my duties as city manager and that ... [he] was wrongfully discharged in violation of public policy." See Appellant's Opening Brief at 4. We disagree.

12  Kaffenberger's involvement of the police, prior to confronting Avilla, showed that he sought to advance private interests as opposed to carrying out a job-related function. He also found Avilla's letter to Kruetzberg, the mall developer's attorney, explaining that an error had been made in the addendum and that it would be corrected. We agree with the district court's finding that "Kaffenberger's actions demonstrate his overzealousness

in pursuing his investigation and turning a simple mistake into a full-blown investigation." See Order 7/22/91 at 11. Therefore the district court did not err by finding that Kaffenberger did not engage in the type of whistleblowing protected by public policy, see Wagner, 722 P.2d at 257, and properly granted summary judgment, see Fuller, 916 F.2d at 563.

13 Because Kaffenberger stated an arguable claim, irregardless of his misperception of the law, we deny appellee's request for costs, damages, and attorney fees.

14 AFFIRMED.

1 The cassettes contained interviews conducted by Avilla regarding Kaffenberger's alleged connection to unrelated improper activities

# PLAINTIFF'S

# EXHIBIT 12



Stacy Ford
Engineer in Training
6712 - SW Lake Havasu City Infrastructure

April 21, 2009                                    Private & Confidential

Dear Ms. Ford:

The purpose of this letter is to confirm our conversation in which you were informed that effective April 21, 2009, your employment with AMEC Earth & Environmental will cease.

In recognition of your service and to assist you while seeking alternate employment, AMEC Earth and Environmental is prepared to provide to you, upon the signing of a full and final release, (enclosed), the following:

**Severance:** You are being offered a severance payment equal to **two (2) weeks** of pay-in-lieu of notice. This amount is taxed at the IRS supplemental rate. In addition, you are being offered payment equal to one month's COBRA costs.

**Benefits:** If you are enrolled in the Health Insurance program your Health Insurance coverage will continue through **April 30, 2009.** After that date, you will be eligible to continue health plan benefits at your own cost for up to 18 months under the COBRA program. You will receive further information in writing from CIGNA about your COBRA options and sign-up requirements (i.e. you have 60 days from your termination date to elect COBRA coverage) for health plan continuation.

If you are enrolled in a health care or dependent care reimbursement account, you may submit claims for expenses incurred up to your termination date. All claims for dependent care must be submitted by March 31st of the following year and all claims for health care within 90 days of termination date or funds will be forfeited. You may also elect to continue contributing to your health care reimbursement account at your own cost under the COBRA program. You will receive further information in writing from CIGNA about your COBRA options and sign-up requirements. COBRA coverage is not available for dependent care accounts.

Your Accidental Death and Dismemberment, Long Term Disability, and Life Insurance coverages will cease effective on **April 21, 2009.**

If you are enrolled in the 401(k) program, your contributions will also cease effective **April 21, 2009.** A packet explaining all of your 401(k) options will be mailed to your home.

**Unemployment Compensation:** Please be aware that you may be eligible for unemployment compensation through the local state offices. You may apply after **April 21, 2009.**

**Employee Assistance Program (EAP):** Counseling services have been arranged through LifeWorks, a Ceridian Service. You are eligible for five visits without cost to you anytime during the months of **April and May** under AMEC's agreement with LifeWorks. You may call them at 888-267-8126.

**Job Openings:**
If you are interested in future employment opportunities with AMEC, please be sure to look on www.amec.com for open job postings.

**Final Pay:** Your final paycheck will be issued on **April 24, 2009.** The paycheck includes the entire pay period through **April 21, 2009** as well as any accrued, unused vacation.

In exchange for the severance described above, we require you to confirm your acceptance by executing the attached Final Release and Indemnity within 21 days. Please forward a signed original of the document to **Melinda Knott, AMEC Earth & Environmental, 11810 North Creek Parkway North, Bothell, WA 98011** no later than May 12, 2009.

We thank you for your efforts on behalf of E&E and wish you much success for the future. Should you have any questions please contact Human Resources.

AMEC Earth & Environmental, Inc.

Mike Lywood
Unit Manager—Lake Havasu, AZ

## CONFIDENTIAL SEPARATION
## AGREEMENT AND GENERAL RELEASE

AMEC Earth & Environmental ("AMEC") and **Stacy Ford**, Employee's heirs, executors, administrators, successors, and assigns (collectively referred to throughout this Confidential Separation Agreement and General Release ("Agreement") as "Employee"), agree that:

1.    **Last Day of Employment**.  Employee's last day of employment with AMEC is April 21, 2009.

2.    **Consideration.**    In consideration for signing this Agreement, and complying with its terms, AMEC agrees:

a.    to pay to Employee, Stacy Ford, $3,818.66, representing two (2) weeks of salary at Employee's base rate of pay, less lawful deductions, and one (1) month of COBRA costs (grossed up) within fourteen business days after AMEC receives a signed original of this Agreement.

3.    **No Consideration Absent Execution of this Agreement**.    Employee understands and agrees that Employee would not receive the monies and/or benefits specified in paragraph "2" above, except for Employee's execution of this Agreement and the fulfillment of the promises contained herein.

4.    **General Release of All Claims**.  Employee knowingly and voluntarily releases and forever discharges AMEC, its parent corporation, affiliates, subsidiaries, divisions, predecessors, insurers, successors and assigns, and their current and former employees, attorneys, officers, directors and agents thereof, both individually and in their business capacities, and their employee benefit plans and programs and their administrators and fiduciaries (collectively referred to throughout the remainder of this Agreement as "Releasees"), of and from any and all claims, known and unknown, asserted or unasserted, which the Employee has or may have against Releasees as of the date of execution of this Agreement, including, but not limited to, any alleged violation of:

- Title VII of the Civil Rights Act of 1964;

- Sections 1981 through 1988 of Title 42 of the United States Code;

- The Employee Retirement Income Security Act of 1974 ("ERISA") (except for any vested benefits under any tax qualified benefit plan);

- The Immigration Reform and Control Act;

- The Americans with Disabilities Act of 1990;

- The Workers Adjustment and Retraining Notification Act;

- The Fair Credit Reporting Act;

- Arizona Civil Rights Act – Ariz. Rev. Stat. §41-1401 et seq.

- Arizona AIDS Testing and Confidentiality Act - Ariz. Rev. Stat. Art. 4, Tit. 36, §36-661, 664-668

- Arizona Equal Pay Law – Ariz. Rev. Stat. Art. 6.1, Ch. 2, Tit. 23, §23-340 et seq.

- Arizona Genetic Testing Laws – Title 12, Ch. 19, Art. 1, Ariz. Rev. Stat. §12-2801 and Title 20, Art. 6, Ariz. Rev. Stat. §20-448.02

- Arizona Employment Protections Act – Title 23, Ch. 9, Art. 1, Ariz. Rev. Stat. §23-1501

- Arizona Constructive Discharge Law – Title 23, Ch. 9, Art. 1, Ariz. Rev. Stat. §23-1502

- Arizona Wage Payment and Work Hour Laws

- Arizona Occupational Safety and Health Act, as amended

- Arizona Political Activities of Employees Law – Ariz. Rev. Stat. §16-1012 et seq.

- Arizona Drug Testing Law – Ariz. Rev. Stat. §23-493
- any other federal, state or local law, rule, regulation, or ordinance;

- any public policy, contract, tort, or common law; or

- any basis for recovering costs, fees, or other expenses including attorneys' fees incurred in these matters.

5. **Acknowledgments and Affirmations.**

Employee affirms that Employee has not filed, caused to be filed, or presently is a party to any claim against AMEC, except _____.

Employee also affirms that Employee has been paid and/or has received all compensation, wages, bonuses, commissions, and/or benefits to which Employee may be entitled. Employee affirms that Employee has been granted any leave to which Employee was entitled under the Family and Medical Leave Act or related state or local leave or disability accommodation laws.

Employee further affirms that Employee has no known workplace injuries or occupational diseases.

Employee also affirms that Employee has not divulged any proprietary or confidential information of AMEC and will continue to maintain the confidentiality of such information consistent with AMEC's policies and Employee's agreement(s) with AMEC and/or common law.

Employee further affirms that Employee has not been retaliated against for reporting any allegations of wrongdoing by AMEC or its officers, including any allegations of corporate fraud.    Both Parties acknowledge that this Agreement does not limit either party's right, where applicable, to file or participate in an investigative proceeding of any federal, state or local governmental agency. To the extent permitted by law, Employee agrees that if such an administrative claim is made, Employee shall not be entitled to recover any individual monetary relief or other individual remedies.

6.    **Confidentiality and Return of Property.**    Employee agrees not to disclose any information regarding the underlying facts leading up to or the existence or substance of this Agreement, except to Employee's spouse, tax advisor, and/or an attorney with whom Employee chooses to consult regarding Employee's consideration of this Agreement.

Employee affirms that Employee has returned all of AMEC's property, documents, and/or any confidential information in Employee's possession or control. Employee also affirms that Employee is in possession of all of Employee's property that Employee had at AMEC's premises and that AMEC is not in possession of any of Employee's property.

7.    **Governing Law and Interpretation.** This Agreement shall be governed and conformed in accordance with the laws of the state in which Employee worked at the time of Employee's last day of employment without regard to its conflict of laws provision. In the event of a breach of any provision of this Agreement, either party may institute an action specifically to enforce any term or terms of this Agreement and/or to seek any damages for breach. Should any provision of this Agreement be declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, excluding the general release language, such provision shall immediately become null and void, leaving the remainder of this Agreement in full force and effect.

8.    **Nonadmission of Wrongdoing.**    The Parties agree that neither this Agreement nor the furnishing of the consideration for this Agreement shall be deemed or construed at any time for any purpose as an admission by Releasees of wrongdoing or evidence of any liability or unlawful conduct of any kind.

9.    **Amendment**. This Agreement may not be modified, altered or changed except in writing and signed by both Parties wherein specific reference is made to this Agreement.

10.    **Entire Agreement**. This Agreement sets forth the entire agreement between the Parties hereto, and fully supersedes any prior agreements or understandings between the Parties. Employee acknowledges that Employee has not relied on any representations, promises, or agreements of any kind made to Employee in connection with Employee's decision to accept this Agreement, except for those set forth in this Agreement.

**EMPLOYEE IS ADVISED THAT EMPLOYEE HAS A REASONABLE 21 DAYS TO CONSIDER THIS AGREEMENT.**

**EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST RELEASEES.**

The Parties knowingly and voluntarily sign this Agreement as of the date(s) set forth below:

AMEC EARTH & ENVIRONMENTAL

By:_____

By:_____
    Stacy Ford

    Mike Lywood
    Unit Manager—Lake Havasu, AZ

Date:_____

Date:_____

# PLAINTIFF'S

# EXHIBIT 13

Earth & Environmental 

**Employee Action Form**

DATE 04-21-09     EFFECTIVE DATE 04-21-098     UNIT 6712D     EMPLOYEE NO. 506536

NAME OF THE EMPLOYEE Stacy Ford
EMAIL ADDRESS stacy.ford@amec.com     New Hire ☐ Rehire ☐ -enter 1st day worked ☒ Term)

## New Hires/Offer Proposal Information (Mark off all applicable boxes)

Level Title _____    Work Location _____
Job Title _____    Hours/week
☐ Regular, Full-Time (24 - 40 hr/wk)    ☐ Exempt (salaried)    ☐ Nonexempt (hourly)
☐ Temporary, Full-Time (24 - 40 hrs/wk – Max. 6 mo.)*    Pay $_____ (biweekly if exempt / hourly if nonexempt)
☐ Regular, Part-Time (Max. 23 hr/wk)*    Unit Billable (average 70% unit pricing work) ☐ Yes ☐ No
☐ Temporary, Part-Time (Max. 23 hr/wk – Max. 6 mo.)*    Timesheet Approver /Supervisor _____
☐ On-Call (no set schedule or hours / no benefits)*   *not eligible for Choices benefits    Participation in: ☐ Driving Program ☐ Medical Surv. Program
Vacation Exception: ☐ 3 weeks ☐ 4 weeks    ☐ Signing Bonus: $_____ ☐ Moving Allowance: $_____
*Please attach applicant resume or application

## Changes (Mark off all applicable boxes)

☐ New Level Title _____    ☐ New Job Title _____
☐ New Location _____    ☐ New Supervisor/Manager _____
☐ New Unit _____    ☐ New Timesheet Approver _____
☐ Regular or ☐ Temporary _____    ☐ Exempt to Nonexempt
☐ PT to FT (24 - 40 hr/wk) _____ hrs/wk    ☐ Nonexempt to Exempt (attach job description; prior HR approval)
☐ FT to PT (Max. 23 hr/wk / no benefits) _____ hrs/wk    ☐ New Hours per Week _____
☐ FT/PT to On-Call (no set schedule or hours / no benefits)    ☐ On-Call to FT or PT (circle one) _____ hrs/wk
   ☐ Employee requested or ☐ Employer requested, if due to lack of work contact HR

☐ Base Pay Change   Current Pay $_____    New Pay $_____ (biweekly if exempt / hourly if nonexempt)
   Reason for Change**    ☐ Merit Increase ☐ Promotion ☐ Market Adjustment _____ % Increase
   ** Attach appropriate documentation (i.e., market data if this is a adjustment) or use explanation area below

## Leave of Absence (Start – use first day not working. Return – use first day back. Attach appropriate documentation)

☐ Start Leave of Absence   Date: _____    Type: ☒ FMLA    ☐ Military
☒ Return from Leave of Absence   Date: 04-21-09    ☐ Personal    ☐ Lack of Work (Temporary Layoff)

## Terminations (Attach resignation letter/form. For separations attach documentation and final timesheets.)

☐ Resignation    Separation Code [O]    (reference leave codes)
☐ Involuntary Separation – Term with cause    Eligible for rehire? ☒ Yes or ☐ No (if No is checked, please attach
☒ Involuntary Separation – Layoff      or provide explanation)

*2weeks sev. 11mo COBRA 1379.46 ✻*

**Explanations/Notes:** Ms. Ford has been on an extended FMLA leave beginning on 12-16-08. She has medial approval
to return to work tomorrow, 04-21-09. Since Ms Ford has been absent, her duties have been redistributed to other
personnel, and there is no need to reinstate her subsequent to her leave. She is being laid off coincidental with her return
✻ Dental F/F 120.82, ✻ OAP IN E/F 1240.93 ✻ Vision E/F ~~~~~ 17.71

| AUTHORIZATIONS | WHEN REQUIRED | SIGNATURE | DATE |
|---|---|---|---|
| Unit Manager | All Changes | *signature* | April 20, 2009 |
| Area Manager | See Limits of Authority | attached | |
| Regional Manager | See Limits of Authority | | |
| Human Resources | Reviews All Changes; Concurrence per Limits of Authority | attached | |
| Exec. Vice-President | See Limits of Authority | | |

**For Office Use Only:** revised March 2006    ENTERED BY HR    Billing Class Code _____    EEO Code_____
☐ New Hire ☐ Promotion    APR 1 7 2009 254 Title_____    Headcount Title_____
☐ Rehire ☐ Other    Accrual Rate _____%    Continued Service date _____

HR/Payroll Use Only | HR Initial AO | ADP Initial | RST Initial

Glacier

---

## Knott, Melinda R

**From:** Galchenko, Maya I
**Sent:** Monday, April 20, 2009 4:42 PM
**To:** Bennion, David B
**Cc:** Knott, Melinda R
**Subject:** RE: Stacy ford Layoff APPROVAL NEEDED

---

Approved.

---

**From:** Bennion, David B
**Sent:** Monday, April 20, 2009 4:39 PM
**To:** Peterson, David E; Brickey, William J; Galchenko, Maya I
**Cc:** Leon, Lisa; Cleland, Teresa L; Knott, Melinda R
**Subject:** Stacy ford Layoff APPROVAL NEEDED
**Importance:** High

Hello:

I am attaching an EAF for the layoff of Stacy Ford. Stacy was slated for the 01-11-09 layoff, but since she was on an active FMLA leave, it was decided to hold off on her layoff until after she was allowed to return to full duty.

She will be returning to work tomorrow, and we want to do the layoff coincidental with her return to work. Stacy's work has been redistributed to several other people.

Stacy has exhausted her 12-week FMLA leave job protection, and thus we are not obligated to return her to work. Since her workload has already been reallocated, it makes sense to do this layoff at this time. Please respond to Melinda Knott, cc to me with an approval of this layoff. Please do this ASAP, as we need to generate the paperwork for the layoff today. Thank you.

Dave Bennion
SW Region HR Manager
Mesa, AZ
480-648-5331

04/20/2009

.Glacier

## Knott, Melinda R

| | |
|---|---|
| **From:** | Peterson, David E |
| **Sent:** | Monday, April 20, 2009 4:59 PM |
| **To:** | Bennion, David B; Brickey, William J; Galchenko, Maya I |
| **Cc:** | Leon, Lisa; Cleland, Teresa L; Knott, Melinda R |
| **Subject:** | RE: Stacy ford Layoff APPROVAL NEEDED |

ok by me
DEP

**From:** Bennion, David B
**Sent:** Monday, April 20, 2009 4:39 PM
**To:** Peterson, David E; Brickey, William J; Galchenko, Maya I
**Cc:** Leon, Lisa; Cleland, Teresa L; Knott, Melinda R
**Subject:** Stacy ford Layoff APPROVAL NEEDED
**Importance:** High

Hello:

I am attaching an EAF for the layoff of Stacy Ford. Stacy was slated for the 01-11-09 layoff, but since she was on an active FMLA leave, it was decided to hold off on her layoff until after she was allowed to return to full duty.

She will be returning to work tomorrow, and we want to do the layoff coincidental with her return to work. Stacy's work has been redistributed to several other people.

Stacy has exhausted her 12-week FMLA leave job protection, and thus we are not obligated to return her to work. Since her workload has already been reallocated, it makes sense to do this layoff at this time. Please respond to Melinda Knott, cc to me with an approval of this layoff. Please do this ASAP, as we need to generate the paperwork for the layoff today. Thank you.

Dave Bennion
SW Region HR Manager
Mesa, AZ
480-648-5331

04/21/2009

# PLAINTIFF'S

# EXHIBIT 14

**Earth & Environmental**                                                    **amec**

## Disability Leave of Absence Request
## Non-FMLA

Last Name _Ford_          First Name _Stacy_          Employee # _5066536_

Unit Number and Work Location _6712 Lake Havasu City, AZ_

Supervisor Name _Darin Miller_          Work Phone # _928-854-8030_

I request approval of a disability leave of absence for the period of (month/day/year) _12/15/08_ through
(month/day/year) _____, for an injury or illness which is eligible for AMEC's Short Term Disability Program.
_→ waiting for authorization for testing & then Dr. release_

- I understand I need to discuss the status of my benefits (including my potential eligibility for AMEC's STD or LTD benefits) with Human Resources.
- I understand that I will receive a letter from Human Resources that will explain my eligibility to continue company benefits such as health insurance and short term disability.
- I understand that I do not currently meet the eligibility criteria for Family Medical Leave.
- Prior to returning to work, I will provide Human Resources with a doctors release to return to work.

Employee Signature: _Stacy D. Ford_          Date: _1/22/09_

### Disability Leave of Absence  (Non-FMLA Eligible)

Written disability leave of absence (DLOA) requests for non-FMLA eligible should be submitted as soon as the need for leave becomes known to the employee.  Initial notification may be verbal, but employees must also submit a written DLOA Request Form for supervisory approval.

- Immediate supervisors should consider the request and, upon approval, assign the appropriate level of reinstatement on this form.
  *(Note: see back of form for details.)*
- The employee must provide a signature acknowledging the reinstatement level recommended by the immediate supervisor.  Once the employee's signature is obtained, the approved form should be forwarded to: 1) the appropriate second level per the Limits of Authority Chart (i.e. Business Unit Manager, Vice President or Senior Vice President), 2) Human Resources
- Once a non-FMLA disability leave is approved by Human Resources, the department initiates an EAF placing the employee on a "disability" leave status.
- Employee is responsible for paying the employee costs associated with eligible benefits program.  All employee costs for benefits will be deducted from the employee's disability checks upon approval of disability pay by Aetna.

### Reinstatement Levels *(Supervisors check the appropriate box)*

- ☒ Level I - Return to same position, at same rate of pay if business conditions permit
- ☐ Level II - Return to similar position, at similar rate of pay, if business conditions permit.
- ☐ Level III - Consideration as internal applicant for any vacant position for which you are qualified.
- ☐ Level IV - Other.  Reinstatement level defined by the attached written agreement.

### Supervisory Approval & Employee Acknowledgment *(Employee acknowledges supervisor's recommendation for reinstatement)*

| Business Unit Manager Approval (up to 4 weeks): | Date | Employee Acknowledgment: _Stacy D. Ford_ | Date _1/22/09_ |
|---|---|---|---|
| Group Manager (VP) Approval (up to 8 weeks): or Regional Manager (SVP) Approval  (up to 6 months): | Date | Executive Vice President Approval (> 6 months): | Date |

* **Levels of Reinstatement**

The purpose of leave without pay is to provide the employee flexibility outside of leave accruals while maintaining AEEI's ability to manage the impact of such leave within a department or business unit. For this reason, part of the DLOA approval process includes assigning a level of reinstatement. The level of reinstatement communicates the circumstances under which an employee may return to work. In designating a reinstatement level, supervisors should consider the nature of the request, the needs of the department during the period of requested leave and the impact the temporary loss of the position (i.e., hiring a temporary employee, reassigning work to current employees, etc.) would have on maintaining business operations. Before forwarding this form to the second level supervisor, the employee must sign to acknowledge the level of reinstatement recommended by the supervisor (any change in the level of reinstatement must also be initialed by the employee).

- Level I - Return to same position, at same rate of pay if business conditions permit
- Level II - Return to similar position, at similar rate of pay, if business conditions permit
- Level III - Consideration as internal applicant for any vacant position for which you are qualified
- Level IV - Other. Reinstatement level defined by the attached written agreement.

**Note:** Because the business needs of a department change (i.e., peak periods, funding, restructuring, etc.), a level of reinstatement should be assigned on a case-by-case basis. Please consult with Human Resources.

* **Approvals**

All requests must be approved according to the Limits of Authority chart. Requests that are equal to or less than 4 weeks require a DLOA Request form that must be approved by a Unit Manager. Requests that exceed 4 weeks and are equal to or less than 8 weeks must be approved by a Group (Area) Manager/VP. Requests that exceed 8 weeks and are equal to or less than 6 months must be approved by a Regional Manager/SVP. Requests that exceed 6 months must be have Executive Vice President approval.

* **Benefits**

Employee premium costs for benefits will be deducted from the employee's disability checks upon approval of disability pay by Aetna.

# Short Term Disability Payment

Paydate ___2/27/09___

W/E ___12/26/08 - 2/20/09___

Employee Name ___Stacy Ford___

File # ___506536___

Scheduled Hours ___LGFT___

Hourly _____

Salary _____

Cancel Auto Pay _____

Rate Code 2 _____

w/e 1/2/09 ee pd
(8) H riches
(32) V riches

w/e 12/26/08 ee pd
8 H
16 V
riches
(10) H
(8) V

| PAYDATA BATCH # | 37 | |
|---|---|---|
| Hours Code | # of Hours | Entered |
| 25 | 32 + 40 + 40 + 40 + 272 +24 + 24 + 24 + 24 = 272 | 20 |

Hours Entered by _____  Date ___2/23/09___

Entry Audited by _____  Date  **POSTED**
FEB 23 2009

# Short Term Disability Payment

Paydate _3/13/09_

W/E _2/27/09, 3/6/09_

Employee Name _Stacy Ford_

File # _506536_

Scheduled Hours _RGFT_

Hourly _____

Salary _____

Cancel Auto Pay _____

Rate Code 2 _____

PAYDATA BATCH # _31_

| Hours Code | # of Hours | Entered |
|------------|------------|---------|
| 25 | 24 + 24 = 48 | ✓ |

Hours Entered by _____ Date _3/6/09_

POSTED

Entry Audited by _____ Date MAR 09 2009

# PLAINTIFF'S

# EXHIBIT 15

January 12th, 2009


Stacy D. Ford
1561 Mohican Dr.
Lake Havasu City, AZ 86406

Dear Stacy,

**Re:** Short-Term Disability due to your qualifying event

Effective December 22nd, 2008 you will be eligible to apply for AMEC Earth & Environmental Inc.'s (AEEI) short-term disability (STD) program.   While you are out on disability leave you will be placed on a Disability Leave of Absence (DLOA) as you are not eligible for Family Medical Leave (FML). Please complete and return the attached DLOA form to me in the Bothell office. To be eligible for FML you must have been employed with AEEI for more than one year.

**To report your claim you will need to call Aetna at 1-800-488-2386.** They will get all the information that is needed from you to start processing your claim. Please note the length of your short-term disability is determined based upon the length of your actual disability.   The table below indicates the level of benefit provided by week.


**Illness**

| **Weeks Out** | **Benefit** |
|---|---|
| Week 1 | STD waiting period, 5 consecutive working days |
| | - must use sick leave/vacation/leave without pay |
| Weeks 2 – 5 | 100% of your salary |
| Weeks 6 – 26 | 60% of your salary |


As of the week ending January 7th, you have 6.92 hours of sick and 20.88 hours of vacation time.  You will be responsible for submitting a timesheet for the waiting period. If you are unable to submit a timesheet in the appropriate time frame please contact me so that a timesheet can be submitted on your behalf.

Disability payments are paid through AEEI's payroll based on approval and length from Aetna. You will receive your disability payments biweekly with the regularly scheduled pay dates and will be direct deposited if you have it established.  If not, the checks will be mailed to your home.

Your health care benefits continue while you are on STD leave. The employee share of your benefits will be deducted from your disability check. Please note that vacation and sick leave will NOT accrue while you are on short term disability.

When you are released back to work by your doctor please have your physician fax a release to work note to Human Resources at 425-368-1005.

If you have any questions about LWOP or short-term disability or any portion of the paperwork, please feel free to contact me at 425-368-1000.

Sincerely,

Dave Bennion
HR Manager

cc: DLOA File

/attachments

# PLAINTIFF'S

# EXHIBIT 16

TODAY'S **NEWS-HERALD**    Havasunews.com    Print Page

Serving Lake Havasu City & The Lower Colorado River Area

News

## City, AMEC review claims
### Say 'no evidence' to support allegations

**By NATHAN BRUTTELL**
Thursday, November 19, 2009 6:22 AM MST

Lake Havasu City staff and AMEC recently reviewed allegations, finding "no evidence to support" a former employee's claims.

Former AMEC employee Stacy Ford-Kelly made statements Nov. 10 during a public comments portion of the City Council regular meeting. Ford-Kelly claimed she was terminated from AMEC after "finding errors" in the sewer project. She also said her comments were "disregarded" by her superiors at AMEC when she worked as an engineer in training in 2008. AMEC representatives said an outside, unnamed ethics auditor evaluated the claims and found nothing substantial.

"The results of the investigation yielded no evidence to support any of Ms. Ford's claims of corruption or misconduct and no further action was deemed necessary," AMEC Senior Vice President David Peterson and Executive Vice President William Brickey wrote in a memo to city staff.

The memo also states the outside firm "performed an extensive audit of documents, files and computer hard drives for any evidence of misconduct" and also interviewed Ford-Kelly and AMEC staff.

Ford-Kelly said she did not feel the outside auditing staff was adequate.

"The problem I had was they're accountants," she said. "They can balance the books but they're not engineers. They didn't look at drawings or specific things I was talking about."

Interim City Manager Charlie Cassens stated city staff researched the claims as well and so far have received no documents or a notice of claim against the city.

"Despite (Ford-Kelly's) expressed willingness to share this information with staff and the city attorney, she has not been forthcoming with any documentation," Cassens said in the memo. "In the absence of any verifiable information to support her claims, staff can only rely on information contained in existing files and reports. Based on the information currently at hand, we feel Ms. Ford's allegations are unfounded and can find no cause to pursue this matter any further."

Ford-Kelly said she filed claims regarding her employment with AMEC to the Environmental Protection Agency, Arizona Department of Environmental Quality, the Internal Revenue Service and the Arizona Board of Professional Registrants.

"I am sure this is why I was 'laid off' from AMEC because I had brought these issues to the attention of my superiors and they did nothing," she wrote in an e-mail to PBS&J. "The more problems I found and reported, the worse things got for me."

Ford-Kelly said she plans to pursue the matter further.

"Just from the time I spent at the Wastewater Treatment Plant, my notes on that have nearly 100 lines that are not to specifications," she said, adding that her intention is to correct errors on the project. "From the beginning, all I've wanted is for the sewer to be correct and nobody would listen. As an engineer, your first duty is to the public."

Interim Public Works Director Mark Clark said he first heard the claims in May.

"AMEC shared with us those issues and we felt comfortable that they addressed the issues," he said. "As far as we're concerned, it's an employment issue related to (AMEC's) employees."

Clark added that he would also review and investigate any possible errors in the Wastewater System Expansion Program.

"City staff does review plans with the project to make sure we're comfortable with the work being done and ADEQ also signs off on plans to make sure they meet their requirements," he said. "Any information that indicated any problems would be looked into immediately."

Ford-Kelly also made accusations claiming former City Manager Richard Kaffenberger was responsible for "blackballing" her from a position with PBS&J. Cassens said city staff reviewed police reports involving Ford-Kelly and "her husband James Kelly."

"After reviewing the various reports and hearing what her former employers had to say, we can find no evidence to support her claim that she was 'blackballed' from a prospective position at PBS&J," Cassens wrote in a memo.

Ford-Kelly also claimed earlier this month that her residence was illegally searched in July 2008.

"I believe (Kaffenberger) was also a part of the search warrant," she said Nov. 10, "which was looking for the documentation that would prove illicit activities."

Ford-Kelly also said she has documents which show the search was performed illegally and plans to release them following federal investigation.

"That's a whole other issue that I can prove," she said.

Cassens said city staff researched the "alleged 'thefts' from her home by police in March 2008 and the subsequent retention of what Ms. Ford refers to as '$60,000 in contraband,'" according to the memo.

"We believe these are cases relating to a large number of assault-type weapons that were seized during the execution of a search warrant on her home in July 2008," the memo stated. "We believe the weapons cases have no bearing on Ms. Ford's present employment condition, and according to documents on file with the U.S. Bureau of Alcohol, Tobacco and Firearms, the seized weapons (excepting three that Mr. Kelly allegedly converted to full auto capability), will remain in their custody until the federal case against Mr. Kelly is resolved."

Ford-Kelly said she does not plan to provide documents with city staff because of the search.

"If they're going to allow an illegal search on my house, and not care about their corruption and help me in that way then why should I help them," she said, adding that she does plan on filing lawsuits against AMEC, the city and the police department.

You can contact the reporter at nbruttell@havasunews.com.

What is RSS?

All original content Copyright © 2009 Todays News Herald and may not be reprinted without permission. Todays News Herald Online is a service of Todays News Herald, Inc. By using the site, you agree to abide and be bound by the site Terms of Use, which prohibit commercial use of any information on the site. Todays News Herald is a publication of River City Newspapers Inc. All Rights Reserved.

# PLAINTIFF'S

# EXHIBIT 17



# Code of Business Conduct



# Contents

Letter from Samir Brikho                                                                    2

Our responsibility to our customers                                                         3
   Ensuring quality performance
   Allowing fair and honest competition
   Respecting contractual obligations
   Making no improper payments

Our responsibility to our business partners                                                 4
   Ensuring fair and honest relationships
   Setting high ethical standards
   Disclosing relevant, material information to the financial community
   Making no improper payments to agents, sponsors and consultants

Our responsibility to each other                                                            5
   Giving mutual respect
   Allowing open communication
   Promoting diversity
   Avoiding harassment
   Working in a safe and healthy environment

Our responsibility to the company                                                           7
   Safeguarding assets
   Protecting trade secrets and confidential information
   Preventing insider trading
   Managing conflicts of interest

Our responsibility to governments                                                          10
   Setting the highest ethical standards
   Committing to full co-operation

Our responsibility to the wider social environment
   Promoting sustainable development                                                       11
   Encouraging volunteering
   Ensuring strict compliance with the law

Upholding the Code                                                                         12

# Our responsibility to each other

AMEC employees come from many countries with different backgrounds and cultures. Every employee contributes to AMEC and contributions are maximised if we provide a suitable work environment. We value the diversity of our people and we respect and uphold their right to work in a safe and healthy environment of mutual respect and open communication, free from harassment and offering equal opportunity for advancement and promotion.

■ Giving mutual respect means treating others with civility and courtesy, accepting differences without necessarily agreeing with them, listening to what others have to say and refraining from ridiculing or embarrassing others. We should observe the highest standards of courtesy and respect when interacting with one another.

■ Allowing open communication means open and honest communication between an employee and their manager on a day-to-day basis. Employees' input should be welcome, advice freely given and issues raised and shared candidly. Such open communication is essential to resolve concerns quickly, to recognise and address business issues as they arise and to address the ever-changing global environment. Open communication includes an annual review of every employee's performance by their line manager, to assess progress and propose plans for development and improvement.

■ Ensuring equal opportunity means that all employees and job applicants are afforded fair and non-discriminatory treatment for both employment and advancement, irrespective of race, ethnic or national origin, age, gender, religion, sexual orientation, disability or other qualities and traits irrelevant to performing the tasks required. Employment, advancement and termination or retirement must be based on aptitude, abilities, skills and qualifications.

■ Promoting diversity means that we value the national and cultural heritage and many differences of our people.

■ Avoiding harassment means not behaving in a way that another person may find intimidating, upsetting, embarrassing, humiliating or offensive irrespective of the intent.

Harassment can take many forms, including:

- Slurs, insults, name calling, ridicule, mockery
- Unwanted physical contact, assaults or threats, intimidation, stalking or spying
- Offensive or obscene comments, jokes, songs, posters, graffiti or gestures
- Improper and repeated isolation or exclusion from social activities, meetings or conversations
- Coercion for favours
- Bullying or deliberately setting unrealistic targets and/ or deadlines, public criticism, undervaluing effort and substituting responsible tasks with menial or trivial ones.

Harassment creates a hostile or abusive work environment and will not be tolerated in any form, whether occurring openly, covertly or in oral, written or physical form.

❑ Working in a safe and healthy environment means protecting the lives and health of AMEC employees. Nothing we do is so important that we cannot take the time to do it safely. We all have a responsibility to work safely and to protect ourselves, others and the environment. Each employee has the right to halt work at any time if health or safety is being compromised.

AMEC is committed to protecting and supporting employees, business partners and the environment by implementing robust health and safety management systems, adopting best practices and engaging in continuous performance improvement. It is the responsibility of each of us to understand the work in which we are involved, to be aware of the risks and to take the necessary and appropriate precautions for the health and safety of all, and for the protection of the environment. Our safety, health and environmental standards can be found on our intranet and in other business unit or project communications.



To work safely, effectively and productively, and to remain alert and responsive to instruction and aware of the consequences of our actions, we must maintain a drug and alcohol-free workplace. The use of illegal drugs or the inappropriate use of legal drugs or alcohol is not permitted while carrying out company business nor is it condoned at other times. Further details can be found on our intranet.

It is crucial that any unsafe conditions or breach of the AMEC standards in health, safety and environment are reported immediately to an appropriate person.

**Code of Business Conduct**

6

# PLAINTIFF'S

# EXHIBIT 18

EEOC Form 161 (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMIS

## DISMISSAL AND NOTICE OF RIGHTS

To:  Stacy D. Ford
1990 McCulloch Boulevard
D128
Lake Havasu City, AZ 86403

From:  Phoenix District Office
3300 North Central Ave
Suite 690
Phoenix, AZ 85012

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 540-2010-00908 | Jason J. Brown, Investigator | (602) 640-5030 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
#### (See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

_Rayford O. Irvin_

Rayford O. Irvin,
Acting District Director

APR 30 2009

(Date Mailed)

Enclosures(s)

cc:  David Bennion
Reg. HR Manager
AMEC
1405 W. Auto Drive
Tempe, AZ 85284