1  Peter K. Strojnik, State Bar No. 026082
   **THE STROJNIK FIRM L.L.C.**
2  Esplanade Center III, Suite 700
   2415 East Camelback Road
3  Phoenix, Arizona 85016
   Telephone: (602) 510-9409
4  Facsimile:  (602) 532-7572
   Strojnik@skplaw.com
5
   Peter Strojnik, State Bar No. 006464
6  **STROJNIK P.C.**
   Esplanade Center III, Suite 700
7  2415 East Camelback Road
   Phoenix, Arizona 85016
8  Telephone: (602) 524-6602
   Facsimile:  (602) 296-0135
9  PS@strojnik.com

10 Attorneys for Plaintiff
   Stacy Ford-Kelly
11

12               UNITED STATES DISTRICT COURT
13                    DISTRICT OF ARIZONA

14 | Stacy D. Ford-Kelly, | Case No: 3:12-cv-08085-NVW |
15 | Plaintiff, | |
16 |  | **DECLARATION OF STACY FORD-KELLY** |
17 | vs. | |
18 | AMEC Environment & Infrastructure, Inc., a Nevada Corporation; AMEC PLC, a British company, | |
19 |  | |
20 | Defendants. | |

21     I, Stacy Ford-Kelly declare under oath as follows:
22     **1.**   I am a married woman with three children residing in Lake Havasu City,
23
   Arizona. The reason I reside in Lake Havasu is because I accepted employment with
24
   Defendant AMEC Environment & Infrastructure, Inc. *fka* AMEC Earth &
25
   Environmental in January 2008. Prior to my acceptance of a position with Defendant, I
26
   was a long time resident of Idaho where I lived with my children.
27

28

2.    I was born on the Navy Base in Rota, Spain and after my father was honorably discharged in May of 1979, when I was seven years old, we moved to Boise, Idaho. In 2006, I obtained my undergraduate degree in civil engineering from Boise State University. Ultimately, I sat for and passed the Fundamentals of Engineering (F.E.) examination for certification as an Engineer-In-Training (E.I.T) before I graduated from my Bachelor of Science in Civil Engineering (B.S.C.E.) studies. In the Fall of 2006, I began my Masters education in civil engineering at Boise State. During my Masters education, I focused my studies on wastewater and water treatment facilities design with an emphasis in hydrology and hydrogeology encompassing the environmental aspects of civil engineering, e.g. the application of civil engineering to well design and sewer and water treatment design. In January of 2008 I had completed over half of the requirements, but I put my Masters education on hold because I relocated to Lake Havasu having only twelve credit hours left when I withdrew from graduate school.

3.    I am a design engineer, which is synonymous with E.I.T. A design engineer/E.I.T. distinguishes him/herself from a drafter because a design engineer designs the entire system, writes the appropriate engineering reports, applies for the required construction and environmental permits, approves the materials contractor is using and performs inspection of work completed during all phases of construction, e.g. a sewer system, as well as the engineering of the design in order to develop the conceptual, preliminary and detail design, e.g. the slope, gravity, and keep the flow vis-à-vis accommodation of large objects within the sewer system. In simpler terms, a design engineer creates the construction drawings and three-dimensional computer modeling requisite for a prototype and production of the applicable project and ensures the proper reports, permits, materials and construction are in compliance with environmental regulations and within the required specifications for that particular project; all under the supervision of a licensed engineer.

4. In early January 2008 (either Jan. 3 or 4), Chris Hassert telephoned me. Mr. Hassert was the Unit Manager at Defendant's Lake Havasu office. Mr. Hassert invited me to Lake Havasu for an interview for the open design engineer job to work on the new contract Defendant signed to develop a new sewer system in Havasu. The Havasu sewer project was a six-year project.

5. The interview was scheduled for on or about January 14, 2008 with all expenses paid by Defendant. I flew into Las Vegas via Southwest Airlines on the evening of January 13, 2008 and thereafter rented a vehicle to drive to Lake Havasu that evening. I spent the night at a local Havasu hotel.

6. On the following morning, my interview took place at Defendant's Havasu office and continued over lunch at the golf course country club. After returning to the office I told Mr. Hassert that I was looking for a starting salary between $60,000 and $65,000 per year and that I wanted some term guarantee because I would be relocating from Boise. I requested the agreement include our discussion of the salary increase to $85,000 I would get upon passing the Professional Engineer (P.E.) examination to get my license as a P.E. and stamp, both issued by the Arizona Board of Professional Registrants. An E.I.T. is eligible to take the P.E. examination after four years of work under the supervision of a P.E or a combination of work and graduate studies.

7. During the interview, Mr. Hassert also told me that Defendant's contract with Havasu extended through the end of 2013 and was scheduled to be completed by the end of 2013. Mr. Hassert advised that they would require my services through the end of the Havasu contract and until the Defendants closed the Lake Havasu office.

8. The sole purpose of hiring me was for me to work on the Havasu sewer project. In fact, the Defendant's Havasu office was opened for the sole purpose of working on the Havasu contract.

9. On or about January 16, 2008, Mr. Hassert telephoned me and told me I was selected for the position. He further advised that a contract would be delivered to

me from Defendant's Bothell, Washington office. That same day I filled out the application for employment that Mr. Hassert had given to me the day of my interview. Mr. Hassert told me that it was just a formality and the Defendant required the completed employment application to be on file. I was instructed to fill it out at my leisure and return it when I came back to Lake Havasu.

10. On January 21, 2008, I received the contract via express mail. I signed it, called Mr. Hassert and advised him that I would be driving to Havasu shortly. Mr. Hassert advised that when I arrived, I should deliver the signed contract to Renee Lair in the Havasu office and arrange with her the drug testing and background checks.

11. The contract I signed and my signature on the signed contract has been the same contract I have presented during this litigation. Attached as Exhibit 1 is the true and correct employment contract that I signed, and my signature is my signature.

12. On Janaury 23, 2008, I arrived in Havasu and immediately delivered the signed original contract to Renee Lair in Defendant's Havasu office.

13. A true and correct copy of my business card showing my employment as a design engineer with Defendant is attached as Exhibit 2.

14. At 7:30 a.m. on April 21, 2009 (the scheduled date of my return after FMLA leave), I arrived at Defendant's Havasu office medically cleared to return to work. Mr. Miller called me into his office and asked Mr. Lywood to join us. Mr. Lywood told me that Defendant was "letting you go" due to the "economic downfall" and presented me with a letter confirming the termination and a Separation and Release Agreement. True and correct copies of the termination letter and Release Agreement that Mr. Lywood handed me are attached as Exhibits 3 and 4, respectively.

15. I requested whether I would be paid the balance of the contract. Mr. Lywood advised that I speak with David Bennion about that. Mr. Bennion is the HR manager for Defendant.

16. I called Mr. Bennion to request the balance of the monies due on the contract. Mr. Bennion told me that Defendant was not obligated to fulfill their

obligation under the employment contract because "it is not our fault that you exhausted all of your FMLA leave and we don't need you anymore." I knew I was being fired because of the reports and complaints I made about Defendant's unethical business practices and over-estimation of material quantities with respect to the Havasu sewer project.

17. Defendant terminated my employment after a little more than a year after I started working there. Despite my weekly efforts, I have been unable to find gainful employment since the termination.

18. Defendant did not tender the balance of the employment contract following termination.

19. The foregoing is true and correct under the penalty of perjury under the laws of the State of Arizona.

Further the declarant sayeth naught.

DATED this 11th day of February, 2013.

*[signature]*
Stacy Ford-Kelly

# EXHIBIT 1



January 21, 2008

***Private & Confidential***

Stacy Ford
1720 Dearborn St. #4
Caldwell, ID 83605

Dear Ms. Ford,

On behalf of AMEC Infrastructure (AMEC), I am pleased to offer you the position of Design Engineer, reporting to me in the Lake Havasu, AZ office, effective January 28, 2008. If you need to change the date, we will be pleased to discuss one that is mutually acceptable.

The following will outline the terms and conditions of employment:

## Compensation Agreement

- Status – Exempt; Contracted and salaried full-time employee.
- Contract of employment beginning January 28, 2008 and expires December 31, 2013.
- Starting salary is $2,384.62 payable on a bi-weekly basis, which annualizes to $62,000.12.
- Salary to increase to $85,000.00 beginning January 1, 2010, ending December 31, 2013 with a 2.25% annual minimum cost of living increase beginning January 1, 2011.
- The balance of monetary compensation of this contract due to you shall be paid in full within three business days if employment with AMEC ceases due to no fault of your own and is initiated by AMEC after the three-month probationary period. Balance of compensation is to include any accrued and future benefits ending December 31, 2013 for both vacation time and sick leave as outlined below. If such action takes place by AMEC you will also receive payment equivalent to 18 months of COBRA costs which will be included with the balance of this contract compensation due to you. If the remainder of contract is less than 18 months COBRA costs to be paid will be adjusted accordingly.
- You will receive a relocation allowance in the amount of $4,500.00 – the terms of this allowance are attached. Please sign and return with this employment agreement.

## Benefits

Enclosed, please find the *Choices Benefits Package* that explains the benefits currently offered to AMEC regular, full-time employees. Upon your employment you will be immediately eligible for:
- Health insurance coverage, including medical, vision, dental and prescription drug.
- Participation in AMEC's 401(K) program.
- Flexible Spending Account.
- Employee Assistance Plan.
- Short Term Disability, Long Term Disability, Life Insurance, Accidental Death & Dismemberment Insurance.
- You will accrue annual vacation leave at a rate of 15 days per year or 4.62 hours bi-weekly.
- Holidays – AMEC observes 7 holidays per year plus 3 floating holidays throughout the year, the details of which are provided in the Employee Handbook.

## Background Screening and Employment Documentation

It is AMEC's policy to provide a safe and secure work environment for both our employees and our clients. To that end it is the policy of AMEC that all offers of employment are contingent upon the successful completion of a background screening, drug screening and educational credentials

AMEC Infrastructure
94 Acoma Blvd South # 100
Lake Havasu City, AZ 86403
Phone: 928-854-8030
Fax: 928-854-8035

www.amec.com

confirmation (where applicable). If any of the screenings returned are found to be in conflict with AMEC's policy we will discuss the results with you and determine if employment will continue. All screenings will be conducted within the guidelines of all state and federal legislation.

Employees are required to complete the Employment Eligibility Verification Form (I-9) attesting to their employment eligibility and must provide documentation to support their statement. Examples of acceptable proof of employment eligibility include a U.S. Passport, or both a valid State Driver's License and Social Security Card. Please bring these documents with you on the first day of your employment. If you do not have the documents mentioned you may contact the Human Resources Department for further information.

## Probationary Period and Employment Termination

AMEC has a three-month probationary period for all newly hired contracted and non-contracted regular, full-time and part-time employees during which time an employee's work performance and/or general suitability for AMEC employment will be evaluated. While we are confident that your employment with us will be a positive and mutually rewarding experience please understand that your employment, both during and after the probationary period, is not guaranteed for any specific amount of time and is terminable at will, which means that either you or AMEC may end the employment relationship at any time for any reason. Your employment relationship with AMEC is not terminable at will after the three-month probationary period if a contract of employment is outlined within the Compensation Agreement section on the first page of this offer of employment and will be in accordance with the Compensation Agreement.

### Severability

If any part of this offer of employment is held to be invalid, illegal, or unenforceable, the remaining provisions of this agreement will be enforced.

Further information regarding AMEC, its policies and programs will be provided during your orientation. Upon acceptance of the above and enclosed, please sign and return the enclosed copy of this letter, a completed application for employment and any other enclosed documents within seven business days to the Lake Havasu, AZ location. Please feel free to contact me should you have any questions.

We look forward to having you join us and wish you much success in your new position.

Sincerely,
AMEC Infrastructure, Inc.

*[signature]*

Chris Hassert
Unit Manager – Lake Havasu, AZ

I have read and accept the offer of employment contained in this letter, including the referenced attachments.

Date: January 21, 2009                     Employee Signature: *[signature]*

2

# EXHIBIT 2



CHAIRMAN - ETHICS
CHAIRMAN - RETIREMENT &
RURAL DEVELOPMENT
APPROPRIATIONS
FINANCE

SENATOR RON GOULD
Serving Legislative District 3

ARIZONA STATE SENATE
CAPITOL TOWER SN
1700 W. WASHINGTON
PHOENIX AZ 85007

(602) 926-4138
1-(800) 352-8404 ext. 3
FAX (602) 417-3167
E-MAIL rgould@azleg.gov



Rick Sellers
Corporate Security Manager

One Plymouth Meeting
Suite 500
Plymouth Meeting, Pennsylvania
USA 19462-1388

Tel
Dir
Cell
rick.sellers@amec.com

www.amec.com

Judi Branter CFA
Vice President
Ethics & Internal Audit

111 Dunsmuir Street
Suite 400
Vancouver, British Columbia
Canada V6B 5W3

Tel  (604) 664-3085
Cell (604) 312-7749
judi.branter@amec.com

www.amec.com



Czarina C. Au
Director
Advisory Services

KPMG LLP
Suite 2000
355 South Grand Avenue
Los Angeles, CA 90071-1568

Tel  213 955 8587
Fax 213 688 6504
Cell 213 200 3427

cau@kpmg.com



Douglas Farrow, CPA, CFE
Partner
KPMG Forensic

KPMG LLP
Suite 2000
355 South Grand Avenue
Los Angeles, CA 90071-1568

Tel  213 955 8558
Fax 213 947 0620
Cell 310 721 3170

dfarrow@kpmg.com



Stacy Ford
Design Engineer
Infrastructure

94 Acoma Blvd South
Suite 100
Lake Havasu City, Arizona
USA 86403

Tel  (928) 854-8030
Cell (928) 486-9371
Fax  (928) 854-8036
stacy.ford@amec.com

www.amec.com

# EXHIBIT 3



Stacy Ford
Engineer in Training
6712 - SW Lake Havasu City Infrastructure

April 21, 2009 <span style="float:right">Private & Confidential</span>

Dear Ms. Ford:

The purpose of this letter is to confirm our conversation in which you were informed that effective April 21, 2009, your employment with AMEC Earth & Environmental will cease.

In recognition of your service and to assist you while seeking alternate employment, AMEC Earth and Environmental is prepared to provide to you, upon the signing of a full and final release, (enclosed), the following:

**Severance:** You are being offered a severance payment equal to **two (2) weeks** of pay-in-lieu of notice. This amount is taxed at the IRS supplemental rate. In addition, you are being offered payment equal to one month's COBRA costs.

**Benefits:** If you are enrolled in the Health Insurance program your Health Insurance coverage will continue through **April 30, 2009.** After that date, you will be eligible to continue health plan benefits at your own cost for up to 18 months under the COBRA program. You will receive further information in writing from CIGNA about your COBRA options and sign-up requirements (i.e. you have 60 days from your termination date to elect COBRA coverage) for health plan continuation.

If you are enrolled in a health care or dependent care reimbursement account, you may submit claims for expenses incurred up to your termination date. All claims for dependent care must be submitted by March 31st of the following year and all claims for health care within 90 days of termination date or funds will be forfeited. You may also elect to continue contributing to your health care reimbursement account at your own cost under the COBRA program. You will receive further information in writing from CIGNA about your COBRA options and sign-up requirements. COBRA coverage is not available for dependent care accounts.

Your Accidental Death and Dismemberment, Long Term Disability, and Life Insurance coverages will cease effective on **April 21, 2009**.


FORD 00119

If you are enrolled in the 401(k) program, your contributions will also cease effective **April 21, 2009**. A packet explaining all of your 401(k) options will be mailed to your home.

**Unemployment Compensation:** Please be aware that you may be eligible for unemployment compensation through the local state offices. You may apply after **April 21, 2009**.

**Employee Assistance Program (EAP):** Counseling services have been arranged through LifeWorks, a Ceridian Service. You are eligible for five visits without cost to you anytime during the months of **April and May** under AMEC's agreement with LifeWorks. You may call them at 888-267-8126.

**Job Openings:**
If you are interested in future employment opportunities with AMEC, please be sure to look on www.amec.com for open job postings.

**Final Pay:** Your final paycheck will be issued on **April 24, 2009**. The paycheck includes the entire pay period through **April 21, 2009** as well as any accrued, unused vacation.

In exchange for the severance described above, we require you to confirm your acceptance by executing the attached Final Release and Indemnity within 21 days. Please forward a signed original of the document to **Melinda Knott, AMEC Earth & Environmental, 11810 North Creek Parkway North, Bothell, WA 98011** no later than May 12, 2009.

We thank you for your efforts on behalf of E&E and wish you much success for the future. Should you have any questions please contact Human Resources.

AMEC Earth & Environmental, Inc.

*[signature]*

Mike Lywood
Unit Manager—Lake Havasu, AZ

FORD 00120

# EXHIBIT 4

## CONFIDENTIAL SEPARATION
## AGREEMENT AND GENERAL RELEASE

AMEC Earth & Environmental ("AMEC") and **Stacy Ford**, Employee's heirs, executors, administrators, successors, and assigns (collectively referred to throughout this Confidential Separation Agreement and General Release ("Agreement") as "Employee"), agree that:

1. **Last Day of Employment.** Employee's last day of employment with AMEC is April 21, 2009.

2. **Consideration.** In consideration for signing this Agreement, and complying with its terms, AMEC agrees:

   a. to pay to Employee, Stacy Ford, $3,818.66, representing two (2) weeks of salary at Employee's base rate of pay, less lawful deductions, and one (1) month of COBRA costs (grossed up) within fourteen business days after AMEC receives a signed original of this Agreement.

3. **No Consideration Absent Execution of this Agreement.** Employee understands and agrees that Employee would not receive the monies and/or benefits specified in paragraph "2" above, except for Employee's execution of this Agreement and the fulfillment of the promises contained herein.

4. **General Release of All Claims.** Employee knowingly and voluntarily releases and forever discharges AMEC, its parent corporation, affiliates, subsidiaries, divisions, predecessors, insurers, successors and assigns, and their current and former employees, attorneys, officers, directors and agents thereof, both individually and in their business capacities, and their employee benefit plans and programs and their administrators and fiduciaries (collectively referred to throughout the remainder of this Agreement as "Releasees"), of and from any and all claims, known and unknown, asserted or unasserted, which the Employee has or may have against Releasees as of the date of execution of this Agreement, including, but not limited to, any alleged violation of:

- Title VII of the Civil Rights Act of 1964;

- Sections 1981 through 1988 of Title 42 of the United States Code;

- The Employee Retirement Income Security Act of 1974 ("ERISA") (except for any vested benefits under any tax qualified benefit plan);

- The Immigration Reform and Control Act;

- The Americans with Disabilities Act of 1990;

- The Workers Adjustment and Retraining Notification Act;

- The Fair Credit Reporting Act;

FORD 00121

- Arizona Civil Rights Act – Ariz. Rev. Stat. §41-1401 et seq.

- Arizona AIDS Testing and Confidentiality Act - Ariz. Rev. Stat. Art. 4, Tit. 36, §36-661, 664-668

- Arizona Equal Pay Law – Ariz. Rev. Stat. Art. 6.1, Ch. 2, Tit. 23, §23-340 et seq.

- Arizona Genetic Testing Laws – Title 12, Ch. 19, Art. 1, Ariz. Rev. Stat. §12-2801 and Title 20, Art. 6, Ariz. Rev. Stat. §20-448.02

- Arizona Employment Protections Act – Title 23, Ch. 9, Art. 1, Ariz. Rev. Stat. §23-1501

- Arizona Constructive Discharge Law – Title 23, Ch. 9, Art. 1, Ariz. Rev. Stat. §23-1502

- Arizona Wage Payment and Work Hour Laws

- Arizona Occupational Safety and Health Act, as amended

- Arizona Political Activities of Employees Law – Ariz. Rev. Stat. §16-1012 et seq.

- Arizona Drug Testing Law – Ariz. Rev. Stat. §23-493
- any other federal, state or local law, rule, regulation, or ordinance;

- any public policy, contract, tort, or common law; or

- any basis for recovering costs, fees, or other expenses including attorneys' fees incurred in these matters.

5. **Acknowledgments and Affirmations.**

Employee affirms that Employee has not filed, caused to be filed, or presently is a party to any claim against AMEC, except _____.

Employee also affirms that Employee has been paid and/or has received all compensation, wages, bonuses, commissions, and/or benefits to which Employee may be entitled. Employee affirms that Employee has been granted any leave to which Employee was entitled under the Family and Medical Leave Act or related state or local leave or disability accommodation laws.

Employee further affirms that Employee has no known workplace injuries or occupational diseases.

FORD 00122

Employee also affirms that Employee has not divulged any proprietary or confidential information of AMEC and will continue to maintain the confidentiality of such information consistent with AMEC's policies and Employee's agreement(s) with AMEC and/or common law.

Employee further affirms that Employee has not been retaliated against for reporting any allegations of wrongdoing by AMEC or its officers, including any allegations of corporate fraud. Both Parties acknowledge that this Agreement does not limit either party's right, where applicable, to file or participate in an investigative proceeding of any federal, state or local governmental agency. To the extent permitted by law, Employee agrees that if such an administrative claim is made, Employee shall not be entitled to recover any individual monetary relief or other individual remedies.

6. **Confidentiality and Return of Property.** Employee agrees not to disclose any information regarding the underlying facts leading up to or the existence or substance of this Agreement, except to Employee's spouse, tax advisor, and/or an attorney with whom Employee chooses to consult regarding Employee's consideration of this Agreement.

Employee affirms that Employee has returned all of AMEC's property, documents, and/or any confidential information in Employee's possession or control. Employee also affirms that Employee is in possession of all of Employee's property that Employee had at AMEC's premises and that AMEC is not in possession of any of Employee's property.

7. **Governing Law and Interpretation.** This Agreement shall be governed and conformed in accordance with the laws of the state in which Employee worked at the time of Employee's last day of employment without regard to its conflict of laws provision. In the event of a breach of any provision of this Agreement, either party may institute an action specifically to enforce any term or terms of this Agreement and/or to seek any damages for breach. Should any provision of this Agreement be declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, excluding the general release language, such provision shall immediately become null and void, leaving the remainder of this Agreement in full force and effect.

8. **Nonadmission of Wrongdoing.** The Parties agree that neither this Agreement nor the furnishing of the consideration for this Agreement shall be deemed or construed at any time for any purpose as an admission by Releasees of wrongdoing or evidence of any liability or unlawful conduct of any kind.

9. **Amendment**. This Agreement may not be modified, altered or changed except in writing and signed by both Parties wherein specific reference is made to this Agreement.

10. **Entire Agreement**. This Agreement sets forth the entire agreement between the Parties hereto, and fully supersedes any prior agreements or understandings between the Parties. Employee acknowledges that Employee has not relied on any representations, promises, or agreements of any kind made to Employee in connection with Employee's decision to accept this Agreement, except for those set forth in this Agreement.

**EMPLOYEE IS ADVISED THAT EMPLOYEE HAS A REASONABLE 21 DAYS TO CONSIDER THIS AGREEMENT.**

**EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST RELEASEES.**

The Parties knowingly and voluntarily sign this Agreement as of the date(s) set forth below:

By:_____
  Stacy Ford

Date:_____

AMEC EARTH & ENVIRONMENTAL

By:_____
  Mike Lywood
  Unit Manager—Lake Havasu, AZ

Date: April 21, 2009

FORD 00124